# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| RICK'S MUSHROOM SERVICE, INC.<br>1007-1013 Newark Road<br>P.O. Box 416<br>Avondale, PA 19311 | : Case No. 06 255C |
| v. | : |
| UNITED STATES OF AMERICA, acting through the UNITED STATES DEPARTMENT OF AGRICULTURE NATURAL RESOURCE CONSERVATION SERVICE<br>United States Department of Agriculture<br>Washington, DC 20250 | : |

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS

Plaintiff Rick's Mushroom Service, Inc. ("Rick's"), by its undersigned counsel, respectfully submits this Supplemental Memorandum of Law in Further Opposition to the Government's Motion to Dismiss.

At a lengthy argument held before this Honorable Court on December 8, 2006, the Court requested that the parties supplement their briefs with factual citations to the record in the Eastern District of Pennsylvania case, Reynolds v. Rick's Mushroom Service (E.D.Pa No. 01-3773) as well as statutory and administrative citations since this is a subject matter jurisdiction motion which may be decided on a full record. As Rick's argued during the proceedings on December 8th, the contract between the United States Department of Agriculture Natural Resources and Conservation Service ("NRCS") is **not** a "cooperative agreement" between Rick's and the NRCS which the government argued is exempted from the Contract Disputes Act, but rather, a cost

sharing agreement arising under P.L. 83-566, the Watershed Protection and Flood Prevention Act, 16 U.S.C. §§1001 to 1008 (the "Act").[1] The Act is the mechanism by which the NRCS achieves its departmental purpose of protecting the nation's watersheds. As declared in the Declaration of Policy to the Act, 16 U.S.C. §1001:

> Sec. 1001. Declaration of Policy.
>
> Erosion, flood water, and **sediment damages in the watersheds of the rivers and streams of the United States**, causing loss of life and damage to property, constitute a menace to the national welfare and it is the sense of Congress that the federal government should **cooperate with states and their political subdivisions**, soiled or water conservation districts, flood prevention or control districts, and other local agencies for the purpose of preventing such damages, of furthering the conservation, development, utilization and disposal of water, and the conservation and utilization of land thereby of preserving, protecting, and improving the Nation's land and water resources and the quality of the environment.

16 U.S.C. §1001 (emphasis added).

As specifically recited in the statute, the "cooperation" is **not** cooperation between the NRCS and individual property owners, but rather, between the NRCS and local conservation districts and political subdivisions. That is **precisely** what occurred in this case, i.e., that the NRCS entered into a cooperative compact with the Chester County Conservation District ("CCCD") and the New Castle Water Resource Protection Area ("WRPA") in creating the Red and White Clay Creek PL-566 Project. Attached hereto as Exhibit "B" is both the Brandywine Conservancy's and the NRCS'

[1]A copy of the Act is attached hereto as Exhibit "A".

description of this program, and attached hereto as Exhibit "C" is a published itinerary of a presentation on April 14, 2005 at the University of Delaware entitled "Water and our Changing Landscape". As page 6 of that itinerary is a description of Chester County initiatives by Daniel J. Greig, Director of the Chester County Conservation District. Mr. Greig gave an overview of the CCCD's programs, noting that "CCCD Agricultural Team works closely with NRCS to provide funding for BMP (Best Management Practices) and Environmental Compliance." That same Mr. Greig and his subordinate, Jesse Davis, both testified at the Reynold's v. Rick's Mushroom Service proceedings in the Eastern District of Pennsylvania. Transcripts of their testimony are attached hereto as Exhibits "D" and "E". In addition, Peter Vanderstappen, the NRCS engineer who designed and oversaw construction of the project, also gave a deposition (Exhibit "F"). Among other things, these individuals testified that:

> (1) the CCCD, in conjunction with the NRCS, had created a "Red-White Clay Creek Program" to clean up the watersheds of the Red Clay and White Clay Creeks (tributaries of the Christiana River) and were seeking funding to accomplish the purposes of that program. Greig deposition at pp. 15, 19, 26, 37-38;
>
> (2) to effectuate the goals of the Red-White Clay Creek Program, the CCCD teamed up with the NRCS to utilize funding available under the Watershed Protection and Flood Prevention Act, P.L. 83-566. Davis deposition at p. 164, Greig deposition at pp. 38-39. Also see, Judge Rufe's Findings of Fact and Conclusions of Law at the Preliminary injunction hearing, Number 11;
>
> (3) to further the purposes of the Red-White Clay Creek Program, the NRCS drafted a regional environmental

plan entitled the "Mushroom Manual" as well as individual mushroom farm environmental management plans. Greig deposition at pp. 32-37; Davis deposition at pp. 164-166. As stated by Mr. Greig at his deposition:

"The Red-White Clay land treatment program; its a federal program. Again, a USDA Natural Resource Conservation Service Program that the District is a - - is the local sponsor in Chester County on it, **which was a plan that was put together to improve the water quality within the Red and White Clay watershed.** And we had specific actions identified. One of the actions identified was to work with approximately, I believe, it was approximately 75% of the mushroom operations within those two watersheds and implement best management practices to minimize the amount of runoff going into the streams. By doing that we expected to reduce NP&K [nitrogen, potassium and phosphorus] by a certain amount and there were other items going along with that, such as working on increasing riparian corridors, stabilizing streambanks, etc. etc. **And, again, it was a whole plan.** As part of that we developed contracts and, again, a combination of the Conservation District and NRCS with developed contracts with agricultural and other operators and landowners to implement best management practices and we could pay up to $100,000 per farm operation."

Greig deposition at pp. 37-38 (emphasis added).

(4) Rick's Mushroom Service came to the CCCD and NRCS to voluntarily become part of the program after Rick Masha had been told by the Pennsylvania Department of Environmental Protection that they would have to institute controls if they wanted to operate the preexisting mushroom substrate operation at the property. Davis deposition at pp. 176-177. Vanderstappen deposition p. 30. District Court Finding of Fact 12.

(5) At that time (March of 1997), the Red and White Clay Creek watershed project had been approved by the

NRCS and was funded. The NRCS drafted the contract and all of the supporting documents obligating the construction of the environmental facilities at Rick's Mushroom Service. Vanderstappen deposition at pp. 31-36; Greig deposition at pp. 38-39.

(6) **All** of the facilities at Rick's Mushroom Service were designed by the NRCS. Gregg deposition at p. 69; Vanderstappen deposition at pp. 18-20; 74-76. District Court Finding of Fact 14.

(7) This was the first waste and water impoundment structure that Mr. Vanderstappen had designed for a mushroom facility. Vanderstappen deposition at pp. 81-84. As Mr. Vanderstappen testified:

Q. So was this, in fact, the first impoundment that you had designed for mushroom waste water?
A. It would be the first one for - - using HDPE, yes. . . .
Q. Had you actually designed a facility like you have at Rick's Mushroom Service to collect and spray irrigate waste water previously to this?
A. Not to this scale, no.

Vanderstappen deposition at pp.81,84.

(8) Mr. Vanderstappen designed the facility for a 25 year 24 hour rainfall event based on a 3.2 acre drainage area. Vanderstappen deposition at pp. 86-88.

(9) The 3.2 acre drainage area was determined based on Mr. Vanderstappen's own drawings. Vanderstappen deposition at pp. 95-96.

(10) The NRCS determined which contractors would be used to built the facility (Vanderstappen deposition at pp. 107-110) and provided the operation and maintenance requirements for the facility as well. Vanderstappen deposition at pp. 111-112.

(11) The NRCS also worked with the contractor and provided him with all of the information on how the facility was to be built. Vanderstappen deposition at pp. 123-125.

> (12) The facility was designed so that there would be no runoff to Trout Run below the facility and all of the salts and minerals in the SMS would be taken up by the hayfields grown at the property. Gregg deposition at pp. 79-86; Vanderstappen Davis deposition at pp. 122-124; 155-156. As Mr. Vanderstappen stated at his deposition:
>
> "if the - - if it [the facility] was maintained according to the original design and operated properly and all its activities were within the dikes and the runoff into the storage, **we would expect zero discharge of that area.**"
>
> Vanderstappen deposition at pp. 166-67.

At the preliminary injunction hearing, however, Mr. Vanderstappen admitted under cross-examination that he had miscalculated as to the area which drained into the impoundment and that the facility should have been able to handle far more precipitation that it eventually did, resulting in runoff and forced spraying during periods of precipitation during a raining season in the Autumn of 2003. Transcript of proceedings on February 18, 2004 at pp. 111-114 (Exhibit "G" hereto)[2]

Thus, quite contrary to the presentation of the government at the argument held before this Court on December 8th, this was no "cooperative agreement" between Rick's and the NRCS. The "cooperation" was between the local conservation authority, i.e., the CCCD and the NRCS pursuant to a program established jointly by the NRCS and the CCCD, namely the Red-White Clay Creek Watershed area. The

---

2

In this testimony, Mr. Vanderstappen acknowledged that the 8 inch rains of September 2003 should not have come close to overflowing the facility based upon a 3.2 acre drainage area. He also testified that there was to be the ability to truck out excess leachate in an emergency (at p. 117). However, no mechanism was installed for trucking and the 8 inch storm did overflow the facility. Accordingly, as experts opined in the Pennsylvania District Court action, the NRCS design was inadequate and based on faulty assumptions and incorrect calculations. .

NRCS, looking to accomplish its departmental goals, obtained funding under the Watershed Protection And Flood Prevention Act, P.L. 83-566 and went out actively looking for facilities to build to further the goals of that Act. One of those facilities was the facility at Rick's Mushroom Service. The facility was completely designed, soup to nuts, by the NRCS engineer, Peter Vanderstappen and that design was created to adhere to the environmental plan for the watershed, also designed by the NRCS. The contract was an NRCS document as were all of the specifications and contract documents. The contractors were dictated by the NRCS as well. The **only** thing that Rick's Mushroom Service did was pay for one-third of the cost of the project.

As Rick's argued at the argument on December 8th, under the established precedents set forth in Rick's brief, the Court must look to the realities of the situation and that "if it quacks like a duck, its a duck." This project clearly "is a duck." It is the NRCS project designed to further the NRCS' objectives of compliance with P.L. 83-566. There was no "cooperation" between the NRCS and Rick's. Indeed, the NRCS left all regulation subsequent to the construction of the facilities to the Pennsylvania Department of Environmental Protection. Unfortunately, the facility was not built to the proper specifications. It drained far larger in area than was contemplated under the design, and resulted in Rick's being forced to spray during wet periods and cold periods when runoff would inevitably occur. Moreover, although contemplated under the design, there was no emergency pump-off mechanism built into the facility so that Rick's could bring in tanker trucks to drain the facility when it became filled near the near capacity. While the NRCS

characterizes this as "operational," it is nothing of the sort. Had the facility been designed properly, it never would of had the repeat overflow situations which ended up resulting in liability to Rick's in the Pennsylvania District Court Action.[3] Nothing in the Contract Disputes Act takes this project out of the definition of a contract subject to the Act. This is **not** a cooperative agreement between Rick's and the NRCS. Rather, it is a cost share contract designed to procure what it is that the NRCS does - - i.e., design, construct and build environmental treatment facilities to comply with the legislative mandate of the Watershed Protection And Flood Protection Act. The facilities at Rick's were built under Rick's name pursuant to a contract with the NRCS. There is no dispute that the NRCS requested that these structures be built, designed the structures and paid for the majority of the cost of the structures. This claim fits squarely into a procurement contract as that term is defined under the Contract Disputes Act and, as noted at argument, the NRCS has been unable to cite to a **single** case holding that a contract is not subject to the Contract Disputes Act simply because it is a cost share, rather than a fully funded government contract. Under the facts as stated above, it is clear that there is jurisdiction under the Contract Disputes Act and that Rick's should be permitted to go forward on its prima facie Spearin claim.

---

[3] Moreover, this is a Motion to Dismiss and the allegations of the Complaint must be accepted as true. The government may defend on the basis that the facility was not improperly designed but rather, operational issues resulted in the eventual liability enclosure, but that is a factual defense - - not a subject matter defense or one which may be considered on a Rule 12(b)(6) motion.

For all the reasons set forth herein and in Rick's previous briefs, it is respectfully submitted that the Motion to Dismiss should be denied.

Respectfully submitted:

SILVERMAN BERNHEIM & VOGEL

Dated: 12/22/06

BY: ______________________
Jonathan J. Bart, Esquire

Two Penn Center Plaza, Suite 910
Philadelphia, PA 19102
Tel: 215-569-0000
Fax: 215-636-3999