# EXHIBIT "D"

Cont'd

growers so, you know, he does have a limited pool of operators that he does work with.

MR. BURCAT: Off the record for a moment.

* * *

(Whereupon, a discussion was held off the record.)

* * *

(Best Practices for Environmental Protection in the Mushroom Community, (also Davis-4), 64 pages, was received and marked as Greig-1.)

* * *

(MFEMP for Rick's Mushroom Service (also Davis-2), 13 pages, was received and marked as Greig-2.)

* * *

(Conservation Plan (also Davis-3), 6 pages, was received and marked as Greig-3.)

* * *

(Detailed Operation and Maintenance Requirements for Settling Basin, HDPE Lined Storage and Spray

Field (also Davis-6), 2 pages, was received and marked as Greig-4.)

* * *

MR. BURCAT: Let's go on the record.

BY MR. BURCAT:

Q. Mr. Greig, we are going to get some documents in front of you and we are going to try and do this as efficiently as we can.

We have had a document marked by the reporter as Greig deposition Exhibit-1 and I ask you whether you have ever seen that document before?

A. Yes, sir, I have.

Q. Can you tell us generally what that is?

A. That's a document that was developed by a committee made up of a group of DEP representatives, representatives of conservation districts, some representatives of the mushroom farm community. There was some members of solid waste were involved. I think there were a couple members of, excuse me, farm bureau involved in it. It was basically a guidance document that was put

together to assist the mushroom farmers to comply with environmental rules and regulations.

Q. Now, that's officially titled, Best Practices for Environmental Protection in the Mushroom Farm Community?

A. That's correct.

Q. Is that also known as the Mushroom Manual?

A. Yes.

Q. Now, I understand that you had some involvement in putting that together. Can you tell us a little bit about that?

A. Yes. I was involved on the committee, the steering committee basically, that actually worked on this, various different portions of it.

There was a consultant that did some of the work but, you know, that was reviewed, you know, by this committee. I think we are in the process -- it took us close to three years before we actually had a product come out.

This was actually based,

initially based, on a document that was started in Chester County back in 1978 or 1979 that was never accepted by the department at that time and it was the Department of Environmental Resources.

Q. Was there -- you said there was a committee of people involved in putting this Mushroom Manual together?

A. Yes.

Q. Would that have included members of the conservation district and other governmental officials?

A. Yes. There were people from PDA all the way -- Pennsylvania Department of Agriculture to Penn State -- and here's the list right here. (Indicating.)

Q. Were the representatives of the mushroom industry on that?

A. Yes.

Q. We will come back to that. Like I said, I wanted to get some of these documents out on the table and I just want to get some sense of what is going on.

I have another document that

has now been marked as Greig Deposition Exhibit-2. It is titled, Mushroom Farm Environmental Management Plan and ask you whether you have ever seen this document before.

A. I have seen this document. I would say I have never read the entire thing but this is -- the Mushroom Farm Environmental Management Plans are the management things we are doing for all the operations. As I said, I have never read this one fully all the way through. I do -- I was aware that there was one developed for Rick's operation.

Q. Now, there are quite a few of these, as I understand it?

A. Yes. Yes.

Q. Now, as I also understand it, this document which is also known as an MFEMP --

A. Uh-huh.

Q. -- is this document based on the Mushroom Manual essentially?

A. For the most part it's a combination really -- well, if you go into one section of the manual here, there is a section of what is

required for the Mushroom Farm Environmental Management Plan and this is really trying to make the cross between what is in your typical farm conservation plan and what are the additional requirements or recommendations that are in the manual here.

Q. I have another document and this might make it a little easier to discuss, a document we have identified as Greig deposition Exhibit-3. At the top it says, conservation plan, and ask you whether you have ever seen that before?

A. Again, this one specifically I am not sure if I have actually read it. But this is a typical, you know, conservation plan.

Q. Now, does your organization prepare the conservation plans or does somebody else do that?

A. It depends on -- it depends on the operation. In some cases -- some cases we do and some cases we don't. It just depends on who is working with who first.

Q. Can you tell from this deposition Exhibit-3 whether your organization prepared

this or somebody else did?

A. This was done by the U.S. Department of Agriculture and Natural Resources. John Magagna does work for NRCS.

Q. So how does the conservation plan fit in with these other two documents that we have here -- if it fits in at all?

A. Well, it should fit. They should run together. However, you know, again, I am looking at the dates on these two and if I wouldn't be mistaken, there should have been what would be more up to date is this and the contract that is for Rick's operation which includes the Best Management Practices to be installed as part of the Red-White Clay Land Treatment Program.

Q. You know, before we go on too much further, you keep referring to this Red-White Clay Land Treatment Program. Can you tell us what that is?

A. The Red-White Clay Land Treatment Program it's a federal program. Again, a USDA Natural Resource Conservation Service Program that the district is a -- is the local sponsor in

Chester County on it, which was a plan that was put together to improve the water quality within the Red and the White Clay Watershed.

And we had specific actions identified. One of the actions identified was to work with approximately, I believe, it was approximately 75 percent of the mushroom operations within those two watersheds and implement Best Management Practices to minimize the amount of runoff going into the streams. By doing that we expected to reduce N P and K by a certain amount and there were other items going along with that, such as working on increasing riparian corridors, stabilizing stream banks, etcetera, etcetera. And, again, it was a whole plan.

As part of that we developed contracts and, again, a combination of the conservation district and NRCS would develop contracts with agricultural and other operators and landowners to implement Best Management Practices and we could pay up to $100,000 per farm operation.

Q. Does that have any relevance in

particular to Rick's?
A. Yes.
Q. And how does that have relevance to Rick's?
A. This operation here has a contract to implement Best Management Practices.
Q. So what you are saying then is that the contract could conceivably be as much as $100,000?
A. Yes.
Q. Do you know how much it was for?
A. I don't -- again, I don't have the specifics in front of me.
I do know there was a cost share. And, again, the amount on waste storage facilities is up to, I think it's 60 percent of the cost of the, you know, of the cost of the installation of the practice. So, you know, the lined pond, the waste storage facility there and some of the other structures, the sediment structure that was originally placed in were probably cost shared at 60 to 65 percent.
Q. Who pays what? Who pays --

A. It's Federal -- it's Federal money.
Q. And you mean to say that the owner of the facility pays 60 percent or 65 percent and the --
A. No, it's the opposite.
Q. So the government pays 60 or 65 percent?
A. And the owner makes up the difference.
Q. I see. So in this case, Rick's Mushroom Service could have received up to $100,000 for installation of these facilities; is that right?
A. That's correct.
Q. And then he would have been obligated to pay 30-35 percent, whatever the case may be?
A. Uh-huh. And then, again, as I said, I can't -- I don't know specifically how much the contract was written for.
Q. It seems like a pretty good deal to me. Somebody has an obligation to put in a treatment facility of some sort and the government comes along and pays 60 to 65 percent of that and the owner of the facility only has to pay 30 or 35 percent of that as the case may be.

How does that come to be?
A. Everybody wants cheap food. And an agricultural operator, one way or the other, if they want -- or if they have to install these environmental controls, you can't pass that money on to the consumer because of the middleman, you know. That's -- in agriculture that is where the money is made is in the middle people and in the super markets. So, you know, until that changes --
Q. Well, do you make any kind of an evaluation of the financial ability of the operator or the farmer to pay or is it just -- is it just fill out these forms and you get the money? How does that work?
A. There is --
Q. Let me give you an example. Right now my oldest daughter is getting ready to go away to college and we have got a gazillion forms that we have to fill out to show whether or not she is entitled to a scholarship. Is there something like that, like an aid form along those lines for the farmer or for the operator?

A. The farmer has to fill out a form. I am not sure this is very relevant to what we are discussing here but the farmer does fill out forms.

Q. Well, can a farmer be turned down because he has got too much money or he is too wealthy or are all farmers entitled to this?

A. As far as I know, all farmers would be entitled.

Q. Oh, so it really is -- financial aid really is not a question, financial ability isn't a question then?

A. Again, as far as I know.

Q. So just so I understand this then -- and we will be specific to Rick's -- in Rick's instance, he would have notified the conservation district of his willingness to participate and to cooperate, correct?

A. Okay. Yes.

Q. And then the conservation district works with the NRCS and they develop this document here, the conservation plan, and they develop the MFEMP. Does somebody like Rick, does he pay for either of these documents?

A. No. There is no charge for agricultural operators for those types of documents nor is there any charge for any of the engineering technical design.

Q. Okay. So Rick gets all that stuff for free and then if I understand this correctly, when it comes to actually building the facility, he gets almost two thirds of that paid for by a government grant; is that right?

A. For the specific Best Management Practices called for in the plan.

Q. And this is all according to law, of course?

A. Yes, sir.

Q. Just one more document here to get this out on the table. We have another document marked Greig deposition Exhibit-4 and across the top, Detailed Operation and Maintenance Requirements for Settling Basin, HDPE Lined Storage and Spray Field for Rick's Mushroom Service. Have you ever seen that before?

A. Yes, I have.

Q. And why have you seen that document?

A. That was prepared for by -- prepared by

Mr. Vanderstappen once the, excuse me, the lined storage facility was put in and the spray field was installed. That is to be, if I am not mistaken, should have been either attached to the conservation plan or attached to the MFEMP.

Q. So looking at these four documents now, we have got Exhibit-1 which is the Mushroom Manual. That's a combination of policy statements and regulations and Best Practices and it's sort of a generalized discussion?

A. Correct.

Q. And then you have these other three documents, Exhibits-2, 3 and 4 which are very, very site specific to a particular operation?

A. That's correct.

Q. And in this instance you have the Exhibit-3, the conservation plan, was prepared by the NRCS and also Exhibit-4, you said Mr. Vanderstappen prepared that, so he is NRCS, right?

A. Uh-huh.

Q. So these two are prepared by the NRCS and then Mr. Davis of your office prepared

Exhibit-2, which is the MFEMP?
A. Uh-huh.
Q. And like we just said two, three and four basically work together and are very site specific?
A. Right. And by rights two, three and four, should be able to go into one package like that. (Indicating.)
Q. Do they always -- you have two different government agencies working on this. Does the conservation plan and the MFEMP always coincide or is there ever any conflict between the two?
A. There has been very little conflict because we have been working very closely. The specifications involved as far as the Best Management Practices, we use NRCS' technical specifications.
Now, a lot of the Mushroom Farm Environmental Management Plans, once you get outside of those technical specifications for constructed Best Management Practices, a lot of that is housekeeping items. A lot of it is setbacks that have been recommended by the

State.

So in those particular cases we are not running into conflict issues with NRCS and/or those are being discussed, you know, during the process of design.

Q. Now, who is it that makes a decision as to whether or not a particular operation is an agriculture operation?

A. I am smiling because it's an age old question.

It depends on what you are comparing it to I guess. Again, in dealing with mushroom agriculture in Chester County because mushroom agriculture doesn't fit any of your -- your normal agriculture definitions, federally, even though mushrooms are a commodity crop and the same thing in Pennsylvania, even though it doesn't quite fit your normal agriculture definition, mushrooms are a 350 million dollar commodity crop in the State of Pennsylvania.

And in reality they are only normal agriculture in about four counties. They don't quite fit, you know, again, they

don't quite fit the mold. So if you look at it from a conservation district point of view, which is the way we have looked at it and the way our district directors have looked at it and the way our county has looked at it, agriculturally, preparing fresh compost, growing mushrooms and handling and utilizing spent compost, would be all normal agricultural activities. It would be just the same thing if you're on a dairy farm handling and growing the crops, feeding the animals and raising and harvesting, I should say harvesting the milk, and then dealing with the manure, it is all part of the same system.

Q. So if we are dealing with the same system, let's just focus in on the mushroom industry rather than any other industry, if you are obtaining the compost to use in a mushroom house, if you are growing mushrooms in the mushroom house and then if you are removing the spent mushroom compost from the mushroom house at the facility itself, all of that would be considered normal agricultural operation by Chester County?

A. I'm not sure about your last -- I think you may need to clarify your last -- if you are removing it at the house, on the farm or --

Q. Let's just break it down.

A. Go ahead.

Q. If you are introducing compost into a mushroom house, --

A. Right.

Q. -- you would consider that, as the managing director of the conservation district, you would consider that to be a normal agricultural activity?

A. Right. I'd even consider the actual making of that compost and that has been accepted. That has been accepted by the Department of Agriculture.

Q. And then, of course, the growing of the mushrooms itself, you would consider agriculture?

A. Right.

Q. And then if Farmer Jones has compost and he takes it, now it's spent, and he takes it out of the mushroom house and he dumps it on

his land, right outside of the door of the mushroom house, is that still an agricultural activity?

A. That would be. And yet I still -- we would still consider even if it wasn't dumped on his own property. Again, whatever in dealing with the spent compost, and that's what I had just said, as you know, in bringing compost, making the compost, growing the mushrooms and taking the compost, it's the same thing as dealing with, you know, dairy manure all the way through.

Q. Well, now, let's say you take the compost from Farmer Jones and Farmer Brown and Farmer Smith, and you take them all over to a third place and we will call it Rick's, and you dump it there, do you still consider that a normal agricultural operation?

A. I would at this point, yes.

Q. So no matter what is going on over at Rick's, you'd consider that to be a normal agricultural operation?

A. I am not saying no matter what is going on at Rick's, but at this point, if he is just

taking spent compost and utilizing spent compost, then at this point I would consider that as an outlet for the agricultural waste.

Q. So let's say he takes that spent compost and dumps it on a wharf and 24 hours later a truck comes along and he puts it on to another truck and the truck hauls it away to some other place, you are saying that you would consider that to be a normal agricultural operation?

A. Yeah. That's just a matter, you know, of stockpiling it so somebody can take it away.

Q. If he takes that material and if he does passive composting or active composting, you would also consider that to be a normal agricultural operation?

A. That's correct.

I think where you step over the line and it is where you bring additional material in to mix in with that compost.

Q. Like what kind of material?

A. Other types of residual waste material such as water treatment plant waste and, again, DEP has looked at those types of things

within the county and has permitted those types of operations.

Q. Do you know if the Federal government agrees with your definition of normal agricultural operations?

A. I am not sure I understand the question or -- and/or I think it may need some clarification. What part of the Federal government?

Q. Well, let's start with the EPA.

A. I don't know EPA.

Q. How about the Federal Department of Agricultural?

A. At this point I can suffice it to say that the -- that the Natural Resource Conservation Service does.

Q. How about the United States District for the Eastern District of Pennsylvania?

A. That would be up to the United States District Court to make that decision. I am not going to second guess them.

Q. So how then do you decide whether a particular operation falls under the parameters of Exhibit-1, the Mushroom Manual?

A. How do I decide?
Q. Yes. Well, let me ask -- maybe you don't make that decision.
Do you make that decision?
A. I -- I am not sure if I quite understand. We basically use that manual to work with mushroom operations and mushroom-related operations, whether it's on the front end or the back end or whether it's a fresh compost or fresh substrate operation, where all they are doing is making fresh substrate. Okay. Or if it's a -- or if it's a growing operation or if it's an operation that's handling spent compost.
MR. BURCAT: Can we go off the record for one second.
* * *
(Whereupon, a discussion was held off the record.)
* * *
BY MR. BURCAT:
Q. Well, what is this Best Practices manual used for then? Does it substitute for anything as far as DEP is concerned; do you

know?

A. It gives DEP -- or at least according to DEP, it gives them some discretion as to if Best Management Practices are being followed as to whether they have to require permits or not on some things.

Q. So then if I understand what you are saying correctly, this tells DEP whether or not a particular operation would require a permit; is that right?

A. No. What it does it says if you're following Best Management Practices, if you're implementing Best Management Practices, DEP has the discretion at least in some operations as to whether they need permits or not.

My read on it is DEP can require a permit at any given time on any of these operations.

Q. Well, theoretically aren't there a whole bunch of permits that DEP could require from waste management permits to Clean Streams Law permits?

A. Theoretically, there's -- again, theoretically just about on every agricultural

operation in the State of Pennsylvania, DEP could require permits.

Q. But you helped to write this Mushroom Manual, correct?

A. That's correct.

Q. So the Mushroom Manual, as I understand it, doesn't it substitute for DEP permits if you file -- if you're the right kind of operation and you fall within the Mushroom Manual, don't you then -- aren't you -- don't you then get exempted from the permits?

A. It gives DEP the discretion at that point as to whether to require the permits or not. That's all. It doesn't, you know -- it's their discretion.

Q. Of course, that's assuming DEP even has the discretion?

A. Well, again, that's a question for DEP. That is not a question for me. You know, we work long and hard on that. Mushrooms were not mentioned in the manure management manual language of the state specifically. Spent compost wasn't mentioned. Those manuals give other types of agriculture the same -- or DEP

the same discretion. If they follow the manual, then permits may not be necessary. This gives the mushroom agriculture just the same -- the same opportunities.

Q. Well, -- but, again, the Mushroom Manual seems to apply to normal farming operations, correct?

A. That's correct.

Q. Okay. So if something is a normal farming operation then, the Mushroom Manual applies to it, correct, whatever that activity might be?

A. That's correct.

Q. And if the activity is not a normal farming operation, then the Mushroom Manual doesn't apply. For example, if -- I don't know, let's say it didn't have anything at all to do with mushrooms, then the Mushroom Manual wouldn't apply?

A. No, I mean, if it was a woodchip operation, a woodchip composting operation, some other requirement would apply. I am sure.

Q. And also would it be fair to say then

that if an operation that otherwise would fall under the Mushroom Manual is in violation of the Mushroom Manual, that the Mushroom Manual may no longer apply to it?

A. Might -- I am not quite sure I understand that question because there is really no violations to the Mushroom Manual because it's not rule or regulation.

Q. Let me use an example that you used before. You had said that there are certain operations that add other things that have nothing at all to do with mushrooms --

A. Correct.

Q. -- to the mushroom compost. For example, they might add waste, I think you said from a sewage treatment plant?

A. (Nods in the affirmative.)

Q. And there could be other kinds of -- maybe other agricultural waste, farm waste or woodchips or other stuff like that. If there was a composting facility that added all of that stuff to the spent compost, would the Mushroom Manual still apply or are they now outside the Mushroom Manual?

A. It could apply. It still could apply. The Best Management Practices applies. It's a question as to whether DEP, you know, accepts that or are they going to require them to have additional permits?

Again, I cannot second guess DEP in regards to the permits.

Q. So the question then is that if a water quality management permit would be required by DEP, that's DEP's jurisdiction?

A. That's correct.

Q. And if a solid waste permit of some sort were required by DEP, again, that's DEP's jurisdiction, right?

A. Uh-huh.

Q. And that has nothing at all to do with your jurisdiction?

A. No, other than the Best Management Practices we recommend, you know, are usually -- if there is a permit required, are usually taken almost verbatim by the consultant who puts together that permit.

Q. But the basic question of whether or not a permit is to be required is not one that's

answered by you but it's answered by DEP?

A. That's correct and we usually ask DEP directly before we get too far into a project as to whether a permit is necessary.

Q. To the extent that there is any enforcement of these documents, who is it that is enforcing exhibits one through four? Would that be -- are you an enforcement agency or do you not enforce the law in a sense of issuing violations and penalties and the like?

A. What we do -- we do not enforce. What we do is status reviews and if we find an operator, again, who has a plan, who is either not implementing the plan or has implemented the plan and is having either maintenance issues and/or is not following the plan and maintaining it. If they are not going to correct it, if they won't correct them, then that will be passed on to DEP.

And DEP would be, again, at that point DEP is the enforcer. And at that point DEP has the opportunity to enter, you know, a NOV on them, issue a NOV, consent agreement and/or require a permit.

Q. Well, does your agency have authority to issue a Notice of Violation?

A. No. Again, we send those directly up to -- we send the complaint directly up to DEP and we have that agreement worked out with DEP.

Q. Does your agency have the authority to issue a civil penalty?

A. No.

Q. Could you issue an order?

A. No. DEP does all that.

Q. And for that matter, if you decided that a particular entity needed a permit and DEP disagreed with you, that's DEP's fault?

A. That's DEP's issue, yeah.

Q. Got it.

A. Again, I'm not sure what Mr. Davis said but we have been working very closely with DEP and particularly for enforcement issues down in that watershed and, you know, particularly with people that we have tried to work with and, you know, you cannot get any action at all and, you know, DEP has been taking some enforcement actions so.

Q. Do you know if your employees like Jesse Davis, are they obligated to identify violations and essentially turn them over to DEP or do they try to work with the farmer or work with the operator to try and work out those violations?

A. Our obligation, our mission, again, is to seek voluntary compliance. If we see a violation and it's -- and if there is a concerted effort by the landowner to actively correct that violation, we will work with them and not report it.

Q. Well, I mean, there would be a problem for your agency, wouldn't there be, if you have a voluntary compliance situation, if people thought gee, if the conservation district shows up and they see that I have violated the law, you wouldn't have much voluntary compliance; is that right?

A. Right. However, but at the same time within a voluntary compliance program, a voluntary compliance program doesn't work if you also don't have that stick out there, too. And when there are major violations and