# EXHIBIT "D"

Cont'd

A. That's correct, yes.
Q. So --
A. Many of those farms are farms that don't have animals on them, so it's an excellent organic replacement for manure.
Q. So you have 1,300 units. About 100 of them that are not in the mushroom business themselves are using compost. Of that 100 how many of them would have an MFEMP?
A. Those operations are not required to have an MFEMP as long as they have a conservation plan for their agriculture operation that balances their N-P-K.

MR. BURCAT: We will take a short break.

* * *

(Whereupon, a brief recess was taken.)

* * *

MR. BURCAT: Back on the record. Let's mark Exhibits-6 and 7.

* * *

(Inspection/Investigation Report (also Davis-5), 1 page, was

received and marked as Greig-6.)

* * *

(Inspection/Investigation Report, 1 page, was received and marked as Greig-7.)

* * *

BY MR. BURCAT:

Q. Mr. Greig, I am giving you a document that has been marked as Greig Deposition Exhibit-6 and ask you to take a look at that.

Is this a document from your department -- first of all, let me ask you. I see in the lower right-hand corner it says received and then it says CCCD and then it says D. Greig. Would that be you?

A. Well, it -- that's the stamp that they stamp all the mail that comes into the office.

Q. So that comes into your office?

A. So that comes into our office, yeah.

Q. Is this a form that your office would use?

A. Yes. We were -- we have been taking some samples at some mushroom operations and some other operations in the watersheds and running

them through the health department.
Q. And do you have any personal familiarity with this document?
A. I may have looked at it. I can't tell you what all the numbers are to be honest.
Q. In the lower left-hand corner do you know what DO stands for?
A. DO is dissolved oxygen.
Q. And so, I mean, you would know what these various --
A. I know what some of them are but, again, what the threshold numbers are and everything like that for a lot of them, I don't know.
Q. So you may have seen this, you just don't know --
A. Yeah.
Q. -- whether for sure you saw this?
A. Yes.
Q. I show you another document we marked as Greig Deposition Exhibit-7.
A. It's taken the same day.
Q. Well, let's take a look at it. Actually, it looks like the same thing.
A. Yeah, it does.

Q. In fact, if you look at the -- what would be the number that would ensure that we are looking at the same thing? Up there in the upper right-hand corner where it says log number, would that be a good thing to look at?

A. Yes.

Q. So it's basically -- it looks like the same document, doesn't it?

A. Yes, it does.

Q. There is only one difference that I noticed on this one. On Exhibit-7, the second one that I gave you, it looks like there is more writing in the middle.

Do you see that?

A. Uh-huh.

Q. Is any of that your writing?

A. No.

Q. Do you recognize that handwriting, by any chance?

A. No, I don't. I don't know if it -- it may have been our watershed coordinators. We have a watershed coordinator in the office. It may have been Jesse, you know, got some information from the health department as to

what the -- or even from DEP as to what the numbers meant.

Q. So where it says --

A. You mean like high?

Q. Yeah, high and low.

A. Yeah. And with, I guess, the $NO_2$, the nitrate within, I guess that means -- I don't know.

Q. Where it says $NH_3$-N and then high; do you know what that means? If you know.

A. It looks like ammonia. The 59.97 parts?

Q. Yes.

A. It looks like ammonia -- ammonia.

Q. You don't personally have any --

A. No, I am not a water quality specialist. You know, what little I do know, I am dangerous.

MR. BURCAT: Let's mark eight.

* * *

(Memorandum dated 12/26/00, 1 page, was received and marked as Greig-8.)

* * *

BY MR. BURCAT:

Q. Mr. Greig, I have had the reporter mark a document as Greig Deposition Exhibit-8. Could you please tell us what that is?

First of all, have you ever seen that document?

A. I do remember this, sending this out, yes.

Q. So where it says from Dan Greig and then it's signed Dan Greig; is that your signature there?

A. Yes.

Q. And you sent that to Kim Hummel?

A. That's correct.

Q. And what was the point of this memorandum, if you recall?

A. I think it was in response to some questions that Kim had asked or -- it had sent in a fax. I can't remember the exact questions that were in the fax.

Q. I just want to draw your attention to the very last sentence. It says, "Ultimately however, it is the landowner/operator who is responsible for the day to day management and

operation of the site."

Did I read that correctly?

A. That's correct.

Q. And you actually said that a while ago?

A. That's correct.

Q. And you don't -- that is your position?

A. That's correct, yes.

* * *

(Verification, 1 page, was received and marked as Greig-9.)

* * *

BY MR. BURCAT:

Q. Mr. Greig, I have had another document marked as Greig Deposition Exhibit-9 and ask you whether you have ever seen that before?

A. Yes, I remember seeing this.

Q. And is that your signature --

A. That is my signature.

Q. -- in the middle?

A. Yes.

Q. And it's dated November 20, '01; is that right?

A. Uh-huh.

Q. Why is it that you filled out this

document?
A. I was asked by Mr. Masha to do that.
Q. Why did he ask you to do it?
A. Because of the -- because of this lawsuit, basically, that the Best Management Practices were installed, you know, according to -- according to the plan basically. And we as a conservation district have taken the position that if a landowner is installing Best Management Practices and working with the conservation district and basically trying to do the right thing, that the conservation district will work with that landowner. That is the position that our board has taken.
Q. Why would you go to the trouble though -- this is a verified document --
A. Well, it's verified in the fact that I signed it, yes, but it is not notarized or anything like that. I don't see where it's more verified than anything else.
Q. So you are saying that you are only verifying your signature, you're not verifying the statements in it?
A. Well, I am verifying the statements, yes,

but it would be the same thing whether I signed it or not.

Q. All right. So what this says in it is your position regarding this facility?

A. That's correct. Again, our district board has made a policy statement that, you know, and I will state it once again for the record that it's -- if a landowner or an operator is actively implementing a conservation plan, is trying to do the correct thing as far as implementing the plan and stuff that the conservation district is going to support that activity and this would be no different than what we do for any other operator.

Q. I will show you a document that has been previously marked as Masha Deposition Exhibit-19 and Davis Exhibit-9 and ask you whether you have ever seen that before?

A. No, I haven't but can I ask what the date is on that?

* * *

(Whereupon, a discussion was held off the record.)

* * *

BY MR. BURCAT:

Q. That's a March 2001 photograph.

A. So it was 2001 March. So it was at least six or seven months prior to my letter going out; is that correct?

Q. Approximately.

So you never saw that?

A. No.

Q. Here is another one. This is Davis-10, Masha Exhibit-20. Do you see that? Have you ever seen that picture before?

A. No, I have not seen any of these pictures I don't believe.

Q. Just to clarify the record, it's March 13, 2001.

A. Okay.

Q. We understood these pictures to have been taken by Steve Piller and you have never seen these pictures before?

A. No.

Q. Were you aware of any blue hose prior to this time?

A. No. You know, again, as I said, I'm not

aware of that there.

Q. So you really know nothing at all about these pictures?

A. No.

Q. Actually, that memorandum that we just took a look at a couple minutes ago and the discussion that we had before, the day to day operation, that is the requirement of the operator to conform with Best Management Practices, correct?

A. That's correct.

Q. And you guys in the conservation district can't be there every day and every hour?

A. That's correct.

Q. So it's really up to the operator ultimately to carry out what is known as quote "Best Management Practices"?

A. That is correct.

Q. Mr. Greig, have you ever observed either Mr. Masha or Mr. Cutone give cash or a free meal or a gift to Steve Piller?

A. No.

Q. Have you ever observed Mr. Masha or Mr. Cutone give cash or a meal or a gift to

John Hundertmark?

A. No. I don't know who Mr. Hundertmark is.

Q. To Jesse Davis?

A. No.

Q. To Peter Vanderstappen?

A. No.

Q. Lester Jiles?

A. No.

Q. Sam High?

A. No.

Q. Have you ever accepted anything from either Mr. Masha or Mr. Cutone?

A. No.

* * *

(Whereupon, a discussion between Mr. Burcat and Ms. Hummel was held off the record.)

* * *

A. (Continuing.) I would if there is any evidence that any of my staff has done anything like that -- want to be notified regardless.

Q. Because that would be wrong?

A. Well, besides being wrong, it's a

criminal offense.

MR. BURCAT: I have no further questions.

* * *

(Whereupon, a discussion was held off the record.)

* * *

EXAMINATION

* * *

BY MR. HOWELL:

Q. Good evening.

A. Good evening.

Q. Mr. Greig, under the Mushroom Manual how has the RMS property been classified?

A. Well, again, we really didn't classify it per se. I mean, we have worked with it right from the beginning as a mushroom operation, a mushroom-related operation and put together a Best Management Practice plan, a Mushroom Farm Environmental Management Plan for that operation.

Q. So then in your opinion as officer of the Chester County Conservation District, the RMS property, Rick's Mushroom Service property, is

an agricultural or farming operation?

A. We looked at it that way, yes.

Q. Earlier you talked about the Best Management Practices on farming operations like the Rick's mushroom property. If Best Management Practices are not kept by the property owner or operator on such property, what is the next step of the Chester County Conservation District with regards to that property.

A. Well, again, I think I stated this before, you know, we try to work with the landowner and if we can't get voluntary compliance and, again, in this particular case because there's some funding involved, the funding I believe can be requested or required to be paid back through the Federal government and also to refer it to DEP. Again, if we can't work it out voluntarily and then let DEP take an enforcement stance on it.

Q. Specifically, in regard to the Rick Mushroom Service property, do you have any direct knowledge of Best Management Practices that have been implemented and then

disregarded?

A. I think there has been some problems, some issues, you know, down there operational-wise and also in actually going through the implementation of it because the implementation phase has taken some time for various reasons, I understand. But Rick has seemed to be responsive in at least, you know, taking the -- the initiative to rectify those situations so.

Q. Have you ever known of an instance where Rick Masha was aware of a Best Management Practice that had been violated and no action was taken --

A. No.

Q. -- on his part?

A. No.

Q. As soon as Rick Masha learned of any Best Management Practice that had been violated to your knowledge what was his response?

A. His response was to address it.

Q. In a timely fashion?

A. I would call it a timely fashion, yes. I don't have exact dates or anything. Again, I

think Mr. Davis' comments would probably be better for that. But, again, from what in my discussions with Mr. Davis it was in a timely fashion so.

Q. Generally, it was timely --

A. Yes.

Q. -- on Mr. Masha's part?

A. Yes.

Q. Are there any emergency situations related to the HDPE storage pond located on the RMS property?

A. Emergency situations?

Q. That refer to the HDPE flooding, that sort of thing.

A. Well, there is -- I mean, there is an underground detection system, leak system involved. There's an underdrain that is supposed to ensure the integrity of the liner so, you know, if there is an issue with the liner itself, it should show up quite -- it should be quite apparent.

Q. Are you familiar with any rules and regulations relating to emergency situations and the liner pond on the RMS property?

A. Again, I know the leak detector was a requirement. I do remember, again, in I believe it was last year, you know, when the pond was relatively full that there was discussion for various things about -- and one of them was spraying on frozen ground. And, again, that was discussed with both DEP and our office, but it was DEP who actually made the ultimate call on that.

Q. Do you know what that call was?

A. That call was to, again, to do that rather than, you know, let the system, the pond itself overflow. And, again, I think there was also discussion, you know, about hauling, potentially hauling, too.

Q. Are you familiar with any regulations that relate to rain events that happen once every 25 years?

A. I believe all of the structures on that site were built for a 25 year storm event.

Q. What is that?

A. A 25 year storm event, -- oh, gosh, I can't -- I can't recall it off the top of my head. I think it's -- I think a 25 year storm

event, just off the top of my head is about five inches, 5.5 inches, something like that for Chester County plus freeboard. All storage facilities have to have a certain amount of safety margins built into it. So that facility is built to handle on top of the specific amount of storage that's built into it.

And I forget how many gallons that was set up for but it's also set up to hold after it's full, to hold a 25 year storm event and then plus at least on top of that a foot of freeboard. And, again, Mr. Vanderstappen should have all that information. But that's just a general requirement.

Q. If two or three of these storm events happened in a row consecutively within the same amount of time there, day after day, what would be the official position of the Chester County Conservation District with relationship to the storage of the material in the RMS pond?

A. Well, that would be if -- just if the

scenario was that you -- that that site was -- the pond itself was filled to the storage capacity and was filled to the 25 year storm event and then to your freeboard and you had not been able to pump it down or was not able to pump it down or truck it out or whatever and it overflowed, it would be considered at that point an act of God and I believe the DEP would even look at it that way. It would be outside of the bounds of the design criteria.

Q. So then would the owner or operator of the land be responsible for this act of God?

A. That would be an enforcement issue. From my knowledge though in working with the Department of Environmental Protection, they do take that into consideration during an enforcement issue.

Q. You have been referred earlier to the Mushroom Farm Environmental Management Plan or MFEMP.

A. Yes, sir.

Q. On page 3 of that plan it states that "Requirements - Storage Ponds/Storage of Wastewater in Impoundments. Must have a valid

permit from PADEP for storage of wastewater."

Does Rick Masha or Mike Cutone or M.A.Y. Farms or Rick's Mushroom Service have a valid permit from the PADEP as listed in the Mushroom Farm Environmental Management Plan?

A. No, I don't believe DEP has required one.

Q. So then the Mushroom Farm Environmental Management Plan would be the rules and regulations contained within would be discretionary?

A. In that particular instance, again, that section of that and we, again, when we put the manual together and we worked on the manual, that was something that was insistent from the waste management section to put in but to be honest, I don't think that DEP in the southeast region has required that for any operation, whether it's a mushroom farm operation or agricultural operation or any kind of waste storage facility. So, again, I would say it's at least at this point it's discretionary based on the regional DEP office.

Q. If within the Department of Environmental Protection's discretion they have decided that a permit is not necessary, is there any way for an owner or operator of land like Rick Masha or Mike Cutone to obtain a permit?
A. I guess you could apply for one.
Q. With whom would you apply?
A. You would apply through the department. You would apply through the department.
Q. Department -- which department?
A. The Department of Environmental Protection.
Q. In my scenario they have already decided that a permit is not necessary.
A. Right.
Q. So what good would that application do?
A. There are permits that you could apply for.
Q. Other unrelated permits?
A. Well, they -- no. There is actually a permit for a mushroom processing facility, I believe. I forget what the general permit number is that you can apply for. So there is a permit out there.

Q. Some sort of a permit?
A. Yeah.
Q. But the ultimate decision for issuing such a permit would be with who?
A. With DEP.
Q. DEP?
A. Yes.
Q. You discussed earlier the Mushroom Farm Environmental Management Plan. You stated that a certain number of facilities within southern Chester County have such plans?
A. That's correct.
Q. Within each plan there is certain rules and regulations listed, correct?
A. Guidance.
Q. Guidance listed?
A. Guidance.
Q. Of the facilities that have Mushroom Farm Environmental Management Plans how many of those facilities have fully implemented those plans?
A. I don't have an exact number but --
Q. Approximately.
A. That have -- I would estimate the ones

that have and I would not like to use the word "fully implemented" because these plans are dynamic plans in many cases because agriculture is dynamic so things change rapidly. But I would say substantially implemented in the fact that the key components are in.

And what I mean by the key components, I mean the key structural components, the key management components. I would probably say 40 operations.

Q. 40 operations --

A. 40 operations.

Q. -- have completed the key structural components of the plan?

A. That's correct.

Q. Okay. And of those 40 is Rick Masha -- is Rick's Mushroom Service one of those --

A. Yes.

Q. -- that has fully complied with all the key structural elements --

A. Yes.

Q. -- of the Mushroom Farm Environmental Management Plan?

A. Yes.
Q. You had mentioned earlier that the Red and White Clay Program is designed to improve water quality within watersheds?
A. (Nods in the affirmative.)
Q. You are a member of this plan or --
A. The conservation district sponsored these -- is the local sponsor for that plan within Chester County. The Cecil, excuse me, the New Castle County Conservation District is the sponsor of it within the section of the Red and the White Clay in Delaware, the State of Delaware. So it's an interstate coordinated effort.
Q. And the reason for visiting the Rick's Mushroom Service property in connection with this plan was what?
A. To again minimize the runoff, the runoff and impacts on the streams, you know, from that site.
Q. That was the purpose in visiting the Rick's Mushroom Service property?
A. That was the purpose of getting involved at that site, yes.

Q. And have such runoffs been curtailed?
A. From my initial visit at that site with Mr. Frezzo there has been a major change.
Q. In what way?
A. In that there are controls. When Mr. Frezzo had the site there were no controls whatsoever. When it rained, everything ran off the site.
Q. Is it your understanding that any runoff occurs now on the Rick's Mushroom Service property?
A. I can't say for 100 percent that there is no runoff that comes off of it. I will say that the Best Management Practices that have been installed should contain it, you know, up to the design criteria. It's -- I go back to this. It's practically impossible to design, excuse me, to design a system that is 100 percent foolproof really for any activity we do, any activity that humans will do, whether it's farming or whether it's construction or whatever. The best we can do is hope to minimize it and minimize the impacts.
Q. If I were to show you a paper that showed

that Rick Masha had, in fact, applied spray irrigation to one of his fields for a period of 40 minutes, would that prove to you that Mr. Masha had saturated the fields to such a point that runoff would occur?

A. No. I mean, again, I think that it's going to be site specific. It's going to depend on the soils. It's going to depend on the conditions. It's going to depend on a lot of things. I can't go by time, you know, I mean, again, it's going to be site specific. Again, I think that some of the people that may have been working specifically intimately on the site may be able to tell a little bit better than I am -- than I can.

Q. Other than the Reynolds' farm property and the Rick's Mushroom Service property are you familiar with any other properties located upstream of the Reynolds' farm and Rick's Mushroom Service property that may produce runoff into the stream of compost or other pollutants.

A. Yes. We did work -- tried to work voluntarily and that didn't work with

Calvarese, I think it was called the Calvarese-Ianieri site which had a tremendous amount of spent compost on it, a very steep slope area which flowed down I think towards the -- eventually towards the railroad tracks there and came in on that side.

Q. Could you be more specific about exactly what area you are referring to?

A. Unfortunately, the map doesn't have roads on it. It flowed down towards this tributary here. (Indicating Davis-1) I believe it actually came down -- the property is located down through here. (Indicating.)

Q. The Ianieri property is located north of the Rick's Mushroom Service property?

A. That's correct.

Q. Okay.

A. And plus we are also -- we had also -- that was involuntary. I believe DEP had to get involved with an NOV and a consent order on that site to get anything accomplished.

Q. No voluntary compliance then for the Ianieri site?

A. No.

Q. Okay.
A. And then we were also working with the Blackwell site. I can't remember the actual name of the operation but they are also, again, just down the road here to the north. Clint Blackwell. And they are in the process of implementing the Best Management Practices, Red and White Clay Plan also. And there was some runoff from a spent compost pile that they actually had there. I don't believe they have that pile back there anymore.
Q. Was it runoff into Trout Run or --
A. Well, again, it went down through that same tributary area.
Q. Concerning the actual Reynolds' farm property are you aware of any compost that was stored on that property?
A. The one day that we were out with Mr. Piller and Mr. O'Neil from DEP, there was some spent compost down on the Reynolds' property. I believe the -- on the drive as you came in from Baltimore Pike, just off the drive somewhere. I believe it would have been -- it's down here. It would have been down

here some place. The drive comes in off Baltimore Pike just across the railroad tracks. (Indicating.)

Q. Is it possible that runoff from that compost could have entered the Reynolds' pond?

A. Not the large pond, no.

Q. Why not?

A. Because it's definitely -- it's downslope.

Q. It's downstream?

A. It's downstream at that point, yes.

Q. Are you familiar with any compost present on the Reynolds' farm property at any time within the past 10 years that could contribute to the contamination of the Reynolds' farm pond?

A. Specifically, no. I mean, again, I don't know what was being used up in the upper fields above there or not.

Q. Do you know of any instances where the Rick Masha, Mike Cutone, M.A.Y. Farms or Rick's Mushroom Service operated in direct contravention to the operation of the management of the site in accordance with the

Mushroom Farm Environmental Management Plan?

A. No, I am not familiar with any time that there was any specific, you know, time that they did anything, you know, willfully or anything like that that was directly opposite or, you know, in contention of it.

Q. Okay.

MR. HOWELL: Thank you very much.

MR. BURCAT: Just a couple follow-up questions.

* * *

EXAMINATION

* * *

BY MR. BURCAT:

Q. Mr. Greig, just a couple questions and we will have you out of here.

A. Sure.

Q. You had said there was a discussion early on about emergency situations. You said there was an underground drain that went under the impoundment. Do you recall that?

A. Yes.

Q. And you said that that ensured the