# EXHIBIT "D"

Cont'd

integrity of the liner?
A. That's correct.
Q. Is that what you said?
A. Correct.
Q. Does that drain -- should that drain be allowed to be plugged? Let me rephrase my question.
If that drain were plugged with sediment, would that have an impact on the ability of that drain to work properly?
A. The -- I am going to ask for some clarification.
Q. Sure.
A. The outlet of the drain that you talked about or the entire drain?
Q. If either the outlet or a portion of that drain were plugged with dirt or sediment, would that have --
A. It may have an effect. Again, I think you need to ask the engineer that question. I really can't respond to it -- to the effect of that.
Q. You had also said that last year or maybe two years ago there was an issue regarding

potential breaching of the pond and DEP was asked whether it was okay to spray on frozen ground. Do you recall that?

A. Yes.

Q. Do you remember who at DEP was asked?

A. I think Mr. Piller was the person who was asked and it seems to me that, again, I know I can't say, don't quote me, but I believe he may have -- I believe he talked to Mr. O'Neil also before that decision was made.

MR. BURCAT: Let's mark this as Exhibit-10.

* * *

(An Ecological Blueprint for Today, 10 pages, was received and marked as Greig-10.)

* * *

A. I have to make one disclosure about that document.

Q. Sure. Well, let me just ask the question.

A. Okay.

Q. I am about to put in front of you a document identified as Greg Deposition

Exhibit-10 identified as An Ecological Blueprint for Today. We understand it was an article written by Benjamin Reynolds.

Now, you wanted to say something about it?

A. Well, just that someone in my family had something to do with writing it. So I don't know if that makes any difference.

Q. Do you know why that would have been in your department files?

A. Yeah, the conservation district was also involved in this project.

Q. Well, why would that have been in the files relating to Rick's Mushroom Service?

A. It's, you know, been something that we have always been involved with stuff irregardless of this type -- these types of things.

Q. Now, this Ecological Blueprint for Today is this viewed as like some sort of a negative thing or how --

A. No, this is a very positive thing.

Q. Why is it very positive?

A. Because it was probably the first spray

irrigation operation in the State of Pennsylvania in regards to utilizing agricultural wastes in Pennsylvania on crop grounds.

Q. And was it -- was there something special about the way that this was being devised or what was particularly unique about it other than the fact you are spraying it? Was there anything particularly unique?

A. It was unique because it had never been done before.

Q. And do you know that Benjamin Reynolds was an author of this?

A. Yes.

Q. And do you know that to be Warren Reynolds' father?

A. Yes.

Q. And you have said, just so that the record is clear, you had a relative that was involved with this?

A. Yes.

Q. Who might that have been?

A. My mother.

Q. And how would she have been involved?

A. She worked for Representative Reynolds writing some of the environmental things for him in regards to when he was in the House.
Q. So this is viewed as a progressive document --
A. Very much so.
Q. -- compared to what had gone on in the past?
A. Uh-huh.
MR. BURCAT: I am all done.
MR. HOWELL: Thank you. Let me follow up real quick.

* * *

EXAMINATION

* * *

BY MR. HOWELL:
Q. Are you aware of any controls in place on the Reynolds' farm in place to prevent runoff from entering the Reynolds' farm pond?
A. No, I think we have had a discussion in regards to the need for an updated conservation plan on that farm.
Q. Who has had that discussion?
A. I have had that discussion with Warren.

Q. With Warren Reynolds himself?
A. Yes.
Q. What has he told you in relationship to placing controls on his property?
A. Well, now, I didn't say placing controls.
Q. Sorry.
A. I said the need for an updated conservation plan on the farm.
Q. I am sorry.
A. The farm plan on that farm has not been updated since his father's time so it is at least 1960 -- a 60's farm plan. So, as I said, it needs to be updated and whether there is additional Best Management Practices needed, you know, that still remains to be seen. I mean, that would have to come out within the planning process.
Q. So since the 1960's nothing has been done on that farm property in relationship to --
A. I can't --
MR. BURCAT: Objection to the form of the question. That is not what he said.

MR. HOWELL: I am trying to understand what he said, Joel. I apologize if I misunderstood.

A. (Continuing.) What I am saying is that the farm plans needs to be updated. Again, I can't tell you whether there has not been any improvements on the farm or there is a need for improvements on the farm. What I am saying is that there is a need for an updated conservation plan to reflect the cropping -- the type of cropping that is being done on the farm today.

Q. The plan has not been updated, correct?

A. That's correct.

Q. Do you know what type of activity was carried on on the Reynolds' farm property, during Reynolds father's occupation?

A. Well, yeah, it was a dairy at that time. It was the entire -- basically, the entire farm was in contour strips, alternate strips of corn, which were farmed in alternate strips of hay and corn -- of corn and either hay or small grain.

Q. Do you have any knowledge of what was

done with the manure produced by the dairy
farms cows?
A. Well, they were -- it was used for nutrients on the farm, you know, for growing the crops.
Q. It was applied --
A. Yes.
Q. -- to the land?
A. Yes.
Q. Do you know where the crops where grown at in relationship to the Reynolds' farm pond?
A. Again, from the plan it's shown in all the fields that are being cropped so, yes, there are some fields that, you know, would have been tributary to that farm pond.
Q. So fields next to the pond --
A. Yes.
Q. -- were used to apply manure?
A. Yes. Typical. I mean, it would be a typical agricultural practice.
Q. Isn't it true that in the Ecological Blueprint for Today, written by Mr. Reynolds' father, Benjamin J. Reynolds, that he advocates dumping composted manure directly

into streams and ponds?

A. I don't believe that to be true, no.

Q. I would like to refer you to CD0053, page -- one of the last pages in the ecological blueprint document. And the first -- the indentation of the first full paragraph on the right-hand side. The sentence states, "The nutrification of our streams, rivers and lakes is brought about by the massive amounts of nutrients that are placed in our streams by our sewage, effluent and agricultural waste." Excuse me -- agricultural waste.

What does that sentence mean to you?

A. That means we have been polluting our streams.

Q. I am sorry.

A. That means we have been polluting our streams with tremendous amounts of agricultural waste.

Q. That is actually a sentence stating that pollution of streams is going on?

A. Well, yes, from sewage effluents and agricultural waste. He's not advocating it.

Q. What is he saying to do with it?
A. He is saying that that's the problem and by utilizing the nutrients in our agricultural wastes and sewage waste for agricultural crops as opposed to just dumping it in the stream.
Q. I see. So previously --
A. Will utilize them as opposed to disposing of them.
Q. So previously the agricultural waste was dumped directly into streams and ponds by most farmers?
A. It wasn't utilized for its nutrient value. Okay. A lot of farmers were just dumping it on the ground, okay, and then adding the amount of -- the amount of commercial fertilizer that they needed to grow the crop. They weren't taking it into any consideration at all, the value, the nutrient value of the manure which is considerable.
Q. And Mr. Reynolds, Mr. Benjamin J. Reynolds was, in fact, taking it into --
A. Yes, very much so. He was a pioneer at that.
Q. And how did he do that?

A. Again, with capturing the manure, storing the manure -- storing the manure.

Q. Where did he store the manure?

A. In a manure storage lagoon and also, you know, spray irrigating it and, you know, taking care of the solids.

Q. Where was this lagoon located on the Warren Reynolds' property; do you know?

A. I can't remember exactly. But I do know it was somewhere around the buildings.

Q. But then Mr. Reynolds did apply that manure to his fields?

A. That's correct.

Q. Those were the same fields that were located next to the Reynolds' pond with no controls in place to prevent the manure from running into pond, right?

A. No, there were -- again, according to the conservation plan back then there was, you know, there was contour strips which are effective conservation practices back in the 60's and early 70's so.

Q. Did the strips prevent manure from running into the ponds?

A. If applied, you know, correctly, they should, you know, at least minimize it.
Q. Why didn't Rick Masha just put in contour strips?
A. Because Rick is not growing crops for contour, you know, contour strips for crops are rows -- are crop rows that are a minimum of 100 feet wide that go along the contour. It's a definition thing. I am probably not getting it across.
Q. Is it my understanding that the contour strips used on the Reynolds' farm property fully prevented any and all manure from flowing into the pond?
A. I am not making that statement. Again, conservation practices and it's -- it seems to be -- conservation practices are not the ultimate, you know, they are not 100 percent effective in any given situation. You know, they are just not. So you cannot make a statement -- I cannot make a statement and say, no manure got into a creek if you have conservation practices in or into a pond. No manure, you know, it -- conservation practices

will minimize depending on what they are, will minimize the amount of pollution that reaches water. And depending on how many conservation practices or what types of conservation practices you have will minimize closer and closer and closer but you are never going to get to that 100 percent point. And as you try to decrease it down to that last one percent it gets -- the expense gets to be the extreme and, you know, that's the point you wonder whether, you know, it's worth the amount of cost, you know, for what you get out of it.

Q. To the degree they are able has Rick's Mushroom Service property effectively minimized runoff into Trout Run stream?

A. I think with the best available technology we have with the Best Management Practices, yes.

MR. HOWELL: Nothing further. Thank you.

MR. BURCAT: Two questions based on what he asked.

* * *

EXAMINATION

* * *

BY MR. BURCAT:

Q. Are you aware that Mr. Benjamin Reynolds died back in the 1970's?

A. Yes.

Q. And the discussion that we had -- that you had with Mr. Howell for several minutes all related to activities that may or may not have taken place on the Reynolds' farm over 30 years ago; is that correct?

A. Yes.

Q. Were you on the Reynolds' farm over 30 years ago that you would have any personal knowledge regarding that?

A. I have been on the farm, yes.

Q. You have personal knowledge though of the farming activities?

A. Yes.

MR. BURCAT: Thank you.

THE WITNESS: I was a young man then, a real young one.

* * *

EXAMINATION

* * *

BY MR. HOWELL:

Q. To your knowledge what is the amount of time manure or compost material may remain in a pond the size of the Reynolds' farm pond?

A. Oh, it depends on the types of nutrients. It's going to vary depending on the nutrients. Some of them, you know, can -- if you start -- if you go to dredge a pond, I mean, you never know what you are going to find, you know, within the pond itself. You may have, you know, obviously suspended solids. You may end up with some -- particularly a lot of phosphorous which binds itself, unless it's unbelievably saturated and it let's loose. Most of the nitrogen will probably be gone and then most likely if there is any heavy metals or anything like that, that shouldn't show up within the, you know, within the sediments. So it could be years I mean.

Q. 30 years?

A. Yeah. Yes.

MR. HOWELL: Thank you.

MR. BURCAT: I have no further

questions.

* * *

(Witness excused.)

(Whereupon, the examination concluded.)

* * *

INSTRUCTIONS TO WITNESS

Read your deposition carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any change in form or substance which has been noted on the following errata sheet, along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to the deposing attorney, JOEL R. BURCAT, ESQUIRE promptly! Court rules require filing within 30 days after you receive the deposition.

ERRATA SHEET

PAGE LINE # CHANGE REASON THEREFOR

SIGNATURE PAGE

OF

DANIEL JOSEPH GREIG

I hereby acknowledge that I have read the aforegoing deposition, dated March 14, 2002, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

SIGNATURE: ______________________________

WITNESSED BY: ______________________________

DATE: ______________________________

SANDRA E. ROSIEJKA, C.S.R.
Registered Professional Reporters
19 West Second Street
Media, Pennsylvania 19063
(610) 566-2011

April 3, 2002

Mr. Daniel J. Greig
24 Hunter Road
Fallowfield, Pennsylvania 19320

RE: Warren Reynolds, et al v.
Rick's Mushroom Service, et al

DOCKET NO. 01-CV-3773
DATE TAKEN: March 14, 2002
WITNESS: Daniel Joseph Greig

Dear Mr. Greig:

Signature of this transcript is required within 30 days of this notice. Since you did not order a copy of the transcript to be sent to you or counsel for your employer, it will be necessary for you to please call our office to arrange for an appointment to come to our office to read and sign the transcript of your deposition.

The original transcript, with original signature and errata pages, will be available in our office for 30 days, at which time if it has not been read and signed, they will then be forwarded to Mr. Burcat.

Please call if you have any questions.
Thank you in advance for your cooperation.

Sincerely,
Sandra E. Rosiejka, C.S.R.

REPORTER'S CERTIFICATE

I, SANDRA E. ROSIEJKA, a Certified Shorthand Reporter, (State of New Jersey, License No. XI 00746), with offices in New Jersey and Pennsylvania, do hereby certify that the foregoing is a true, complete, and accurate transcript of the deposition of DANIEL JOSEPH GREIG who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am not related to or employed by any of the parties to the action in which this deposition was taken, or any attorney or counsel employed in this action, nor am I financially interested in this case.

SANDRA E. ROSIEJKA, C.S.R.
Certified Shorthand Reporter
Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

SANDRA E. ROSIEJKA, C.S.R.
19 West Second Street
Media, Pennsylvania 19063
(610) 566-2011