# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
* * *

| | |
|---|---|
| WARREN REYNOLDS, JOHN REYNOLDS, through his Guardians, JACKLEN E. POWELL and WILMINGTON TRUST COMPANY, WILMINGTON TRUST COMPANY, as Trustee | Civil Action No. 01-CV-3773 |
| Plaintiffs | |
| vs. | |
| RICK'S MUSHROOM SERVICE, INC., M.A.Y. FARMS, INC., and RICHARD MASHA | |
| Defendants | |

* * *
Media, Pennsylvania
Thursday, March 14, 2002
* * *

Deposition of JESSE W. DAVIS, taken pursuant to notice in the law offices of Kassab, Archbold and O'Brien, L.L.P., 214 North Jackson Street, Media, Pennsylvania 19063, on the above date, commencing at approximately 10:15 A.M., before Sandra E. Rosiejka, a Certified Shorthand Reporter and Notary Public.

APPEARANCES:

JOEL R. BURCAT, ESQUIRE
and
KIMBERLY A. HUMMEL, ESQUIRE
Of Kirkpatrick and Lockhart, L.L.P.
Payne Shoemaker Building
240 North Third Street
Harrisburg, Pennsylvania 17101

Counsel for Plaintiffs

WILLIAM E. HOWELL, III, ESQUIRE
110 East State Street
Kennett Square, Pennsylvania 19348

Counsel for Defendants

* * *



INDEX


| WITNESS: | PAGE |
| --- | --- |
| JESSE W. DAVIS | |
| BY: Ms. Hummel | 8, 216 |
| BY: Mr. Howell | 171 |


* * *



EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Davis-1 | Sample Location Diagram, 1 page | 64 |
| Davis-2 | MFEMP for Rick's Mushroom Service, 13 pages | 71 |
| Davis-3 | Conservation Plan, 6 pages | 79 |
| Davis-4 | Best Practices for Environmental Protection in the Mushroom Farm Community, 64 pages | 97 |
| Davis-5 | Inspection/Investigation Report, 1 page | 115 |
| Davis-6 | Detailed Operation and Maintenance Requirements for Settling Basin, HDPE Lined Storage and Spray Field, 2 pages | 125 |
| Davis-7 | Application Rate Log, 7 pages | 128 |
| Davis-8 | Calendar, 2 pages | 133 |
| Davis-9 | Photograph, 1 page | 136 |
| Davis-10 | Photograph, 1 page | 136 |
| Davis-11 | Photograph, 1 page | 136 |
| Davis-12 | Photograph, 1 page | 139 |
| Davis-13 | Photograph, 1 page | 139 |
| Davis-14 | Photograph, 1 page | 139 |
| Davis-15 | Photograph, 1 page | 139 |





| CONTINUATION OF EXHIBITS | | PAGE |
| --- | --- | --- |
| Davis-16 | Photograph, 1 page | 139 |
| Davis-17 | Photograph, 1 page | 139 |
| Davis-18 | Photograph, 1 page | 139 |
| Davis-19 | Photograph, 1 page | 140 |
| Davis-20 | Photograph, 1 page | 140 |
| Davis-21 | Photograph, 1 page | 140 |
| Davis-22 | Photograph, 1 page | 140 |
| Davis-23 | Photograph, 1 page | 140 |
| Davis-24 | Photograph, 1 page | 140 |
| Davis-25 | Letter dated 3/27/01, 1 page | 142 |


* * *

Distribution of Exhibits:
Davis-1 to 6, and 16 are not original exhibits but are attached to the original transcript. Davis-4 not copied in its entirety. All other exhibits are original exhibits and attached to original transcript. No copies in Mr. Howell's copy.)

* * *

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| (None) | | | | | |

Request for Production of Documents

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| 119 | 24 | | | | |

Stipulations

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| 7 | 1 | | | | |

Question Marked

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| (None) | | | | | |



(It is hereby stipulated and agreed by and among counsel for the respective parties that the sealing, certification and filing are waived; and that all objections, except as to the form of the question, are reserved until the time of trial. The witness will read and sign the transcript.)

* * *

....JESSE W. DAVIS, 529 West Marion Street, Lititz, Pennsylvania 17543 having first been duly sworn, was examined and testified as follows:

* * *

THE REPORTER: Do we have usual stipulations this morning?

MS. HUMMEL: Fine. The same as before.

MR. HOWELL: Yes, you wanted him to read and sign before.

MR. BURCAT: Yes.

* * *

EXAMINATION



* * *

BY MS. HUMMEL:

Q. Would you state your name.

A. Jesse Davis.

Q. I will be asking questions of you this morning and the court reporter will be making a record of those questions and your answers.

A. Okay.

Q. So I would ask that you respond to all my questions verbally so that she can record your answers.

A. Okay.

Q. If at any time you don't understand a question that I have asked, just let me know and I will try to clarify it for you.

A. Okay.

Q. If at the same time you are confused about a question I have asked, let me know and I will again try to clarify.

A. (Nods in the affirmative.)

Q. If you don't raise any issues with any of the questions that I ask, I will assume that you do understand the question and that the answers you are giving are complete, accurate



and honest.

A. Okay.

Q. If you mention anything technical or use an acronym, I may ask you to explain what that is --

A. I understand.

Q. -- just so that it's clear about that issue.

Do you understand everything we have covered so far?

A. Yes.

Q. Are you under or on any medication this morning or under the influence of any alcohol or drugs that might impair your testimony this morning?

A. No, ma'am.

Q. You understand you are under oath --

A. Yes.

Q. -- your testimony this morning, you understand what that means?

A. Uh-huh.

Q. Could you state the name of your employer.

A. Chester County Conservation District.

Q. **And what is your position there?**
A. My title is a Mushroom Farm Resource Conservationist and I help mushroom farmers with management issues, design plans according to what the technical advisors or PE's which are, I want to say it correctly, physical engineers, professional engineers, provide me with the information and then I design the plan to the best of my ability.
Q. **Could you state your work address.**
A. 601 Westtown Road, West Chester, Pennsylvania 19 -- it's either 308 or 803. I don't recall off the top of my head -- 380.
Q. **And could you state your home address.**
A. 529 West Marion Street, Lititz, Pennsylvania 17543.
Q. **And have you ever testified at a deposition before?**
A. I don't believe so.
Q. **Ever testified in court --**
A. Yes.
Q. **-- related to your work?**
A. Oh, no, not with environmental. No.
Q. **No environmental issues involved. Okay.**



**Mr. Davis, you started to describe what you do on your job.**
A. Uh-huh.
Q. **Could you go into that in a little more detail in terms of the type of service you provide.**
A. I guess initially I will get a phone call from a farmer and go out and meet the farmer and try to build mutual trust with the farmer. That is probably my initial position.
The next thing I do is complete an I & E which is an inventory and evaluation of the site, whether it be a mushroom farm or various agricultural. I can complete surveying to provide information to the engineer himself or herself. Collect the data, get the recommendations and do a plan which is a Mushroom Farm Environmental Management Plan to, so to speak, educate the farmer on what their correct law and what the regulation is and how he can run his operation, operation and maintenance and management to the best of his ability.



Q. **Now, I believe you said your position title was Mushroom --**
A. Mushroom farm environmental -- Mushroom Farm Resource Conservationist.
Q. **So do you deal exclusively then with the mushroom industry?**
A. No, ma'am. I deal with cash grain or dairy operations. I have worked at tree farms, orchards.
Q. **So even though your position title is Mushroom Farm Resource Conservationist, all of your time isn't just devoted to working with mushroom farmers --**
A. No, it used to be and now I have begun expanding into other areas and my background, I have worked on farms in the past and orchards, so they felt it was appropriate that I could overlap into various watersheds and expand my information to other farmers.
Q. **Are there other individuals in your office that work with the mushroom farmers that write the Mushroom Farm Environmental Management Plans?**
A. No, not in my office.



Q. **So whenever that type of plan needs to be written, you are the person that does that?**
A. I would do it or it would be completed through the NRCS, Natural Resources Conservation Service, which is a separate agency but we do work together on these projects.
Q. **So at times NRCS will actually develop the Mushroom Farm Environmental Management Plan for a facility?**
A. Yes and no. And what I mean by that is they create the plan and then I'll add the -- what we would consider an attachment, which would be the managerial aspects.
For example, record keeping. They may have a blurb in there, a small portion of information saying try to keep records, whereas mine goes into a lengthy detail of what you need to actually keep track of within a record. So it's a little bit more of an expansion, if you will.
Q. **Approximately how many Mushroom Farm Environmental Management Plans have you written?**

Page 14

A. To date?
**Q. To date.**
A. 65.
**Q. 65?**
A. Uh-huh.
**Q. When did you start writing these plans?**
A. Oh, it would probably be between six and eight months after I had been with the district.
**Q. Which was -- when did you start with the district?**
A. I believe it was March 8, 1998. And so approximately six to eight months after that.
**Q. So March -- so the fall of '98 --**
A. Yeah.
**Q. -- approximately?**
A. Yes.
**Q. Had any Mushroom Farm Environmental Management Plans been written before you came to the district?**
A. Yes, ma'am.
**Q. And who would have written those?**
A. John Magagna, M-A-G-A-G-N-A.
**Q. And who is Mr. -- how did you pronounce**

Page 15

**that?**
A. Magagna.
**Q. Magagna.**
A. He is with NRCS, National Resource Conservation Service.
And to my understanding they were complete but they were not -- like NRCS is not supposed to overlap in the DEP, whereas the district is allowed to overlap information through and through. There is sometimes road blocks between agencies.
**Q. But he had -- it's your understanding he had written some plans before that time?**
A. Yes. And they would have been what they consider an RMS, a Resource Management System, which is a -- usually all inclusive, down to where is your downspout on your house going and what are you doing with the grass in your yard kind of thing. They get very, very particular.
**Q. What resources do you use when you develop these plans?**
A. NRCS, their engineers, their technicians, their conservationists, DEP's Mushroom

Page 16

Manual. I may ask other AG related employees that I work with if they have some general information, I may get something from them. But usually NRCS is the technical agency that I go to and DEP to get the rules and regulations.
**Q. So you would coordinate with both agencies any time you would be writing a plan?**
A. Yes.
**Q. How does the -- you had mentioned -- did you refer to it as the Mushroom Manual?**
A. Yes, ma'am. Best Management Practices for the Mushroom Community, I believe that's the title of it.
**Q. How does that fit into the plan development process?**
A. That appears to be an all inclusive document from A to Z with fresh mushroom composting to growing to spent mushroom substrate in dealing with it and various rules and regulations are written in there. It's almost like a laymen's document so anybody could read it and fully understand what is going on in the mushroom community.

Page 17

**Q. Do you use that document when you prepare the plans?**
A. Yes, that was used initially to make the design for the original plan for the first plan that we have written in our office.
**Q. And then when you say it's the first plan, and then you use that -- or were additional plans based on that first plan or --**
A. Yes, there was an original plan written that would cover all the aspects within the Mushroom Manual and we had just taken out all the rules, recommendations and regulations and put it in the document itself.
For example, if we are going to implement something, it may be a managerial practice such as record keeping as I had mentioned or if you have a pest problem in your mushroom house, we develop an integrated pest management system and give them direction to go to Penn State or Penn State Cooperative Extension to get the rest of the information.
**Q. Mr. Davis, what is your educational background?**

Page 18

A. I have a Bachelor's of Science from Shippensburg University and I have six or so certifications through the federal government for inspections -- inspecting concrete, coming up with concrete mixtures, things of that nature, cultural resources background. I have several others but I can't remember them off the top of my head.
**Q. The certifications, you are talking about?**
A. Yes, ma'am.
**Q. Did you work anywhere before you worked for the conservation district?**
A. Yes, I worked at an eye shop with a medical doctor. I managed the store side of the business. And prior to that I was working as a chef for 18 months.
**Q. But this -- so the conservation district basically was the first position you held that used your degree?**
A. Yes, other than my internship, I worked with Spartan Plumbing and Heating, an HVAC service in -- it's between Baltimore and Washington, D.C. I did an internship with

Page 19

them.
**Q. Do you know approximately how many mushroom operations there are in Chester County?**
A. Individual owners or just growing and composting, all inclusive?
**Q. I guess both if you --**
A. I would say growers are probably 80 to 90. Growing sites and composting operations, 150. And these are approximations.
**Q. Yes. So -- I am sorry. 80 growers --**
A. Yes.
**Q. -- places where -- with mushroom houses on them?**
A. Yes, ma'am.
**Q. And then about 150 --**
A. And when I say 80 growers, I mean 80 specific owners. You have 80 owners but there would be as many as 150 operations within southern Chester County.
**Q. Different properties --**
A. Yes. Yeah, there may be --
**Q. -- where mushroom activities are going on?**

Page 20

A. Yeah. Mr. Smith may own four different operations. Two of them are for growing mushrooms, two of them are for composting operations and then there may be five separate guys with five various types of operations, whether one is making peat moss for the casing or one is just dealing with the compost on the outgoing.
**Q. And now you say you have developed 65 Mushroom Farm Environmental Management Plans?**
A. Yes, site specific. They are for each specific site up to 65 sites.
**Q. And would that be of the 150 sites that probably --**
A. Yes, ma'am.
**Q. -- need plans?**
A. Yes.
**Q. Is that the -- and how do you determine which sites you are going to do a plan for, where you are going to prepare a plan?**
A. Usually voluntary cooperation. They give us a call or ask for a request for assistance slip and then when they sign that, we get it to our office. We make note of it. We give

Page 21

it to the federal office, NRCS, and it's provided to the Board of Directors of the Chester County Conservation District. And they say yea or nay, are we going to help the site.
And when they give us a yes, then we can go to the site and begin the process of working with the farmer. We call it voluntary compliance.
**Q. Does anybody -- is anybody responsible for -- in your office does anybody advise farmers or these operations of the Mushroom Manual and their obligations to comply with that manual?**
A. Can you say that again?
**Q. The Mushroom Manual, the Best Management Practices for the Mushroom Farm Community, my understanding is that mushroom operations are required to comply with that --**
A. Yes.
**Q. -- document.**
**Does your office get involved in advising --**
A. Only if they become a cooperator.

Page 22

Q. **And what does that --**
A. Signing that --
THE REPORTER: Could we ask the witness to wait for the question to be completed on the record.
MR. BURCAT: Mr. Davis, what has to happen is she is furiously trying to take down the notes --
THE WITNESS: And you are doing a very good job.
MR. BURCAT: -- and what you have to do is wait until she is done with the question, then give your answer.
* * *
(Whereupon, a discussion was held off the record.)
* * *
BY MS. HUMMEL:
Q. **So does your office advise mushroom operators in the county that they are required to comply with the Mushroom Manual?**
A. If they would make contact with us, then we would advise them.

Page 23

Q. **Okay.**
A. But it is not our job just to drive around and stop and go, "You need to -- you need to." We have such a long list of people that are signing up for assistance and since I am the only mushroom farm resource conservationist in the office, you know as well as I do, one man can only do so much. So if I have 80 people on the list, I will try to get to them as fast as possible.
Q. **Now, you had said earlier after a request comes in, you do something you referred to I think as an I & E or inventory evaluation.**
A. Yeah, inventory and evaluation.
Q. **What does that involve?**
A. Inventory and evaluation of the property, looking for any pollution problems, any possible problems of the future.
Q. **So you go out to the property?**
A. Yeah, and we evaluate the system that they are using. If they have a certain method they are using, we may know of a more advanced method or we may learn something from them, so we evaluate the site, complete a drawing of

Page 24

the site usually to scale. We measure everything and try to get an idea of the size of the buildings and what kind of concrete they have. Approximate areas, which way the water is running on the property and we also take photos.
At this point we now have digital cameras that have been provided to us, so we can take photos of the site.
Q. **Now, you have been saying we. So are there several people that go out at that particular time to do that?**
A. No, I usually work with NRCS on this.
Q. **So somebody from NRCS --**
A. Yes.
Q. **-- would accompany you?**
A. Yes.
Q. **Is there a particular individual that typically goes along?**
A. Mr. Lester Jiles.
Q. **And what is his role?**
A. I believe his title is soil conservationist and he provides technical assistance.

Page 25

Q. **And to you?**
A. To me, yes. To me and then for the farmer also.
Q. **When you say technical assistance, could you be more specific in terms of the kind of information he provides?**
A. First, he'll usually assist with the I & E itself, whether it be measuring or locating possible pollution areas. And, secondly, we will take his recommendations as to where the best location for the BMP's would be.
Q. **And the BMP is?**
A. Best Management Practice.
And at this point it's all preliminary. We just suggest ideas to the farmer whether it be may be this or may be that. Think about it. And then we bring the engineer who will have a little bit more solidity with what we are suggesting.
Q. **Now, do you ever go out to mushroom operations yourself and recommend Best Management Practices?**
A. Yes.

Page 26

**Q. So your job does entail doing that as well?**
A. Yes. I may recommend it and I always follow up with, I am not the professional engineer, so I can only make a recommendation. I tell the farmer I am just making a recommendation, this is preliminary and I can't build anything without the okay of an engineer. There has to be a certification and design process, two of which I cannot do. I am not certified to do.
**Q. Is Lester Jiles a professional engineer?**
A. No, ma'am.
**Q. Okay. So if he is providing -- the same caveat would apply then to any recommendations he makes?**
A. Yes, ma'am.
**Q. And who ultimately then would have to approve the recommendations?**
A. An area engineer from NRCS.
**Q. Is there a particular person you have dealt with in that regard?**
A. Usually it's Pete Vanderstappen.
**Q. Anybody else that you work with?**

Page 27

A. That's the engineer that I work with predominantly. Very rarely do I work with any other engineers.
**Q. So if I understand this correctly, you go out and do this inventory and evaluation and identify Best Management Practices that may be needed on the property and make some preliminary recommendations?**
A. Yes.
**Q. And then those recommendations need to be approved by an engineer, typically Peter Vanderstappen?**
A. Yes.
**Q. Then what happens?**
A. Then the survey would be completed using various survey equipment. Elevations are plotted on what we call plot paper so we have an idea what the area looks like. We will measure the distances maybe a second time for distances of pipe, size of the tank, water collection areas, how much water are they actually producing at these houses, how much water are they using for the fresh composting operation and that entails how we size up or

Page 28

how a manure storage or a tank would be sized. And that gives us a basis to how much water needs to be collected in that area.
**Q. Now, is all this work done before a plan is developed?**
A. Yes, ma'am.
**Q. At what point in the process then would the plan be written?**
A. After all the preliminary work is done and the survey is completed then a plan is designed.
**Q. And would that be a Mushroom Farm Environmental Management Plan?**
A. Yes, ma'am.
**Q. Are there any other plans that would be written besides that?**
A. Possibly a conservation plan.
**Q. And how do those two relate?**
A. One is written -- the conservation plan is written by NRCS and it's possible to add an MFEMP, a Mushroom Farm Environmental Management Plan, to it as an attachment. So not only do they know what their structures are, if there is a contract in there and then

Page 29

they would also have the managerial aspects attached to the plans so it would be all inclusive.
**Q. So if I understand this, does the conservation plan then include the structural measures that would be required as far as Best Management Practices?**
A. Yes, ma'am.
**Q. And the Mushroom Farm Environmental Management Plan has the management recommendations in it?**
A. Yes, ma'am. The Mushroom Farm Environmental Management Plan may also have the structural a second time in the plan.
**Q. Okay. And what is the purpose of the conservation -- or why are there two different plans?**
A. It's two different agencies.
**Q. But it sounds like you are working together --**
A. Absolutely.
**Q. -- so why is there a need to have the two separate plans?**
A. It's two separate agencies.

Page 30

Q. **Okay. So NRCS does the conservation plan and the conservation district does the Mushroom Farm Environmental Management Plan?**
A. I see what you are getting at. I understand what you are saying.
Yes, there can be two plans written because there's two different offices working on it but they are united as one and considered as one document when it's completed.
Q. **Okay.**
A. This ensures both offices work together in a very efficient manner. This does not happen statewide. Not all conservation districts work with NRCS. In our area it's very good that we do work together. It keeps a lot more clarity there but the plans do go together as one. It's a little bit more elaborate with that management aspect on there.
Q. **So is the conservation plan the standard document that NRCS would use for working with any landowner?**
A. Yes, ma'am.

Page 31

Q. **So that is not specific to the mushroom industry?**
A. No, ma'am.
Q. **But the Mushroom Farm Environmental Management Plan is specific to that industry?**
A. Yes, ma'am.
Q. **So that's -- if I'm understanding this, that's sort of an add on --**
A. Yes.
Q. **-- that gets incorporated into for a mushroom operation?**
A. It may even be considered a misnomer because they go together as one and if they -- if NRCS writes a conservation plan, that's what they call it, and we attach it, it becomes a Mushroom Farm Environmental Management Plan. But in their write-up it may say this plan serves as a conservation plan, an RMS, which is a resource management system, and/or a Mushroom Farm Environmental Management Plan, depending on who we are designing it for.
Q. **You added another element in there, a resource management system?**

Page 32

A. Yes. That's the real elaborate plan that goes as far as where's the water from your spout on your house going. And when I say house, I mean your homestead, where you live at. How often are you cutting the grass in your yard, that kind of thing. That's get very specific. And that's just how NRCS writes it at the beginning of one of their plans.
Q. **And would one of these resource management systems typically be written for a mushroom operation?**
A. No.
Q. **What type of operation are they typically involved in?**
A. I believe it's called ALP which is AG land preservation and that's a whole other section in the office.
Q. **So for purposes of the mushroom industry we're really then primarily talking about the conservation plan and the Mushroom Farm Environmental Management Plan?**
A. Yes, ma'am.
Q. **And so when we are talking about**

Page 33

**complying -- for a facility to comply with this Mushroom Farm Environmental Management Plan, that would also encompass the conservation plan?**
A. Yes, ma'am.
Can you imagine how confused I was when I came to work here?
Q. **Now, where does the Department of Environmental -- the Pennsylvania Department of Environmental Protection fit into this process?**
A. They do routine inspections, annual inspections of various mushroom operations. They are in charge of water quality. They ensure that systems are being put in and farmers that are out of compliance are making contact with the conservation district.
Q. **So they are the organization that advises the mushroom operations that they, in fact, need to comply with the various regulations?**
A. Yes, ma'am.
Q. **Do you interact with them on a regular basis?**
A. Yes, ma'am.

Page 34

Q. **And who do you typically work with there?**
A. Three gentlemen -- Steve Piller, Steve O'Neil and James Newbold.
Q. **And do you know what the relationship amongst those three are?**
A. Steve Piller is a Water Quality Specialist. He is a field inspector and his boss is Steve O'Neil. And Water Quality's -- I don't want to say top boss, but James Newbold is above both of them. He is like the administrative aspect from what I understand.
Q. **And you work directly with all three of those individuals?**
A. Yes.
Q. **How do you determine which one you work with on any given project?**
A. If it's enforcement action or it's a Notice of Violation, Steve Piller. For ongoing projects usually Steve O'Neil or if there is a violation, Steve O'Neil. And James Newbold usually with the meetings or the administrative conferences. He is at those.
Q. **And so you have regular meetings with these folks?**

Page 35

A. Whether it be by phone, E-mail or if we have farmers coming in for administrative conferences to explain to them their best option for cleaning up an operation or this is what is going to happen, Steve O'Neil and Steve Piller. They are the two gentlemen I would be working with and that's -- at this point it's much more regular than in the past.
Q. **And when do you have one of these administrative conferences?**
A. They send me an E-mail requesting me to come, if I would like to show up for one of the conferences. At this point maybe once a month.
Q. **So this is DEP -- when you say they, DEP --**
A. Yes.
Q. **-- sends you a notice about this?**
A. Yes, once a month and sometimes it may be as far as three months apart.
Q. **So these are typically facilities that they have identified that have a problem or an issue and they are trying to resolve that problem?**

Page 36

A. Yes, ma'am.
Q. **And they hold one of these administrative conferences and you are typically involved in that?**
A. Yes, ma'am.
Q. **And you said that, if I understood then, the purpose of that conference is to -- for everybody to talk about what needs to be done?**
A. Yes, ma'am.
Q. **What is the outcome -- then what happens after those conferences are held?**
A. The farmer must make contact with me and ask me to come to their farm to begin the process and work through the process as we had discussed earlier.
Q. **Once the Mushroom Farm Environmental Management Plan is completed, who is responsible then for implementing what is in the plan?**
A. The farmer.
Q. **And what is your role in the process at that point?**
A. Comprehension and education for the farmer. A lot of the terms in there may not

Page 37

even be familiar to them. So we explain how the system is going to work, why these systems are beneficial, explain how to run the system officially. I think that's what it comes down to.
Q. **So it's more the educational aspect of it?**
A. Yes.
Q. **And in terms of compliance with the plan is that your responsibility as well, determining compliance?**
A. On some occasions.
Q. **And how do you go about doing that?**
A. If I see something that is not compliant, I talk to the farmer immediately and I say I would like to have this done today or tomorrow. Let's get it done.
If they are slow about it, they can be referred to the DEP and DEP can take enforcement action on them. And quite often a letter is sent to DEP stating this was found, this is what we are working on, this is how we are going to fix the situation.
And then we welcome DEP to come

out for an inspection or a joint inspection if they would like to see the property then.
**Q. So you advise DEP if there is an issue of noncompliance at a facility?**
A. Uh-huh. Yes, ma'am.
**Q. Does DEP conduct inspections independent of that process?**
A. Yes, ma'am.
**Q. When does that occur?**
A. I don't know.
**Q. So you are not involved in that process?**
A. No. Random inspections.
**Q. Now, how often do you contact, would you say, that you contact DEP about a noncompliance issue?**
A. Every few months if I have something that's out of whack or somebody that is not paying attention.
**Q. So you said there are 65 facilities that you have done plans on?**
A. Uh-huh.
**Q. Do you have some schedule that you visit the facilities or to determine compliance?**
A. I check their plan to see when certain



items are needed to be implemented and that -- that ensures the timeliness that I can stop in.
If I know in May I have five different farms that need to incorporate or implement record keeping and that is the date they have to begin, I stop in and talk to them and explain to them and say, let's get this part of your plan implemented and let's do this.
And as far as structure, we look for the structure dates and we know we want to start to build in March is a good time to start pouring the concrete, so the survey may be completed and the design may be completed in January or February and that way we are prepared and we can have a contractor come out and begin the operation or begin building the structure for the farmer that we are working for.
**Q. And once the structure or the management practice is initially implemented, is there any further compliance activity that you conduct?**



A. Regular inspections. General inspections. I may not have an exact but I will have five or six guys that I know are in the area that are cooperators and I will just stop in at random and say, hey, I would like to take a look around.
And usually I walk around with the farmer or the farm manager and they show me and we make sure that all the systems are working. If they are having a problem with clogged pipes or this or that, then we can make a new recommendation.
Or I'll say let me speak to the engineer or let me see if I can get some information for you on how to make this run a little bit more efficiently.
**Q. Now, you said that you typically advise DEP maybe every couple months that you have identified a facility that is not in compliance?**
A. Yes.
**Q. So of the 65 facilities, the mushroom operations that are out there, how many of those would you say that you have notified DEP**



**that there is noncompliance at?**
A. I have no idea.
**Q. Now, you said it was DEP that has the enforcement authority --**
A. Yes, ma'am.
**Q. -- if there is noncompliance?**
A. Yes, ma'am.
**Q. Have you been involved in -- are you involved in that follow-up enforcement activity with DEP?**
A. Yes, ma'am.
**Q. On about how many occasions has that occurred?**
A. Approximately 20, 20 times.
**Q. That there has been some type of an enforcement action taken?**
A. Do you mean like a Notice of Violation?
**Q. Well, I don't know.**
A. I am referring to a Notice of Violation, probably about 20 occasions.
**Q. That there have been Notices of Violation issued to an operation?**
A. To various operations.
**Q. Have you been involved in any situations**

**where anything beyond a Notice of Violation has been issued?**
A. I believe just this with Rick's and the Calvarese-Ianieri site. And I had a third site that had a court order and we provided a plan to the farmer but he rejected the plan.
**Q. Was that an enforcement action taken by DEP?**
A. Yes, ma'am.
**Q. So they had gone to court --**
A. Yes, ma'am.
**Q. -- to take action?**
A. Yes, ma'am.
**Q. And what facility was that?**
A. Howard Sheehan.
**Q. And that is a mushroom growing operation?**
A. No, ma'am, that's a dump site for spent mushroom compost with zero controls and it's a -- it's a gentleman's backyard about the size of a football field where they dump compost 10 stories high and just let it run all over the place.
**Q. And he didn't have any controls in place?**
A. No, ma'am.



**Q. So DEP had taken an enforcement action?**
A. Yes, ma'am, to my understanding.
**Q. And there was a court order for him to take some action?**
A. I believe the court order stated that a conservation plan must be written or a Mushroom Farm Environmental Management Plan must be written for this operation. And it was completed and it was written and presented but, again, he rejected it, so there was no --
**Q. And do you know what -- how that was resolved?**
A. I believe he -- I believe the gentleman has been arrested by multiple enforcement agencies.
**Q. Do you know the time frame that this occurred?**
A. Just recently, probably within the last 30 days.
**Q. Have you ever notified DEP that any mushroom operations that you are working with was in violation of the statutes or regulations?**
A. Can you say that again?



**Q. Have you ever notified any mushroom operator -- DEP that any mushroom operation that you have been working with was in violation of one of the statutes or regulations that you are implementing?**
A. Yes.
**Q. Approximately how frequently has that occurred?**
A. A handful of times, several times.
**Q. What kind of violations had you observed?**
A. Illegal dumping of spent mushroom compost. That's probably the one that -- that's the one I would have to blow the horn on.
**Q. And when you say illegal dumping, what specifically was happening that made it illegal?**
A. Dumping on a flood plain with zero controls within the 100 year flood plain, dumping within 300 feet of an occupied dwelling, 100 feet of a perennial stream, lake, sinkhole.
**Q. Which are requirements, if I understand it, that are in the Best Management Practices**



**Manual?**
A. Yes, ma'am.
**Q. So if you see somebody doing something that's violating one of those requirements in the manual, you have reported that to DEP?**
A. Yes, ma'am.
**Q. And what was their response?**
A. Notice of Violation had been issued and I believe the farmer they -- they request the farmer request assistance from our office immediately. DEP usually calls and says we haven't heard anything, have you been called by this gentleman and it's either yes or no.
**Q. So at that point if there is a violation DEP expects the operator to work with your office?**
A. Yes, ma'am.
**Q. Does DEP get involved in the development of the Mushroom Farm Environmental Management Plan or the recommendations that your office gives?**
A. No, ma'am.
**Q. Do they receive copies of the documents that you develop -- the plans that you**

Page 46

**develop?**
A. Upon request they also have the inner agency ability to come to our office and they can look through all of the MFEMP's that have been designed or written. They are welcome to come in.
**Q. But you don't as a matter of routine send them copies of these plans?**
A. No, ma'am.
**Q. If they specifically request one, you provide it?**
A. Yes. Or if they visit our office, again, they can open our file and go through anybody's information in there. This is also told to the farmer upon becoming a cooperator.
**Q. So if they don't receive copies of the plans that you develop, then they don't typically conduct inspections of those facilities based on those plans?**
A. Most of the plans are very similar. Do they do routine inspections? Is your question -- can you say that again? Ask me again.
**Q. If -- does DEP conduct routine**

Page 47

**inspections of the facilities where you have written Mushroom Farm Environmental Management Plans?**
A. Yes.
**Q. But they don't have copies of the plans that you have developed for those facilities?**
A. No, ma'am.
**Q. So when they conduct their inspections, what do they do?**
A. Look for pollution events or look for system failure. They may request a folder and take the folder with them to take a look at the site.
**Q. When you say request a folder, what does that refer to?**
A. An MFEMP, a Mushroom Farm Environmental Management Plan. That way they have a copy to take with them when they are going to one of these sites or a call may be sent to our office asking certain information about certain systems that were implemented at a site so they have an idea before they get to the site, they know what they are looking at.
**Q. Would they typically contact you before**

Page 48

**going to inspect one of these sites where you have written a plan?**
A. I would say 50/50. It depends what their question is. I don't want to say typically because I don't always know if they are doing inspections out there. And to my knowledge their main concern is water quality. So they are going to look for any type of pollution event or illegal dumping or runoff situations. With or without a plan that can be identified.
**Q. In terms of evaluating compliance with the Mushroom Farm Environmental Management Plan then, is that primarily your responsibility?**
A. I believe it would be equal between my responsibility and Pennsylvania Department of Environmental Protection.
**Q. I am still a little bit confused because it sounds like they don't really look at the plans when they conduct their inspections, so if they don't look at the plans, how are they determining compliance with the plans?**
A. They would have to either look at the

Page 49

file. I understand what you are saying. They would have to look at the file or they would have to request a copy of the file for their office. Otherwise to my knowledge their inspection would be runoff issues, water quality issues, that is what they are looking for.
**Q. And how frequently have you gotten those types of requests from them that they have said that they were coming out to inspect a facility and they would like to look at the plan before they go out there?**
A. I would estimate 30 to 50 times in the last three years.
**Q. So they will contact you and ask to see the plan that's being developed --**
A. Uh-huh.
**Q. -- before they go out --**
A. Yes.
**Q. -- and inspect the facility?**
A. Yes. Or they would -- they, I'm saying Steve Piller, would give me a call and ask me about a site and I would explain to him what is going on. That way he has an idea or

Page 50

ultimately he may say would you like a joint inspection to do this and then I will go out on a joint inspection with DEP and take a look at the site to give him a better understanding or comprehension of the Best Management Practices that had been installed.
**Q. So would -- you say maybe 30 to 50 times that that's -- that kind of call -- you have gotten that kind of call or that sort of thing?**
A. That call or an E-mail.
**Q. And can you estimate how frequently you have actually done a joint inspection in that instance when you have gotten that kind of call or contact?**
A. 75 percent of the time.
**Q. Now, when you conduct your inspection of the facility, what do you typically do? You said you do routine inspections. You go out and just look at a group of facilities that might be in the same area and inspect them. What do you typically do?**
A. Look for water quality, runoff, erosion problems, illegal dumping outside of permitted

Page 51

areas, illegal discharges of water. That is usually the big one.
**Q. And will you take the plans -- their plans with you typically when you go out there?**
A. Yes, ma'am.
**Q. And you'll review the requirements in those plans and look at what they are doing at the facility?**
A. Yes, ma'am.
**Q. Of the 150 or so operations that, mushroom operations, that you said are in Chester County, how many of those are operations that don't involve any mushroom growing or are just dealing with the waste end of the operation?**
A. We are not breaking these down into approved sites, nonapproved sites?
**Q. I am not sure what you mean approved sites or nonapproved sites.**
A. There is only two approved sites for spent mushroom substrate to be delivered to in the raw form. There is several sites -- I know of two sites that are allowed to take the

Page 52

topsoil material once the salts have leached out of the product.
**Q. Well, let's just back up a second.**
**When you say there's two sites that have been approved to take raw spent mushroom substrate from mushroom houses?**
A. Yes, ma'am.
**Q. And what two facilities are you referring to?**
A. Rick's Mushroom Service and Nutra Soil.
**Q. And -- I am sorry. What was the -- then you said there was another facility?**
A. Yeah, there's two other facilities called Scotts Hyponex and Earthgro.
**Q. Right.**
A. Two of which can take the cured product which is considered topsoil. It's completely broken -- or it's broken down to a point where it's considered topsoil and the salts have been leached out to a low enough number that you could use it for potting material.
**Q. And you said that was -- I'm sorry. What were the names of those two facilities?**
A. Scotts Earthgro -- or Scotts Hyponex and

Page 53

Earthgro.
**Q. Scotts Hyponex is one?**
A. Yes, ma'am.
**Q. And Earthgro is a separate one, --**
A. Yes, ma'am.
**Q. -- a separate facility?**
A. Yes, ma'am.
**Q. Okay. The facility -- I believe there is a facility located on Newark Road not too far from Rick's?**
A. Yes, ma'am.
**Q. Now, which one is that?**
A. That's called Earthgro.
**Q. And where is the Scotts Hyponex facility?**
A. Oxford, Pennsylvania which is just 10 or 15 miles west of West Grove.
**Q. And those two facilities can't take raw material but they can take processed or weathered or whatever? I don't know what term to use.**
A. Leached.
**Q. Leached material.**
A. To my knowledge.
**Q. Do you know what level -- is salts the**

Page 54

**primary issue there in terms of determining when a material is -- can go to those facilities?**
A. To my knowledge, yes.
**Q. Do you know what the level is that has to be achieved?**
A. I believe it's between six and nine parts per million.
**Q. Salt content?**
A. Yes. It needs to be lower than that for them to accept it.
**Q. Are there other unapproved facilities that either of these types, I guess, that exist?**
A. Absolutely.
**Q. And how many of those are there?**
A. I would estimate 15 to 20.
**Q. Have you worked with any of those facilities?**
A. Yes.
**Q. Could you just name a few of them that you can recall?**
A. Howard Sheehan.
**Q. Well, we already said --**

Page 55

A. Yeah.
**Q. -- he is not -- well, I don't know what is happening with him.**
**Any other ones?**
A. Just give me a second.
**Q. That's fine.**
A. I have to drive around in my car in my head to think about all these places -- Howard Sheehan. Chandler Mills, C-H-A-N-D-L-E-R, M-I-L-L-S. Fertile Soil, Harold Wagner. Fieni Brothers, F-I-E-N-I. That's probably the best I can do off the top of my head.
**Q. And these are operations that just take the raw material?**
A. Usually.
**Q. Do they have mushroom houses -- are there growing operations that are involved in these, the facilities that you named there as well?**
A. Some of them.
**Q. But they are also taking material from other sources, not just their own material?**
A. Yes, ma'am.
**Q. When you say that the -- that Rick's Mushroom Service and what was the other one?**

Page 56

A. Nutra Soil.
**Q. Nutra Soil are approved facilities, what does that mean?**
A. They have Mushroom Farm Environmental Management Plans that have been completely implemented.
**Q. And who makes that determination?**
A. The conservation district and NRCS.
**Q. And how do you make that determination?**
A. As we inspect and all the dates are implemented on the plan, we mark them off that we know each Best Management Practice has been implemented. And when they are completed, then we know the whole system has been completely implemented.
**Q. And once you have determined that the system has been completely implemented are there continuing inspections that occur?**
A. Yes, ma'am.
**Q. And how frequently does that occur?**
A. As often as possible. Approximately no less than once a month. It would depend on how intense their operation is and how advanced the system that they had installed

Page 57

was.
**Q. And when you say how advanced, what do you mean by that?**
A. If you want to spend a million dollars and build an electrical system that will run itself perfectly, there is going to be a lot less necessity for me to stop in and look at your computer system running the system, running the collection system itself or sizing the pipe can really dictate -- if you know the pipes were possibly -- whether they were the correct size but the farmer doesn't have the best management skills and you are aware of it or he let's you know that in advance, you would want to stop and see his system on a little bit more regular basis.
And we always offer, call us if you want routine inspection or if you have any questions.
**Q. And how would you classify the two facilities, Nutra Soil and Rick's Mushroom Service, in terms of this scale of advanced system?**
A. From one to ten -- a five or a six.

Page 58

**Q. They are both about the same? They both have similar types of operation?**
A. Yes, ma'am. Well, Nutra Soil is about five times the size of Rick's Mushroom Service.
**Q. Do they have the same type of operation?**
A. Similar in the fact that they both take compost but Rick's only does mushroom compost. Nutra Soil uses food waste products, paper materials, wood shavings and other composting materials.
**Q. And does Nutra Soil also have an impoundment and spray irrigation system similar to Rick's?**
A. Several.
**Q. Now, when you come out and do one of these compliance inspections, can you just explain in more detail what exactly you do?**
A. Usually let the farmer know that I have stopped in or whoever is working to let them know that I am on the property.
I usually do a perimeter check where I walk the perimeter to make sure I am not finding any illegal dumping off to the

Page 59

side or runoff issues. Again, whether it be erosion of the sediment or the compost water, leachate water.
And then usually walk through and check the system just to see if I see any visual problems. And at certain points if there is pumps involved, I may ask the farmer to run the pumps just to ensure that things are working properly.
**Q. Okay. Well, I want to talk specifically about Rick's Mushroom Service but I would like us to sort of back up a few steps in the process. Actually, before we even do that, there was one other issue that I wanted to talk about in terms of the general framework under which you operate.**
**When you go out to visit one of these mushroom operations, how do you determine -- who determines whether that particular operation falls within the parameters of the Mushroom Manual versus a facility that might actually require permits from the Department of Environmental Protection?**

Page 60

A. Can you ask me that again?
**Q. When you go out to one of these facilities, --**
A. Uh-huh.
**Q. -- how do you decide whether -- or do you decide or does, I guess really who decides, that this is a facility that falls within the scope of the Mushroom Manual versus a facility that doesn't and, therefore, would require permits from the Department of Environmental Protection?**
A. I would ask my boss and NRCS. They would be the two that I would check with before -- I don't have that ability to determine whether it's going to be considered completely mushroom unless I go and it's completely mushroom as opposed to being industrial or what have you.
**Q. And when you say completely mushroom, would there be instances where it could be a mushroom -- it could be handling completely mushroom waste, for instance, and still require permits?**
A. I believe Nutra Soil is but the reason

Page 61

that they need a permit is because they bring in sludge materials and human waste, food materials, paper and things like that. That goes outside the realm of just dealing with mushroom compost and agricultural waste.
**Q. Do you know how the decision is made -- when you say your boss, who are you referring to?**
A. Dan Greig.
**Q. Dan Greig.**
**And when you say NRCS, is there a particular person in NRCS who would make this determination?**
A. Sam High.
**Q. Do you know how Dan Greig or Sam High would make a decision as to whether this facility falls within the scope of the manual?**
A. No. No.
**Q. But, basically, so then that is not your call. So when you go out to a facility that is not an issue that you attempt to evaluate?**
A. No, ma'am. I write down the information that I see and observe and provide it to them

Page 62

to let them make the ultimate decision.
**Q. Now, let's turn to Rick's Mushroom Service and the Rick Masha facility.**
**Do you recall when you first became involved with Rick's Mushroom Service or the facility that operates where Rick's Mushroom Service is?**
A. I would have to say right after I began working with the district. So it probably would have been some time in March or April.
**Q. Of 1998?**
A. Yes, ma'am.
**Q. And how did you get involved?**
A. Assisting in surveying the property.
**Q. And who were you assisting?**
A. Natural Resources Conservation Service.
**Q. So NRCS was involved with the property at that point?**
A. Yes, ma'am.
**Q. And -- so spring of '98. And what was the -- so you were on the property at that point?**
A. Uh-huh.
**Q. Do you recall what the operation, what**

Page 63

**type of operation was going on or what features were at the site at that point?**
A. Compost removal. The site had leftover compost from previous owners and Rick was cleaning it up and I believe taking it to Earthgro across the street.
**Q. Was Rick bringing new fresh material into the property?**
A. I didn't see any at that time.
**Q. Are you aware of how long Rick had been operating the facility at that point?**
A. No, ma'am.
**Q. And what were you surveying the property for?**
A. To install a settling basin and the HDPE lined pond.
**Q. Now, when you say settling basin, are you referring to the settling basin that's currently at the property now?**
A. Yes, ma'am.
**Q. And the HDPE line pond, the one that is there now?**
A. Yes, ma'am.
**Q. At the time when you were out there doing**

Page 64

**that surveying were there any control measures in place?**
A. A temporary settling basin on the west side of the property.
**Q. On the west side of the property.**
MS. HUMMEL: Let's take a short break.
* * *
(Whereupon, a brief recess was taken.)
* * *
(Sample Location Diagram, 1 page, was received and marked as Davis-1.)
* * *
BY MS. HUMMEL:
**Q. I have asked the court reporter to mark this drawing as Exhibit-1. Do you recognize this drawing?**
A. Yes, ma'am.
**Q. Do you -- can you describe what it is?**
A. It looks to be Warren Reynolds' property and Wilmington Trust and is it M.A.Y. Farms on this side? The office building, concrete

Page 65

wharf, sediment basin, impoundment, Trout Run and Reynolds' lake.
**Q. And you just mentioned when you were first out at the Rick's Mushroom Service facility, I guess back in the spring of 1998, you were surveying for the installation of a temporary settling pond. Is that what you were saying?**
A. We were surveying for the concrete sediment basin.
**Q. Oh, I am sorry. That's right. And you said at the time the structure, the only structure in place at the facility was a temporary sediment basin; is that correct?**
A. Yes. And I want to correct myself.
**Q. Okay.**
A. Temporary settling basin is located on the west and --
**Q. Could you just mark on there approximately where you think that was located.**
A. Okay. (Witness complies.)
**Q. So it was west of the existing impoundment?**

Page 66

A. Yes.
**Q. Okay.**
A. The second thing that was there was a grass filter area.
**Q. Could you label where you put the "X". Just mark it with an "A" and if you could date and initial it. Put today's date which is the 14th, March 14, 3/14, and your initials by that.**
**"A" is where the temporary settling basin was?**
A. (Nods in the affirmative.)
**Q. And then you started to describe something else.**
A. A grass filter area that encompassed the majority of this area here. (Indicating.)
**Q. Could you label that with a "B", a "B" inside that and again date and initial it.**
A. (Witness complies.)
**Q. And when you say grass filter area, it was just an open area with grass cover?**
A. Yes.
**Q. Okay. Anything else that was there at the facility?**

Page 67

A. No, ma'am.
**Q. And where was compost being stored at that time?**
A. There was a small area of compost approximately here and there was compost up in this area. (Indicating.)
**Q. Could you label both of those with a "C" and just again date and initial those if you would.**
A. (Witness complies.)
**Q. Was there anything else at the site that you recall?**
A. No, ma'am.
**Q. The concrete wharf was there at that time?**
A. Yes.
**Q. And after that initial visit then when were you back out at the site?**
A. Approximately a week later.
**Q. Why were you out on that occasion?**
A. Follow up on the survey and discuss whether this operation would warrant a lined pond or a concrete storage structure.
**Q. Were there any plans developed for the property at that point?**

Page 68

A. Not through our office. I don't know if NRCS had already started to begin a plan at that point or not.
**Q. Were you working with NRCS to do the survey?**
A. Yes, ma'am.
**Q. And who were you working with?**
A. Lester Jiles, Peter Vanderstappen. I think there was somebody else but I don't remember.
**Q. And then when you met a week later, who did you meet with from the facility?**
A. I believe it was Rick Masha.
**Q. And who was it that met with him?**
A. Myself, Lester Jiles. At this point I'd imagine Pete was with us but I am not 100 percent. I think he was with us because he was giving them the possible cost estimates on each type of structure so that they could make a final decision as to what was going to be built out there.
**Q. Were there any records made of any of these meetings?**

Page 69

A. Possibly on Con-006 notes. They are called Con-006 notes. They would be with NRCS.
**Q. And this is a form they used to record visits to properties?**
A. Yes, ma'am.
**Q. And after that initial visit, those two visits, what then occurred?**
A. I believe making contact with a contractor which would have been Mr. Masha and Mr. Ciuffetelli's responsibility and get a date from the contractor as to when they could actually build these facilities. A second contractor was needed for excavation so he had to be contacted. I believe a third contractor had to be contacted to build the concrete settling basin. I know we needed three or four different contractors out there for each separate aspect of what we were building.
**Q. And what was the timing to be in terms of construction?**
A. As fast as possible.
**Q. And what happened -- when was the next time you were out at the property?**