# EXHIBIT "E"

Cont'd

A. I would have to guess within the month when excavation had begun.
**Q. Now, we are talking in 1998?**
A. I believe.
**Q. What excavation are you referring to?**
A. The dirt would have to be removed for this pond and for this sediment basin. But I would have to look at probably the NRCS file to get an idea exactly of what the dates were or my monthly records.
**Q. Okay. Other than those two structures were you involved in any other practices that were installed out there?**
A. I believe I was being trained during this whole period so, yes, I was there as they were putting in the spray irrigation system and after the fact to measure off the size of the field and the perimeters of the spray area.
**Q. When you say you were being trained, --**
A. Uh-huh. I had only been with the district the first month that I had been there so I was still in a training process.
**Q. Do you know -- did you ultimately develop a Mushroom Farm Environmental Management Plan**



**for this facility?**
A. Yes, ma'am.

* * *

(MFEMP for Rick's Mushroom Service, 13 pages, was received and marked as Davis-2.)

* * *

BY MS. HUMMEL:
**Q. I have asked the court reporter to mark this document as Davis Exhibit-2. You will also note it has been used in the Masha and Cutone depositions. Do you recognize that document?**
A. Yes, ma'am.
**Q. And what is it?**
A. It's a Mushroom Farm Environmental Management Plan designed for Rick's Mushroom Service.
**Q. Is this the plan that you prepared for the facility?**
A. Yes, ma'am.
**Q. Now, it indicates there on the front that you prepared this plan on December 20, 1999?**
A. I know there was a revision and I don't



know if that is the revision date, before or after.
**Q. Well, I think if you flip to page 2 --**
A. Yes, ma'am.
**Q. -- there is an indication there that there was a revision made in April --**
A. Oh.
**Q. -- well, on June of 2000?**
A. Yes, ma'am, that is correct.
**Q. So the plan was originally written -- is the date on the front the date it was originally prepared?**
A. Yes, ma'am.
**Q. And then it was revised in June of 2000?**
A. Yes, ma'am.
**Q. Was the substance of the plan revised in June of 2000?**
A. I believe the names from Custom Casing to Rick's Mushroom Service and implementation dates have been updated.
**Q. Now, in this plan, if you turn to page 6, there is a table that summarizes the Best Management Practices that are required at the facility.**



A. Yes, ma'am.
**Q. There is a notation there it says, planned amount/date and applied amount/date.**
**Could you explain what those mean?**
A. Planned amount is the approximate acres that we are planning for.
**Q. Uh-huh.**
A. And the date for implementation and simultaneously all the way across -- area planned for and the date it was implemented.
**Q. So when there, for instance, on that first line it says that this practice was planned on five acres for February of 2000?**
A. Yes, ma'am.
**Q. And then when it says applied on five acres February of 2000.**
A. Yes, ma'am.
**Q. That's the actual date it was implemented?**
A. This had been implemented long before I had written this plan with NRCS' conservation plan that was developed with it.
**Q. So NRCS had prepared a conservation plan**

Page 74

**Q. for this facility?**
A. Yes, ma'am.
**Q. Did you use that plan when you developed your Mushroom Farm Environmental Management Plan?**
A. Portions of it.
**Q. So when this plan was prepared in December of 1999, --**
A. Uh-huh.
**Q. -- if the practice was already implemented, --**
A. Uh-huh.
**Q. -- then why was the plan date not December of 1999?**
**For instance, why do we have a dates of February of 2000, June of 2000, August/September of 2000. In each of those instances, the planned and applied dates are the same.**
A. Ask me the beginning of that question again.
**Q. Well, when I asked you why in the first instance there --**
A. Uh-huh.

Page 75

**Q. -- that the planned and the applied date were the same, they are both February of 2000, you said because it was a practice that had already been implemented under their conservation plan.**
A. Yes, ma'am.
**Q. And I was just curious, for instance, if you moved down, the storage pond, say the fourth item down there, it has a June planned amount and an applied planned amount of June.**
A. Uh-huh.
**Q. So it appears that at the time when you developed the plan in December of 1999 that you have already entered -- that the practice was applied but the date is -- was six months -- hadn't occurred yet. It was six months in advance. So I am just trying to understand the relationship between the planned and applied amount.**
A. My guess is I wrote this, completed the first portion of it without any implementation dates, because at that point I didn't understand what implementation dates were and then after reviewing their plan and they

Page 76

explained it to me, they being NRCS, then I came in and filled in the dates and what had been implemented and the amount that had been implemented.
**Q. Okay.**
A. The initial part of the document had been completed up until -- the implementation dates were not put in at that point. That would be my lack of knowledge.
**Q. Now, you had said earlier that when there is a conservation plan and a Mushroom Farm Environmental Management Plan developed for a facility, the Mushroom Farm Environmental Management Plan encompasses that conservation plan?**
A. They become one.
**Q. Is that the case with Rick's Mushroom Service?**
A. Yes, this would be accompanying the conservation plan developed by NRCS.
**Q. Now, if there is any kind of conflict between the two documents, then what happens?**
A. What kind of conflict?
**Q. If they are requiring different things or**

Page 77

**even implementation dates, if there was a -- if one document indicated that the plan date was one time and the other indicates a different date --**
A. That wouldn't cause any grief. We would consider them soft dates and it would be flexibility for the farmer. If it was going to be scheduled for March and the farmer was ready but he couldn't get a contractor in there because the contractor had 12 other jobs to do, that wouldn't be the farmer's fault. That would be because the contractors are not available so we would have to give them another month or two months, depending on what was appropriate.
Weather can be very conflicting. If it's rained very hard and we keep excavating but where we are putting the tank fills up with water every day, that slows us down. The contractor may actually get mad and be like, "I am not pumping this thing out every day. I will be back in a week after the water is down."
**Q. Who determines the implementation dates?**

Page 78

A. Usually myself and Mr. Jiles along with Pete Vanderstappen.
**Q. That's true in both the conservation plan and the Mushroom Farm Environmental Management Plan?**
A. Yes.
**Q. Does the mushroom operator have any input into that process?**
A. Yes.
**Q. And in the case of Rick's Mushroom Service in terms of the timing and the sequence of the practices that were to be installed, who made the decision in this plan as to when things would occur?**
A. I believe NRCS, contractor conflicts slowed us down and because of the pressure of the Reynolds' property, everything was put in all at once. It wasn't in phases as we normally do. It was everything that we could possibly get done as fast as possible.
So it threw us out of sequence a little bit so we would have three different contractors out there working at the same time, whereas normally we would have one do

Page 79

the excavation, we'd resurvey and make sure everything met our standards and specifications and that contractor would complete his job. The next contractor would come in and lay the floor, pour the forms, pour the concrete and the third contractor may come in to put the lining in for the pond.
And to my knowledge there was compost out there so it was hard to complete surveys and complete every practice in a phase fashion because he was cleaning it up as we are building it. He being Rick Masha.
* * *
(Conservation Plan, 6 pages, was received and marked as Davis-3.)
* * *
BY MS. HUMMEL:
**Q. I have asked the court reporter to mark this document as Davis Exhibit-3. Do you recognize that?**
A. Yes, ma'am.
**Q. Could you describe what it is?**
A. Conservation plan by National Resources Conservation Service.

Page 80

**Q. And what is the date that this plan was developed?**
A. It looks like 9/25/97.
**Q. So this plan would have been in existence at the time when you developed the Mushroom Farm Environmental Management Plan?**
A. Yes, ma'am.
**Q. Do you recall looking at this document?**
A. Yes, ma'am.
**Q. So you are familiar with what is in this conservation plan?**
A. I have a pretty good idea.
**Q. And the timing of the planned events in this conservation plan, do you know how they would have been established?**
A. Not at that point in time.
**Q. If you could turn to page 3 of the plan, --**
A. Uh-huh.
**Q. -- you will see the entry there at the top, waste storage pond flexible membrane?**
A. Uh-huh.
**Q. And the planned date on that is August of 1999?**

Page 81

A. Yes, ma'am.
**Q. Do you know why that date would have been selected as in terms of implementation?**
A. I have no idea.
**Q. And then in your plan you have the schedule date for the impoundment as June 2000; is that correct?**
A. The fifth item on there?
**Q. Yes.**
A. Yes, that is what I have written in.
**Q. So, in fact, it appears that Mr. Masha had already planned to implement that practice the summer before August of 1999?**
A. Yes, ma'am.
**Q. But at the time when you -- obviously, when you were preparing this plan, --**
A. Yes.
**Q. -- that date had already passed?**
A. Yes, ma'am.
**Q. Do you know why the structure was not constructed in August of 1999?**
A. Do you know when it was constructed? I don't off the top of my head.
**Q. Well, your plan says June of 2000.**

Page 82

A. Was it in before that? I mean, I don't recall the date that is why I am asking.
**Q. Well, I am taking from your plan. I mean, if what you said before is accurate, then the dates in the applied column would be the dates that this was actually -- the work was actually completed.**
A. Uh-huh. It had to be -- it had to be completed as of June of 2000, if that is what I have written there.
**Q. Okay.**
A. It may have done -- it may have been completed prior to that. I do not recall. I would have to see an NRCS file.
**Q. Well, didn't you just testify though that the applied dates would be the dates that the practice was actually completed?**
A. Yes, ma'am.
**Q. Is there a reason to believe that that date isn't accurate?**
A. No.
**Q. So if that was the date it was completed, do you know why it took until June of 2000 to complete it and why it wasn't installed back**

Page 83

**in August of 1999?**
A. Because we had three separate contractors and it depended on when they could get in and do it.
For example, I have concrete guys that are going to pour tanks now but they can't get in for another year and a half because they have 42 tanks to put in prior to what I am getting on their list to do. Three contractors, the weather and removal all played a roll in how soon we could get this job done.
**Q. Who determines which contractors that you use?**
A. That would be at the discretion of the farmer.
**Q. And is there an option to go with alternative contractors if one is not available?**
A. Yes, ma'am.
**Q. Do you know if that was attempted in this case?**
A. I believe so. I know there is -- I know of one company that builds these flexible

Page 84

membranes and only one company. To my knowledge with only one guy out there, if he has 100 per year, you have to get on his waiting list to do so. To my knowledge Von Brubaker was contacted and he was on a waiting list until Von could get in and put this liner in.
**Q. So it is your understanding that there is only one contractor, when you say one, you are talking about in the county, in the state?**
A. There is only one that I know of in this state. I don't even know if he is in this state. It's the only one I have ever worked with.
**Q. And his name was?**
A. Von Brubaker. V-O-N B-R-U-B-A-K-E-R. And this is a real -- with such a very fragile system, -- when I say fragile, the liner you don't want to go hitting it with a hammer or something. You want to make sure you use a contractor that knows his business and I, to my knowledge, Von Brubaker has done multiple lining systems and is notorious for doing a good job.

Page 85

**Q. Has this type of a lined impoundment been constructed in any other mushroom operations that you have been involved with?**
A. Not to my knowledge. None that I have worked with.
**Q. Was it Nutra Soil, I guess, that was the other facility that had a similar type operation?**
A. They have a clay lined pond.
**Q. As far as determining the Best Management Practices to be included in this plan, particularly the structural measures, did you determine that?**
A. No, ma'am. These were done in '97.
**Q. So those were all based on the conservation plan that NRCS had already completed?**
A. Yes, ma'am.
**Q. And you just incorporated them into this plan?**
A. Yes, ma'am.
**Q. And you added additional management practices based on the Mushroom Manual?**
A. Yes, ma'am.

Page 86

**Q. Now, taking a look at the table that starts there on page 6.**
A. Uh-huh.
**Q. The last item there on that page states in the right-hand column, "Storage ponds constructed after July 4th" there is no year. Do you know what year is supposed to be in there or is there a year that is supposed to be there?**
A. I believe it's '96. 1996.
**Q. Well, the storage ponds constructed after that date "-- are required to have a liner system, a leachate collection system and groundwater monitoring system"?**
A. Uh-huh.
**Q. And you indicate that those have all been completed at this facility in June of 2000?**
A. Yes, ma'am.
**Q. Could you describe the leachate collection system that exists at this impoundment?**
A. That would be the concrete settling basin and the HDPE lined pond. The liner system would be the HDPE lined pond.

Page 87

**Q. Well, the liner system but what is the leachate collection system?**
A. That would be the concrete settling basin prior to transporting to the HDPE lined pond.
**Q. So it's your understanding that what is referred to there as a leachate collection system --**
A. Uh-huh.
**Q. -- is satisfied by the sedimentation basin?**
A. Yes, ma'am.
**Q. And the groundwater monitoring?**
A. That's the observation well that was designed and outlets on the west side of the HDPE lined pond.
**Q. I am sorry. Could you say that again?**
A. That's the observation well that is located on the west end behind the HDPE lined pond.
**Q. Observation well?**
A. Yes, ma'am.
**Q. Could you explain what that is?**
A. It's a pipe that would catch and direct any leakage from this pond to an outlet pipe

Page 88

to be checked and tested.
**Q. So it is not a well that actually monitors groundwater?**
A. No, ma'am.
**Q. So there are no ground monitoring wells installed at the facility?**
A. No, ma'am.
**Q. Are you aware of whether there is any measures in place to collect any seepage that would occur if there was a leak in the pond?**
A. The system that's underneath the lined pond itself.
**Q. What do you mean by that?**
A. I didn't build it so I don't totally know how it works underneath the system. But there's some type of -- there is a rock system under there that would send it out to the pipe. It's all collected and directed in that fashion. You would have to ask the engineer to be honest with you.
**Q. So when you report that this was completed in June of 2000, it doesn't sound like you necessarily were involved in all of the particulars of those structures, so how do**

Page 89

**you determine that this was completed?**
A. NRCS.
**Q. Okay. So they -- you consulted with them --**
A. Yes, ma'am.
**Q. -- in terms of these structures? Okay.**
**On the next page, the second line there where it says, the second row, it says, "Stored wastewater should be kept aerated or agitated to reduce anaerobic activity, odors, and settlement of solids into the collection basin/storage pond." --**
A. Uh-huh.
**Q. And you indicate that that was implemented in July of 2000?**
A. Yes, ma'am.
**Q. Is there any aeration?**
A. I know he has a pump in the bottom of that pond which would cause agitation or increase aerobic activity.
**Q. There is a pump in the bottom of the pond?**
A. Yes, ma'am. The pump pipe is down there and the pump sits off to the side in a small

Page 90

wood shack.
**Q. You are talking about the pump that is used to draw the liquid out of the pond?**
A. Yes, ma'am.
**Q. So it's your opinion that that withdrawal would satisfy this aeration requirement?**
A. It would satisfy the agitation.
Would it increase the oxygen? I believe it would.
Does it create a completely anaerobic environment? No.
And ultimately it says "should". It's a recommendation.
**Q. Does that mean that he is not required then to do that?**
A. I don't believe so.
**Q. So when you note that something has been applied here that that has been done --**
A. Uh-huh.
**Q. -- does that indicate though you believe it had been done?**
A. Yes.
**Q. As you go down that page there, you'll note a number of isolation distances.**

Page 91

A. Uh-huh.
**Q. At least 300 feet from occupied dwellings.**
A. Uh-huh.
**Q. Have you verified that those isolation districts have all been complied with?**
A. 20 inches of soil during all periods of the year. Yes.
300 feet from a drinking water source. Everybody in that area is on -- they don't have well water. They have local water out there. What do you call it -- town water, Chester Water Authority.
Occupied dwellings? Yes. We are 300 feet away from all the trailers located on Michael Pia's, P-I-A, property.
100 feet from streams, sinkholes and streams. Yes, we are 100 feet from the stream out there.
**Q. What about the last column there or the last item, the maximum volume of storage is not to exceed 2,000 -- 20,000 cubic yards or two acres in size?**
A. I would exclude that whole section on,

Page 92

"Storage of SMS at other farms where land application will not occur." Because this would -- to me this is not a mushroom farm or other farms. So if it says other farms, that would be like a cash grain or a dairy operation and that should not be in there.
I have you really confused now, don't I? Ultimately, I would exclude that section.
**Q. So you are saying that Rick's Mushroom Service is not a farm?**
A. It's a hay farm.
**Q. How do you classify -- how do you determine it's a hay farm?**
A. It just appears to me this would be doubling. I am doubling the information, storage of a central location, storage at a farm. That's overlapping information.
**Q. Well, if you're saying this is a hay farm --**
A. Uh-huh.
**Q. -- wouldn't this fit this operation then because --**
A. Yeah, I guess it would. I didn't think

Page 93

of it that way but, yeah.
**Q. And to be classified as a hay farm is there any requirement?**
A. No, just that the hay is harvested. That would be considered agricultural activity.
**Q. And has hay been harvested from this facility?**
A. Yes, ma'am.
**Q. It has been baled and removed from this facility?**
A. Both sides and then last year the second side was not harvested but he couldn't put any SMS on the property to enhance the organic matter, so it seemed to be much more beneficial to leave a little residue on there and increase the organic matter of that side.
**Q. I'm just not clear on your answer. So are you saying that there has been hay harvested from the facility?**
A. Yes, ma'am.
**Q. And when did that occur?**
A. Over the summer.
**Q. This past summer?**
A. Yes, ma'am.

**Q. So when you say that this practice was applied -- that these practices were all applied --**

A. Uh-huh.

**Q. -- in February of 2000, at that point there had been no harvesting?**

A. Don't need to harvest. There wasn't enough grass to harvest. If it was only a foot and a half tall, there really wasn't a need to cut it. We need to keep it at least 8 to 18 inches in height.

**Q. And has he complied with the 20,000 cubic yards requirement?**

A. Is this inside or outside the impoundment? Because that's a very vague requirement. It says, "Additional requirements apply to this storage arrangement such as: The maximum volume of storage for one year cannot exceed 20,000 cubic yards or two acres in size."

**Q. Well, you wrote this plan, correct?**

A. Yes, ma'am.

**Q. Do you know what that means?**

A. That means that an open field, not within



a confined area.

**Q. Does it say that?**

A. No, ma'am.

**Q. And how then -- then how do you make that determination that that's what it means?**

A. I would explain that to the farmer.

**Q. No. I meant how did you determine that this requirement only applies to an open field and not to a storage area like Rick's?**

A. Because I have nothing written in there about an impermeable surface or encapsuled or encircled in a berm in a confined area.

**Q. If you go up to the category right above it. It says, "The SMS must be stored on a pad or under a roof or other structure capable of preventing contact with precipitation. If the SMS is stored on a pad, the pad must be concrete, asphalt, or low permeability, compacted, earthen material capable of containing all solids and collecting and diverting all wastewater to storage or treatment facilities."**

A. I guess my answer would be to my knowledge anything over five acres needs a



waste management permit. Anything under five acres does not. So whoever wrote the manual put that in there.

Is that a curve ball? Yes, it is.

Two acres in size that is completely encapsuled -- yeah, he has more than two acres. 20,000 cubic yards, that would totally depend on how wet the material is, how much material is there, what is being transferred, what is encompassed there? And two acres would be a complete two acre coverage as opposed to windrows, W-I-N-D-R-O-W-S, with space between such as grass filter areas.

**Q. And this five acre requirement that you have just mentioned in terms of when a permit is required, where does that requirement come from?**

A. Pennsylvania Department of Environmental Protection.

**Q. Can you be more specific?**

A. Waste Management Department.

**Q. Is that noted anywhere in the Mushroom**



**Manual?**

A. There is a section in there somewhere. I think there is a spot in there somewhere that mentions any composting operation over five acres.

* * *

(Best Practices for Environmental Protection in the Mushroom Farm Community, 64 pages, was received and marked as Davis-4.)

* * *

BY MS. HUMMEL:

**Q. I asked the court reporter to mark this document as Davis Exhibit-4. Do you recognize this document?**

A. Yes, I do. It's one of several that have been written.

**Q. And what is it?**

A. Best Practices for Environmental Protection in the Mushroom Farm Community.

**Q. Is this the document that we have been referring to today as the Mushroom Manual?**

A. Yes, ma'am.

**Q. And this is the document that you just**

**mentioned that you believed is stated in here somewhere that the limit for requiring a permit was storage on more than five acres?**
A. Yes, ma'am.
Q. **Could you see if you could locate that requirement in here?**
A. (Witness reading document.)
The only thing I see is a permit may be required but I don't see the actual size. So it must, I mean, --
Q. **Be somewhere else?**
A. Yeah.
Q. **Do you have any idea where? Who has told you that that requirement does exist?**
A. NRCS.
Q. **NRCS.**
A. And we honor it.
Q. **While you have the manual there, could** you turn to page -- well, it's Appendix A. It starts on page 33. Can you see that that states that this appendix is a summary of the solid waste rules and regulations?
A. Yes, ma'am.
Q. **If you just flip back to -- well, turn**



**the page and there is a discussion there of -- a discussion about permits. And it says, "Permits must be obtained for a compost processing facility, a land application operation, a transfer facility, or for the beneficial use of SMS if the activities are not part of a normal farming operation."**
A. Yes, ma'am.
Q. **Do you see where I read that? Did I read that correctly?**
A. Uh-huh.
Q. **Then at the bottom of the page it gives some examples of what may and may not be normal farming operation that would require a permit.**
A. Uh-huh.
Q. **And on the next page, if you go to number three, the example number three, it states that, "A mushroom farmer or other person transports the SMS to another farm for storage prior to selling or moving the SMS to another field for land application."**
A. Uh-huh.
Q. **"Chapter 5 indicates that to be considered**



**a normal farming operation, the SMS must be stored at the point of generation or on the area where land application will take place."**
A. Uh-huh.
Q. **"In this instance the operation would require a transfer facility permit." In other words, if it is not stored at the point of generation or at the place where land application is going to be occurring, it would be a transfer facility and a permit would be required. Would that appear to apply to Rick's Mushroom Service?**
A. That would be at the discretion of DEP.
Q. **Were they contacted about this?**
A. Yes.
Q. **And what were you told?**
A. That this facility would not be needing any type of permit. It would be deemed as an agricultural operation.
Q. **That it would not be a transfer facility?**
A. No. That it would not need a permit.
Q. **Was there any discussion of whether or not it was a transfer facility?**
A. I believe so.



Q. **Who did you talk with at DEP?**
A. Water Quality Department. I believe the whole department was there.
Q. **And when was this?**
A. I don't recall. I honestly don't remember.
Q. **Was this a meeting specifically about this facility?**
A. Yeah, this was one of the facilities being discussed the day that I was there.
Q. **And this was a meeting that occurred at DEP?**
A. Yes, ma'am, Conshohocken.
Q. **And this issue was discussed in terms of whether this facility qualified under the manual or would require a permit?**
A. Yes.
Q. **But you don't recall whether there was a discussion of whether it was a transfer facility or not?**
A. Yes, there was a discussion that there was transfer going on at this facility but --
Q. **Do you recall --**
A. Excuse me.

Page 102

**Q. Do you recall if there was any discussion as to why this requirement would not apply?**
A. I don't recall. I just -- it was just at their discretion. It was up to them to decide.
**Q. Who was at the meeting from DEP?**
A. The whole water quality department. I would have to see a whole list of their names. There is probably 12 to 15 people in that office that day or in that room.
**Q. And the purpose of the meeting was to discuss several facilities?**
A. Yes, ma'am.
**Q. Is that typical for that number of people to be involved in a meeting of that sort?**
A. On some occasions.
**Q. How frequently have those types of meetings taken place?**
A. Several times in the last three years.
**Q. Was Steve Piller there?**
A. Yes, ma'am.
**Q. Was James Newbold there?**
A. I believe so.
**Q. And Steve O'Neil?**

Page 103

A. Yes, ma'am.
**Q. Do you recall if there was anybody there from the southeast regional office's solid waste program?**
A. Waste management?
**Q. Yes.**
A. I believe there was some waste management people there.
**Q. Do you recall who?**
A. No, ma'am, I don't.
**Q. If we could turn back to the Mushroom Farm Environmental Management Plan.**
A. What page are you on?
**Q. I was still on page 7. Now, down to that last item again, the 20,000 cubic yards issue.**
A. Uh-huh.
**Q. Now, you indicate there that he has complied with that requirement on February of 2000.**
A. Yes, ma'am.
**Q. How did you make that determination?**
A. At the time we estimate how much product he has on the property, get an idea from his

Page 104

record keeping and there is a lot of incoming and going out there so it's hard to get a perfect determination but we didn't feel there was excess of that amount there and with the settling process that occurs, it can become much more -- 20,000 cubic yards in 30 days can become 10,000 cubic yards.
**Q. So when you say that he complied on that date, --**
A. Uh-huh.
**Q. -- is that all that means, that on that particular date he was in compliance with this or February of 2000 he was in compliance with that requirement?**
A. Say that again.
**Q. The fact that you have a date listed in the applied amount category, does that indicate that just at that time there was compliance?**
A. I might have been there several occasions and that amount has been approximated less than that. At times more than that but, again, in 30 days it could settle so it's very hard to get an exact amount.

Page 105

**Q. So when you have conducted inspections of this facility this is one of the things that you measure?**
A. Yes. I get a general idea of how much is out there and I will talk to him about how much is coming in and going out.
**Q. Do you keep any records of your inspections?**
A. Yes.
**Q. Would you in that inspection indicate approximately what your estimate of the amount of material that was present at the facility at the date of the inspection?**
A. Sometimes -- other times I feel that this is the approximate amount. That's what I would write down.
**Q. And where do you write that?**
A. That would be written in a journal.
**Q. And did you produce that journal to us?**
A. No, I had that journal stolen in Philadelphia. My car got vandalized at one point and they stole everything out of my car, including my briefcase which held a journal that had everything for the first year and a

half of information that I had written in it.
Q. **And when did that occur?**
A. May 13, '99. I think it was 1999, May 13th.
Q. **That's when it was stolen --**
A. I believe.
Q. **-- your log book?**
A. It might have been 2000. I honestly don't remember.
Q. **And after that did you start a new log book?**
A. Yes, I have a journal.
Q. **And have you conducted inspections of this facility since that time?**
A. Yes, I have conducted inspections.
Have I written stuff in the journal referring to Rick's? No, I have not.
Q. **And why not?**
A. Because they usually go in the Con-006 notes for NRCS.
Q. **So when you have conducted these inspections, there has always been someone from NRCS accompanying you?**
A. 99 percent of the time.



Q. **And does that person or do you make the notes on this Con-006 form?**
A. Usually NRCS writes them in there.
Q. **And who accompanied you on the inspections?**
A. Usually it's Lester Jiles would be with me.
Q. **And so he would have records of what occurred at the inspection?**
A. Yes, sometimes.
Q. **And would he indicate this kind of information, what the volume of material was at the facility?**
A. He would if I gave him that -- what my approximation was, yes.
Q. **So you would have been the one making the approximation?**
A. Yes, ma'am.
Q. **And you do that when you go out and conduct an inspection?**
A. On some occasions I do.
Q. **And how do you determine when you will determine that and when you won't?**
A. Area times height will give me an average



estimate.
Q. **No. I am sorry. You said on some occasions that you look at this compliance with this requirement.**
A. Uh-huh.
Q. **When would you evaluate compliance and when wouldn't you?**
**How do you decide whether to evaluate compliance with this fact, this requirement, when you are out conducting an inspection?**
A. I have at that point in time and now to my understanding anything within the five acre, he can pile it up in there, you know, six feet tall if he wants to, 10 feet tall, as long as it's all inside that area. I have yet to see any -- I have yet to see something like this ever enforced because of the conflict of figuring out the volumes. The best thing you can ever do is get an estimation. Sometimes it's by weight. Some of these regulations are by weight. Some are by cubic yards but, again, they can adjust size in 10 days. If it rains, they can flatten out from six feet to a



foot. I have seen it go totally flat before.
It's very hard, so we do the best we can to get a general estimation as to what is there. Again, if it's six feet tall and 30 days later it's three feet tall, I have just cut the cubic yardage down by half. So it's very hard to pinpoint the exact quantity and to my knowledge he can put as much as he wants inside that bermed area.
Q. **So do you -- I mean, have you actually attempted to estimate the volume that's there?**
A. Yes, I have on several occasions.
Q. **On the next page, page 8, where it talks about the passive composting that is occurring, is there passive composting going on at this facility?**
A. Not anymore.
Q. **There is no material that is being stored there for purposes of leaching the material?**
A. Yes.
Q. **And that is not passive composting?**
A. Passive is clumping it thick, tall, in a big square and letting it sit for two years. The stuff that he has sitting in there will

sit for a year or six months and they will turn it, spread it, leach it and then sell it as topsoil.
**Q. So what is that operation called?**
A. Active composting.
**Q. Is active composting discussed in this Mushroom Farm Environmental Management Plan?**
A. I don't remember. I am not sure. At this point I don't think so. No. It would have to be revised to accommodate because in the past it was more of a passive operation.
**Q. And how long has active composting been going on at this facility?**
A. I would guess since last year, in the last year or so. And if I am not mistaken when he was cleaning up the site, he was doing a lot of turning and windrowing, so that would have been considered active at the time but that was during the clean up process.
**Q. Could you just explain to me again the difference between active and passive composting?**
A. Passive is usually a two year process of sitting it and storing it. The other thing is



if you do completely passive and on a nonimpermeable surface, which is very common, you have to let the ground rest for three years after you have removed the material.
Active can be agitating the material once a week, once every six months, once a year, spreading it and agitating it all within one month. You may let it sit for 10 months and then come in and turn it.
The other aspect is windrows are used for active as opposed to passive. Passive is how much can I clump into an area as opposed to active would be -- here's a certain amount, here's a certain height and I am trying to get it to leach at a faster process.
**Q. So could you describe what is going on at Rick's currently?**
A. I would say that is predominantly active composting.
**Q. So you are saying it's in windrows that get turned occasionally?**
A. I am saying that two thirds of the property inside the berm is all in windrows



and the rest is waiting to be put into windrows. And it will be turned when he is ready to spread it, dry it and take it over to Earthgro. And he may have to turn it six times in a week. There is a lot of variables between active and there is a lot of gray area between active and passive.
**Q. And are there Best Management Practices that are associated with active composting?**
A. I believe certain amount of height and it has to be on an impermeable surface or covered by a roof and isolation distances apply and a leachate collection system should be in place. There is probably several other managerial Best Management Practices that --
**Q. That would be required under the Mushroom Manual?**
A. Required or recommended.
**Q. But this plan does not include those requirements?**
A. No, ma'am. It would have to be updated.
**Q. So if the plan does not include those requirements is it possible to evaluate whether that particular activity is in**



**compliance with the manual?**
A. Yes.
**Q. And how would you do that?**
A. By going out and taking a look, make sure that his piles aren't over a certain height and knowing when he is going to turn it and when he is going to take it out.
**Q. And you would base that just strictly on the manual itself, not on what's in the plan?**
A. I would base that on the manual but, again, this would need to be revised to accommodate that.
If I have 80 farmers and one of them changes one detail of his operation, it's very hard for me to get to that one farmer if I already have 79 in line to get to first.
You know what I mean?
**Q. At the bottom of that page there is a requirement that, "Each mushroom farmer or other person who land applies wastewater must analyze the liquids to determine, at a minimum, their N-P-K content."**
A. Yes, and as of this point in time "N" is the only requirement.

Page 114

**Q. Well, that is not what it says here. It says N-P-K.**
A. That's -- it's in the manual, the "N" content. That's -- this is -- N-P-K is a courtesy to NRCS because they ask for N-P and K to be tested.
The manual only requires the "N" amount and nutrient management only requires an "N" amount. We do tests for all three though.
**Q. But the Mushroom Farm Environmental Management Plan that you developed for this facility --**
A. Uh-huh.
**Q. -- states that it must be tested for N, P and K, correct?**
A. Yes.
**Q. Has that been done?**
A. We took a water sample and gave it to the Health Department, Government Service Center, Environmental Health.
**Q. And when did that occur?**
A. You have to look at the date on that paper.

Page 115

* * *
(Inspection/Investigation Report, 1 page, was received and marked as Davis-5.)
* * *
BY MS. HUMMEL:
**Q. I asked the court reporter to mark this document as Davis Exhibit-5. Do you recognize that?**
A. Yes, ma'am.
**Q. Is that the water sample that you were just referring to?**
A. Yes, ma'am.
**Q. And what date was that, did that sampling occur?**
A. 1/23. It's either '00 or '01. I don't know what --
**Q. I think you are referring to the date of the report. If you look at the upper left it says date of sampling.**
A. 1/17/01.
**Q. Now, in the plan you indicate that this component was complied with in September -- August or September of 2000.**

Page 116

A. What page is that?
**Q. The bottom of page 8.**
A. 8 or 9.
**Q. Of 2000?**
A. Yes, ma'am.
**Q. What are you referring to there?**
A. Either NRCS took a sample or I had a delay with the water department.
**Q. Well, the date of sampling was January of 2001.**
A. Yes, ma'am.
**Q. So how would that be a delay with the water department?**
A. They weren't going to take it for them. I know sometimes it can take months or weeks until I can get something in there.
**Q. Do you conduct the sampling that's required in Mushroom Farm Environmental Management Plan for all mushroom operations?**
A. Some of them.
**Q. And how do you determine which ones?**
A. The ones with tanks that are going to do any application.
**Q. You do all the monitoring?**

Page 117

A. No, I would go out and take a sample if they are going to spray irrigate and give it to the health department and get the N-P-K together so they would have an idea what they are.
**Q. Is there any responsibility on the part of the operator themselves to conduct testing?**
A. I don't know.
**Q. Well, this requirement says, "Each mushroom farmer or other person who land applies wastewater must analyze liquids to determine --"**
A. If that's what it says, then that's what it means.
**Q. So that would suggest that they are responsible themselves for having testing done?**
A. Yes.
**Q. Did you ever inform Rick that he was required to --**
A. They have the option of asking --
**Q. -- required to conduct testing?**
A. They have the option to ask us to assist them in that and that's what we did. And if

Page 118

this is the date, then I would have to go through -- I don't know if I -- I would have to check in my journal to see because we can do in-house testing in our office which gives you a very general pH and N and I believe the phosphorous level but this would be the more advanced one.
So if I put the date there, I probably did a general test with the office and I would have to check my journal to make sure.
**Q. Did you look ever produce -- did you look at that journal in terms of --**
A. Yes.
**Q. -- our production requests?**
A. Yes, ma'am.
**Q. Because I do not recall there being any log book entries produced to us.**
A. That's because the original one was lost and the second one I haven't taken many notes but I know I have done this testing and I know I have done it in-house. So if it's in that journal, I can locate it.
**Q. Did you look at that journal though --**

Page 119

A. Yes, I did.
**Q. -- in response to our production request?**
A. Yes, I did.
**Q. And so if it wasn't produced then, it's likely there was no entry relating to this?**
A. What do you mean entry?
**Q. If you didn't produce anything from your journal, --**
A. Yes, ma'am.
**Q. -- then chances are there are no entries if your journal relating to this facility?**
A. If there is, this one is in there. No chances about it. If I said I did it, I did it. I did an in-house testing and it would be written in my journal. With a journal that has got 500 pages in it, you don't find everything every time.
**Q. So then you are going to go back and look at your journal again?**
A. I sure will.
**Q. And if you identify any entries relating to this facility that you missed before, --**
A. Yes, ma'am.
**Q. -- then you will produce them to us?**

Page 120

A. Absolutely.
**Q. On page 9, if you go down to the row that says, Application Rate.**
A. Okay.
**Q. It says that, "A match will be made between the nutrient contents of the wastewater and the needs of the vegetation in the application areas."**
A. Yes, ma'am.
**Q. Again, this indicates that this was done in August or September of 2000?**
A. Yes, ma'am.
**Q. What specifically are you referring to that was completed at that point?**
A. Well, the testing must have been completed in our office and the plants were already planted, the grasses that were recommended and the plants that are recommended would far exceed the N-P-K that is being applied on them.
**Q. And who made that determination?**
A. NRCS.
**Q. So you yourself did not make the determination of what the --**

Page 121

A. No.
**Q. -- application rate should be?**
A. No, I didn't but at this point in time I could. I could get the agronomy guy in there and verify that these plants will absorb N-P-K at an incredible rate as opposed to, you know, they are going to far exceed the N-P-K requirement.
**Q. And how would you make that determination?**
A. By using a Penn State Agronomy Guide.
**Q. And what would you look for in the agronomy guide?**
A. Each grass that is being planted, the number of acres, the amount of nitrogen being absorbed by the plants.
**Q. And does that require harvesting and removal of the material?**
A. Yes, it does unless the soil stinks and you can't put any compost on it, then we would ask for a residual amount to be left.
**Q. I am sorry. I didn't follow what you meant there.**
A. If the soil is very poor, we like to

increase the organic matter in it so we would want to incorporate a certain amount of compost in the ground to give the plants essential nutrients above and beyond what they are even getting from the spray because you can't grow plants on clay.

If it's still very much of a clay base as there is at Rick's Mushroom Service, then we would say, leave some of the material as we call it residue, leftover cuttings, to cut down on soil erosion and provide organic matter to be absorbed by the plants in the following years to come.

**Q. So you are saying that the soil material and the spray fields at Rick's is -- has a high clay content?**

A. Yes, ma'am.

**Q. And what does that do to the spray process?**

A. Well, if there is too much, it could cause runoff. That's why we increase the development of various plants in there to create a sod and sod would cut down on runoff and increase absorption.



**Q. So if it's high clay -- you said if it's high clay content, it could increase runoff?**

A. It could increase runoff, yes.

**Q. And what would you need to do to compensate for that?**

A. Add additional buffers and grass waterways to ensure that if anything would make it from the spray, it would get filtered out in one of the adjacent areas.

**Q. Have you ever observed discharges occurring --**

A. No.

**Q. -- at Rick's?**

A. No, ma'am.

**Q. Have you ever tested any -- done any testing at Rick's other than the sample that was --**

A. No, ma'am.

**Q. But the actual application rate that was developed for Rick's, NRCS developed, you didn't develop?**

A. I believe so, yes.

**Q. And how have you determined Rick's compliance with that application rate?**



A. Excellent.

**Q. I said how have you made that -- how have you determined whether he is complying with it, following it?**

A. Oh, he has records on the amount of times that he sprays and he knows not to spray within 24 hours of a rain event.

**Q. Do you know what the application rate is for Rick's Mushroom Service?**

A. I just know it's a 10 minute application.

**Q. And how was that determined?**

A. I think from the engineer.

**Q. So the engineer told you that it should be a 10 minute application period?**

A. Approximately 10 minutes.

**Q. Do you know anything else about the application rate?**

A. I know that we don't want it to run off the property.

**Q. I meant in terms of how it was developed or the particulars of the application rate for Rick's?**

A. There is a standard and specification designed by the Federal government, NRCS, that



would be used in this situation.

**Q. Developed for Rick's --**

A. Yes.

**Q. -- facility?**

A. Yes, ma'am.

**Q. Are you familiar with that document?**

A. I would say, yeah, I have a pretty good idea.

* * *

(Detailed Operation and Maintenance Requirements for Settling Basin, HDPE Lined Storage and Spray Field, 2 pages, was received and marked as Davis-6.)

* * *

(Whereupon, a discussion was held off the record.)

* * *

BY MS. HUMMEL:

**Q. I asked the court reporter to mark this as Davis Exhibit-6. When you mentioned the NRCS application rates developed for this property, is this the document you were referring to?**

Page 126

A. Yes, ma'am.
**Q. What is the application rate that they have developed?**
A. I would have to read it.
**Q. Well, is -- under number two, that last indented paragraph there, the last sentence says, "Maximum application is 2 inches per week less rainfall." Would that --**
A. Yes, ma'am.
**Q. And then if you turn to the second page, it seems to go through the process for how you would determine an application rate, but down at step four, again, it says, "Limit the application rate to no more than 2 inches per week less rainfall."**
A. Uh-huh.
**Q. And then you are supposed to adjust that for the bulleted items that are listed there?**
A. Yes, ma'am.
**Q. And so this 10 minutes that you talked about, is that what you were told was --**
A. Approximately 10 minutes is what I was told.
**Q. -- to apply for 10 minutes?**

Page 127

A. Yes, ma'am.
**Q. 10 minutes a day?**
A. Sometimes. Depending on the weather and conditions and how much rain we have had per week.
**Q. Okay. If you would exceed more than 10 minutes a day, what would be the impact?**
A. I don't know. It depends on the conditions.
**Q. What is the importance of the application rate? If you would exceed the application rate, what would be the consequence?**
A. It would depend on the conditions.
**Q. Well, the application rate is dependent upon conditions, so I assuming if you haven't complied with those conditions, what would the consequence be?**
A. There would be runoff but, again, it would depend on the conditions. The various types of sod out there were very powerful and can prevent runoff even probably up to 20 minutes or 30 minutes. But it's nice to put it in a safe range. It's better to put it in a safe range.

Page 128

**Q. When you say that the application rate is dependent upon conditions, what conditions are you referring to?**
A. The ones that are on the back of this page here. (Indicating.)
Also, again, as the sod becomes very thick and hardy, you could literally stand there, run it for 10 minutes, wait a couple hours, come back, hit it for another 10 minutes, wait a few hours and hit it again, especially if it's an airy or high and dry day, with a high pressure system moving through, you would be having huge quantities of evaporation as you are spraying. They are all kind of hard to account for but you do the best you can.
**Q. So how do you know if the facility is complying with all those requirements?**
A. Somebody would have to go there every day to see what the weather was and the operation and management comes down to the farmer.

* * *

(Application Rate Log, 7 pages, was received and marked as

Page 129

Davis-7.)

* * *

BY MS. HUMMEL:
**Q. I would ask the court reporter to mark this document as Davis Exhibit-7.**
**Have you ever seen this document?**
A. I have seen it inside the house, yes.
**Q. Could you describe what it is?**
A. An application sheet with the date, length of application, which side of the property, north or south.
**Q. And does that refer to the different -- are they the spray fields? There is a spray field on the north and a spray field on the south?**
A. Yes, ma'am.
**Q. Have you been there on any occasion when he has run the spray?**
A. Yes, ma'am.
**Q. Do you know approximately when?**
A. On multiple occasions.
**Q. And so there would be dates on here when you were -- when you witnessed what was**

Page 130

recorded on here and the spraying that took place?
A. Yes, ma'am.
Q. If you look down through here, you can see on numerous occasions the spray time exceeded 10 minutes.
A. Uh-huh.
Q. Sometimes up to, on the first page, 40 minutes. It varies, you know, from 10 to 40 minutes it looks like at different times. And there are multiple spray times on some days?
A. Uh-huh.
Q. Is this consistent with what the application rate would require?
A. Yes and no. It would depend on the conditions. If the conditions are appropriate, he could run it for a lot longer than 10 minutes, i.e., 30 minutes. Or three sets of 10 or two sets of 20, depending on the conditions and the weather.
Q. So to evaluate whether these applications are appropriate, you would need to know what the conditions are --
A. Yes, ma'am.

Page 131

Q. -- at the time of application?
A. Yeah, and how the grass stand was at that point in time.
Q. Is that information included on this chart?
A. No, ma'am.
Q. So is there any way to determine compliance from this chart?
A. It falls back to the farmer's operation and management.
Q. Right. But would there be any way for you to determine compliance based on this chart?
A. Only on the occasions that I was present. And that would go for any farmer.
Q. Turn to the last page of the Mushroom Farm Environment Management Plan. The last two items relate to record keeping, record keeping of material being given away, sold or taken away and records of material received.
A. Yes, ma'am.
Q. Have you ever reviewed these records for Rick's Mushroom Service?
A. I have seen them but I have never sat

Page 132

down and thoroughly reviewed his personal records.
Q. And what did you -- what records did you see?
A. Various trucking companies, various farmers and Scotts and Earthgro would be the receivers of the material.
Q. But did you see any records?
A. Yes, ma'am, I have seen them.
Q. And were these -- what type of records were they? Were they invoices? Were they --
A. Half of them were for any farmer that he is collecting from or unloading their houses and half of them would be for exporting of the material.
Q. But I'm trying to get you to describe what type of record it was. What -- how did he keep the record?
A. A sheet of paper with the person's name, date, location, who was getting it and where it was going.
Q. And there were individual sheets of paper for these different people?
A. Yes, ma'am.

Page 133

Q. So when you indicate on here on July of 2000 that he was compliant with these requirements, --
A. Yes, ma'am.
Q. -- you had reviewed the records?
A. I had seen his records prior -- yes, prior to this.
Q. Do you continue to check those records when you go out and conduct an inspection?
A. Occasionally.
Q. Can you estimate about how many times you have probably asked to see his records?
A. Three or four times a year.
Q. And on each of those occasions he had individual sheets of paper that indicated --
A. He has a book with all of this information on it.
Q. Of what comes in and what goes out?
A. Documents of material receiving and documents of material going out.

* * *

(Calendar, 2 pages, was received and marked as Davis-8.)

* * *

Page 134

BY MS. HUMMEL:
**Q. I have asked the court reporter to mark this document as Davis Exhibit-8.**
A. Yes.
**Q. Have you ever seen this before?**
A. Yes, ma'am.
**Q. Could you describe what it is.**
A. This looks like a general write-up of who he is going to work with each day and how many doubles he is going to do.
**Q. From looking at this document could you tell me which information is for people bringing material to the facility and which is for people taking material away?**
A. Well, any name that I recognize as a mushroom farmer, I would automatically know that he is taking it from a house.
Foreign names to me that have nothing to do with the mushroom industry other than trucking would probably be under a truck name. These all appear to be incoming from the people that I can see.
**Q. Is this what you looked at when you checked his records?**

Page 135

A. I have seen this and I've seen other records also.
**Q. And what were the other records that you saw?**
A. It's a yearly packet for each year and then an overall book, it's like a green book that has an accumulation amount in there.
**Q. He keeps records of the total that he has accumulated over the year?**
A. Yes, ma'am. He's probably got one of the best record keeping I have seen out of the farmers.
**Q. Why is it important? What is the significance of these records?**
A. I don't know.
**Q. So you don't know why this requirement is in the Mushroom Farm Environmental Management Plan?**
A. I would guess to keep track of where all the compost is going and who is responsible for it.
**Q. Well, if you note in the next to the last box it requires the operator to maintain records of the date, volume and identity of**

Page 136

**the person taking the waste, a brief description of the proposed use and a description of the coproduct use.**
A. You have two uses -- land application or topsoil.
**Q. Did the records that you saw indicate or provide that information?**
A. I don't recall.
* * *
(Photograph, 1 page, was received and marked as Davis-9.)
* * *
(Photograph, 1 page, was received and marked as Davis-10.)
* * *
(Photograph, 1 page, was received and marked as Davis-11.)
* * *
BY MS. HUMMEL:
**Q. I have asked the court reporter to mark three photographs as exhibits -- Davis Exhibit-9, 10 and 11.**
**Looking at Davis-9 first, do you know what this is?**

Page 137

A. It looks like a blue hose and possibly stormwater or dirty water. I don't know.
**Q. Do you recognize where the location is?**
A. I see a lined pond but I don't know what -- on what side or what area of the location.
**Q. This is Davis-10.**
A. Uh-huh. Yeah, that's Rick's. I can see it on here. Not on that one.
**Q. Did you observe this hose at the facility?**
A. No, ma'am.
**Q. Were you aware that he had used a hose at the facility?**
A. Yes, ma'am.
**Q. Here is the third one, too. It's the same.**
**Could you describe what it appears he was doing in -- if you go back to Exhibit-9, what it appears was going on in that photograph?**
MR. HOWELL: I would object as to just I think this is speculation.
A. I can't see what the hose is attached to so I honestly don't know.

Q. **Does it appear that anything came out of the end of the hose?**
A. Well, there is erosion below it but I can't tell if the hose is wet if it came out there.
Q. **Did you discuss this hose with Mr. Masha?**
A. We had discussed the fact that he had some hoses and the fearfulness of the pond overflowing that he could spray onto a grass field.
Q. **Through the hoses?**
A. If he needed to, yes. It would be considered an emergency release, considered by DEP as an emergency release.
Q. **He had discussed this with you?**
A. Yes, he had asked me about it.
Q. **And what specifically was he told?**
A. If the liner -- if it got -- if it looked like it was going to overspill, which I assured him that it would not, then DEP would be made -- contacted and an emergency release would be permitted.
Q. **Do you know when you had that conservation with him?**



A. No, ma'am.
Q. **Do you know if he ever used the hose?**
A. I believe he did. He sprayed it on a couple grass fields.

* * *

(Photograph, 1 page, was received and marked as Davis-12.)

* * *

(Photograph, 1 page, was received and marked as Davis-13.)

* * *

(Photograph, 1 page, was received and marked as Davis-14.)

* * *

(Photograph, 1 page, was received and marked as Davis-15.)

* * *

(Photograph, 1 page, was received and marked as Davis-16.)

* * *

(Photograph, 1 page, was received and marked as Davis-17.)

* * *

(Photograph, 1 page, was



received and marked as Davis-18.)

* * *

(Photograph, 1 page, was received and marked as Davis-19.)

* * *

(Photograph, 1 page, was received and marked as Davis-20.)

* * *

(Photograph, 1 page, was received and marked as Davis-21.)

* * *

(Photograph, 1 page, was received and marked as Davis-22.)

* * *

(Photograph, 1 page, was received and marked as Davis-23.)

* * *

(Photograph, 1 page, was received and marked as Davis-24.)

* * *

BY MS. HUMMEL:
Q. **Do you know if Mr. Masha was issued a Notice of Violation from the Department of Environmental Protection for having that hose?**



A. I think he did.
Q. **And --**
A. I don't know if it was actually because of the hose.
Q. **And did you help -- did you actually help to prepare a response to DEP for Mr. Masha concerning that hose?**
A. I believe I did. There were several issues addressed at that period of time.
Q. **And at that time did you tell them that the hose would be removed and, in fact, the condition that you just said would be imposed that he would only be allowed to spray if given permission from DEP?**
A. Say that again.
Q. **Do you recall what you said in your response?**
A. That he would only be allowed to spray with the permission of DEP? Do you mean --
Q. **What you just said before.**
A. Through the hose or through the spray irrigation system?
Q. **Through the spray irrigation.**
A. I don't remember saying only through the

spray irrigation system.

* * *

(Letter dated 3/27/01, 1 page, was received and marked as Davis-25.)

* * *

BY MS. HUMMEL:

**Q. I have asked the court reporter to mark this as Davis Exhibit-25. She had already marked the photos and we are going to go to them in a minute.**

A. Yes. Here it says he must run it through the spray irrigation system prior. I did not say -- I didn't say that prior to.

**Q. So you recognize this document?**

A. Yes, ma'am.

**Q. And what is this?**

A. This is a response for Rick's Mushroom Service for, I believe, a Notice of Violation issued by the Department of Environmental Protection.

**Q. And you said the blue hoses were removed?**

A. Yes, ma'am.

**Q. And that in the future he would be able to spray through the spray irrigation system?**



A. With contact through DEP.

**Q. Right. So based on that was there ever approval for him to use the blue hoses?**

A. Only if the pond was going to overflow, because if a pond overflows, you jeopardize structural integrity if it's that close to the lip.

**Q. And who -- so you had authorized that use? I mean, DEP came out and did an inspection, correct, and saw the blue hose and issued a Notice of Violation because of the hose?**

A. Yes, ma'am.

**Q. So it would appear that DEP did not approve of the use of that hose?**

A. Unless he had called them in advance.

**Q. Well, if they had done that, would they have issued a Notice of Violation to him for use of the hose?**

A. Yes.

**Q. If he had called in advance and asked to use the hose --**

A. Yes, ma'am.

**Q. -- and DEP said he could --**



A. Yes.

**Q. -- then they would have issued him a Notice of Violation?**

A. No, ma'am.

**Q. So the fact that they issued him a Notice of Violation would suggest that he had not asked permission to use the hose from DEP?**

A. That is what it would suggest.

**Q. I just have a group of -- these are photographs that the conservation district had produced and --**

A. Uh-huh.

**Q. -- I just wanted to run through them quickly, if you could, if you can, just describe what the photographs are.**

**The first one has been marked Davis Exhibit-12.**

A. Windrow compost.

**Q. Is this at the Rick's Mushroom Service facility?**

A. Yes, ma'am.

**Q. And do you know why this picture was taken?**

A. Because the windrows were in place.



**Q. Do you know approximately when it was taken?**

A. No, I honestly don't know.

**Q. This says Davis Exhibit-13.**

A. Yes.

**Q. Could you describe what this photo is?**

A. Yes, Risk's Mushroom Service with an access lane to the pump out station.

**Q. I'm sorry. To a what?**

A. To a pump out station.

**Q. What are you referring to?**

A. In one of these pictures there will be a blue hose attached to a pump out station. If a tanker would need to remove water or if he wanted to cut down on dust within the bermed area.

**Q. And I am sorry, what was this photo of specifically then?**

A. Rick's Mushroom Service.

**Q. But I don't see the pump station in here. Was there something in particular -- something in particular that was being photographed here?**

A. Just the access road and an overall

Page 146

picture.
**Q. Okay. Did you take this photo?**
A. Yes, I did.
**Q. Had you taken the previous one, too?**
A. Yes, I believe I did.
**Q. Do you know approximately when this was taken?**
A. No, ma'am, I do not know.
**Q. Here is Davis Exhibit-14. Is this the blue hose or what you had just mentioned, the pump out station?**
A. Yes, ma'am.
**Q. Could you describe what that is?**
A. That's an area where you could pull a tanker in and unload water out of the HDPE lined pond.
**Q. So there is a line that goes underground down to the pond?**
A. It's attached to the spray irrigation stem.
**Q. Do you know approximately where?**
A. Yeah, at the far end of the corner. (Indicating.) The road is right here. (Indicating.)

Page 147

**Q. Could you just go ahead and mark that on there.**
A. You have a spray line here.
**Q. Right.**
A. And a road that accesses like this and then we have a line over here with the hose right there. (Indicating.)
**Q. So you have labeled that as a hose?**
A. Yeah.
**Q. Can you date and initial that on Exhibit-1?**
A. Yes. We have A, C -- A, B, C. I will make this D.
**Q. Well, you have it labeled hose. That's fine.**
A. Yeah.
**Q. When was this installed?**
A. I don't remember. Last year. I honestly don't remember.
**Q. Do you have any way of checking when this was installed?**
A. I would have to -- if Rick has an invoice, that would be the best way to find out when he installed that.

Page 148

**Q. Was this part of his conservation plan?**
A. No, this is above and beyond his conservation plan.
**Q. And why was this installed?**
A. He had personal fears of the pond getting too full and he wanted to be able to remove water if he had to by tanker or spray down the dust or spray it back on to the compost to leach through it.
**Q. So that's the only time that this is to be used is if he is to put wastewater in a tanker truck or to keep dust down in the storage area?**
A. Yes, ma'am.
**Q. It's not to be used to pump water anywhere in this area up above the storage area?**
A. You mean like in this grass area over here?
**Q. Yes.**
A. I don't know. I mean, it's grass if he wants to spray a little on there, it is not going to hurt anything.
**Q. Are you aware if he has ever used this -- this hose, this system?**
A. Yes.
**Q. He has used it?**
A. Uh-huh.
**Q. Do you know when?**
A. I know he's used it several times to keep the dust down and to spray back through his compost in the last several months since he put it in.
**Q. So he has just put it in within the last several months?**
A. I would guess that.
**Q. Has he ever -- do you know if he has ever actually pumped it into a tanker truck to haul wastewater off site?**
A. I do not know. I don't think he has. He likes to have the option.
**Q. This is Exhibit-15.**
A. Uh-huh.
**Q. Is that the same system --**
A. Yes, ma'am.
**Q. -- that we just described, that being the hose?**
**Here's Exhibit-16. Would you**

Page 149

Page 150

describe what that is?
A. That would be the observation well and we were looking for any type of leachate or wet material to come out that pipe.
Q. And it's -- there is a shovel there with what appears to be soil on it? Was that material --
A. Dried dirt.
Q. Was that in the pipe?
A. That was at the edge of the pipe, yes.
Q. And why would have that material been there?
A. During excavation some soil would have made its way into the pipe.
Q. Is there any way of determining how much soil might have been washed into the pipe during excavation?
A. No idea. Probably not very much, enough to put a small layer down in the pipe.
Q. Was there any verification that the pipe was, in fact, open all the way up to the liner after construction?
A. That would be under NRCS inspection.
Q. So you weren't involved in anything along

Page 151

that line?
A. No, I was still very new at the job.
Q. Is this you in this photograph?
A. Yes, that was me, that was during the inspection.
Q. Was there anybody else there with you?
A. Mr. Jiles, I believe, was with me that day, I think.
Q. Do you know approximately when this was done? Just generally.
A. I don't know. Last fall.
Q. Was that the first time you had inspected this pipe?
A. The first time I had inspected it?
Q. Yes.
A. Yes, since it was installed. I looked at it -- I wasn't the inspector when it was installed but I had looked at it.
Q. Have you inspected it since then?
A. One time.
Q. Do you know approximately when that was?
A. A few months ago.
Q. This is Exhibit-17.
A. Uh-huh.

Page 152

Q. Could you describe what this photo shows?
A. This photo shows that there is not SMS in the stream. It has normal algae build up and the detritus from leaf matter, it's organic matter.
Q. Is that you in the photograph?
A. Yes, ma'am.
Q. And what exactly were you doing?
A. Looking for SMS runoff or any build up in the stream below the HDPE lined pond.
Q. And how would you have determined that with the shovel?
A. I would have scraped off some SMS from the embankment there or off the top of the water because it has peat moss and it would float as opposed to just being an algae bloom.
Q. And were you -- would you have been able to detect whether there was wastewater runoff?
A. Visually, yes.
Q. How?
A. I would have seen it run in to the stream.
Q. If it had been occurring at that time?
A. Yes.

Page 153

Q. If runoff had occurred previously, would there be any way to detect that?
A. Only if there was sediment left over or built up along the stream corridor.
Q. Do you know when this was done?
A. Same time this picture was taken. (Indicating.)
Q. That the pipe was --
A. Yeah, last fall, I would estimate.
Q. Did you take a water sample?
A. That day, no, I did not.
Q. Have you ever taken a water sample?
A. From the stream, no. DEP took care of that. They were the ones that wanted to take the water sample.
Q. Was that the same day?
A. I believe it was a week later that they took their sample. I am not 100 percent on that.
Q. Do you know how frequently DEP has sampled the facility?
A. No, ma'am.
Q. Do you have any idea how many samples they would have collected from out there?

Page 154

A. No, ma'am.
**Q. But you are aware in that one instance that they did take a water sample?**
A. Yes, because I had offered and the lab wouldn't do it for three weeks so they said we will take care of it.
**Q. And this was in the fall?**
A. I believe so.
**Q. How often do you expect that DEP has taken water samples?**
A. I have no idea.
**Q. If they had taken a water sample, would they have provided you with the results?**
A. If I requested it.
**Q. So as a matter of routine, they don't provide you with water samples when they inspect a facility?**
A. I don't believe so. Only if there would be problem or an issue to deal with.
**Q. This is Exhibit-18. Could you describe what that is.**
A. That appears to be a two foot slope but the picture doesn't show a very good angle there. And, again, we were looking for

Page 155

sediment build up. When I say sediment, I mean SMS, spent mushroom substrate accumulation on the embankments, any type of peat moss or left over compost.
**Q. Is this in the same area where you were looking at the water?**
A. Yes. This is even further downstream.
**Q. This is downstream of Rick's Mushroom Service?**
A. Yes, ma'am.
**Q. What were you measuring here?**
A. I was showing the length of the slope but the picture doesn't show that there is a slope on an angle.
**Q. Is this an area where the runoff from Rick's Mushroom Service would enter the stream?**
A. Say that again.
**Q. Runoff that occurs from the facility --**
A. If this --
**Q. -- is this the area where it would enter the stream?**
A. If there was runoff, I would anticipate finding spent mushroom substrate accumulation

Page 156

on these embankments.
**Q. Did you mark in any way this location in the fields --**
A. No, ma'am.
**Q. -- when you were there?**
A. No.
**Q. And this was, again, back in the fall when you did the other --**
A. Yes, ma'am.
**Q. What prompted this activity back in the fall?**
A. Annual inspections, just regular inspections.
**Q. Did you have a written report of this inspection?**
A. No, ma'am, I do not.
**Q. Does NRCS have a report of this inspection?**
A. I don't know. I honestly don't know. DEP might.
**Q. So DEP was there at the time when you did this inspection?**
A. I know Lester was with me. I don't recall. So I guess they wouldn't.

Page 157

**Q. You don't recall anybody from DEP being there when you were doing this?**
A. No. I remember I was with Steve a couple weeks after that but I don't think he was with me that day. If anybody would have been with me, it would have been Steve Piller from DEP but I don't think that he was with me that day. I know Lester Jiles was with me.
**Q. This is Exhibit-19.**
A. Yes.
**Q. Could you describe what is in this photograph.**
A. Just clean water flowing down the stream.
**Q. And is this in the same location as the other photograph of the stream?**
A. This is about 10 feet down the stream.
**Q. Was there any particular thing that you were photographing?**
A. Looking for any type of residual compost or any trails of leachate running through the water.
**Q. Was it raining the day you were there?**
A. Yes, it was. It was a light rain that day.

Page 158

Q. And -- but you don't have any records of what date this was?
A. No, ma'am.
Q. It was a light rain?
A. Yes.
Q. I have given you Exhibit-20. Can you describe what this photograph is.
A. That appears to be a temporary settling basin at the west end of Rick's property.
Q. Is this the structure you mentioned that was present at the facility the first time that you went out there?
A. Yes, ma'am. I believe the reason I took this picture is because it had been cleaned out and it had just been cleaned out a couple days prior.
Q. Do you know approximately when that occurred?
A. No, ma'am, I don't.
Q. This is Exhibit-21.
A. Uh-huh.
Q. Do you know -- Exhibit-21 do you know what this is?
A. This would be probably a couple hundred

Page 159

feet to the east of the settling basin of the area where he had removed the compost.
Q. So you were just showing the general area?
A. Yeah, I am showing preexisting conditions prior to implementation.
Q. The buildings in the background there --
A. Uh-huh.
Q. -- can you -- do you know what those are? I am just trying to orient myself in terms of the direction.
A. They are the trailers on Mike Pia's property.
Q. This is Exhibit-22. Could you describe what is in that photograph?
A. That is a temporary settling basin and it appears that excavation has begun for the HDPE lined pond.
Q. Was the HDPE lined pond constructed in the same location as where the temporary settling basin had been?
A. I believe a portion of it was just above it.
Q. So you believe this is when construction

Page 160

had started on the lined pond?
A. Yes, ma'am.
Q. Are you familiar with how that temporary structure functioned?
A. At that point in time? No, I was not.
Do I have an idea how they work nowadays? Yes.
Did I then? No.
Q. Can you explain how you think it worked?
A. That would be sized to catch a certain size storm. It has a riser pipe that's that black corrugated perforated pipe. There is a certain amount of retention in that bermed area or the pond itself. The water is retained, solids are settled and if the water reaches a certain height, it will be discharged.
Q. And the purpose of that structure, what would the purpose be?
A. Prevent the runoff from the operation.
Q. This is Exhibit-23. Could you describe what is in this photograph.
A. These appear to be grade stakes that were placed during the survey for the contractor to

Page 161

know where to dig and how deep to dig and there is some excavated dirt in the background there.
Q. And when you say excavation, are you referring to for the lined impoundment?
A. Yes, ma'am.
Q. The last one is Exhibit-24.
A. I was bummed. It rained that day and it made the camera get all funky.
Q. And what is this a photograph of?
A. This is the incoming pipe, the outlet from the settling basin into the HDPE lined facility.
Q. You are referring to the -- I don't know exactly what color it is -- it looks like greenish whitish pipe there on the side?
A. Uh-huh.
Q. It appears that there's some small pipe or structure in the bottom of the pond just to the right of the stake in the photograph.
A. I don't know whether that was to hold the liner in place or if that was the actual suction pipe for the pump system.
Q. So there is a suction pipe that comes up

Page 162

into the bottom of the pond --
A. Yes.
Q. -- that goes up into the pump?
A. Yes.
Q. Have you -- are you aware whether any of the representatives from NRCS or Steve Piller or anybody from the Department of Environmental Protection has received any compensation from Richard Masha or Mike Cutone for any of the work that they have provided this facility?
A. Say that again.
Q. Are you aware of whether anyone has received any compensation, any of the government officials that have been providing services to Rick's Mushroom Service, whether they have received any type of compensation?
A. Like bribery or something?
Q. Any type of compensation --
A. No, ma'am.
Q. -- at all?
A. No.
Q. Have you received any type of compensation --

Page 163

A. No, ma'am.
Q. -- from Rich Masha or Michael Cutone?
A. No, ma'am.
Q. Have you ever received any lunches or anything like that from them?
A. No, ma'am.
Q. Are you aware of whether Steve Piller or anyone else from the Department of Environmental Protection has received any such gifts or lunches or --
A. Never with me present. I have no idea.
Q. Are you aware of whether anybody from the NRCS has ever received any gifts or lunches or anything --
A. No.
Q. -- from Richard Masha or Mike Cutone?
A. No, ma'am.
Q. Have you ever received any gifts or lunches or any other thing from Richard Masha or Michael Cutone?
A. No, ma'am.
Q. Have you ever received any complaints regarding the Reynolds' property?
A. The Reynolds' property?

Page 164

Q. The Reynolds' farm.
A. I don't believe so, no.
MS. HUMMEL: That's all the questions I have.
MR. BURCAT: We have a couple more questions for you.
MS. HUMMEL: Just a couple of follow-up questions.
THE WITNESS: No problem.
BY MS. HUMMEL:
Q. You had mentioned in the beginning that you had a Bachelor of Science Degree from Shippensburg.
A. Yes, ma'am.
Q. What was the subject that you had studied?
A. Geoenvironmental studies.
Q. A number of times during the deposition you referred to this NRCS form, the Con-006.
A. Yes, ma'am.
Q. Could you describe what this form is.
A. It would be a form to take notes on site visits or inspections.
Q. This is an NRCS form?

Page 165

A. Yes, ma'am.
Q. Does the Mushroom Farm Environmental Management Plan apply to the south side of the property where the south spray field is located?
A. Yes. The whole -- everything that they own on that property, yes, ma'am.
Q. Who paid for the structures that were implemented at the facility under the Mushroom Farm Environmental Management Plan?
A. I believe PL566 and the land owners.
Q. And what is PL566?
A. It's called Public Law 566. It's a cost share program.
Q. Is this a federal program?
A. Yes, ma'am.
Q. And they cost share for the --
A. For the Best Management Practices to be implemented.
Q. And it's your understanding that cost sharing was provided at Rick's Mushroom Service?
A. Yes, ma'am.
Q. Who paid for the development of the

Page 166

**Mushroom Farm Environmental Management Plan?**
A. I believe the taxpayers' money.
**Q. And what about the conservation plan?**
A. Again, taxpayers' money.
**Q. And was there a resource -- RMS, Resource Management System? Is that what was developed for Rick's Mushroom Service?**
A. Only if John Magagna wrote it.
**Q. You are not -- do you know if one has been developed?**
A. I have no idea.
**Q. Did Rick's Mushroom Service pay for the development of any of those plans, any portion of those plans?**
A. No, ma'am.
**Q. How often have you ever taken any water sample to check for water pollution at any site?**
A. Like the runoff water?
**Q. Yes.**
A. I don't believe I have.
**Q. Have you ever taken any other type of water sample?**
A. At culverts. When it's a direct

Page 167

discharge, I could take a sample at a culvert and hold it for a fishing boat if they would need it. That's the Fishing Boat Commission.
**Q. And how often have you done that?**
A. One time.
**Q. Were there any other samples that you would typically take?**
A. Just from a tank either to go to the health department or do some in-house testing.
**Q. You had indicated earlier that you thought there were approximately 150 mushroom operations in Chester County and that 65 Mushroom Farm Environmental Management Plans had been developed.**
A. Uh-huh.
**Q. So that would mean that there are 85 sites that do not have Mushroom Farm Environmental Management Plans?**
A. Very possible.
**Q. The Mushroom Manual requires Mushroom Farm Environmental Management Plans for these types of operation; is that correct?**
A. Yes, ma'am.

Page 168

**Q. So are there 85 sites in Chester County then that are not in compliance?**
A. It depends. I can't make that statement unless I've evaluated the site.
**Q. So --**
A. I have been to sites that already have a complete water system installed and don't let a drop leave their property. And I will go to the next guy and every ounce of water runs out of his property. So they might not have a plan but their system is fully in place and they have already implemented everything that would need to be implemented but I have yet to write a plan for them.
Does that make sense?
**Q. Well, I understand what you are saying, but does the Mushroom Manual actually require a Mushroom Farm Environmental Management Plan to be developed -- for these facilities to have a Mushroom Farm Environmental Management Plan?**
A. Yes, ma'am.
**Q. So to the extent they don't have plans, then they wouldn't be in compliance with the**

Page 169

**manual, would that be correct?**
A. Yes, ma'am.
**Q. The 150 operations that you had mentioned, does that include farmers who take spent mushroom substrate to spread it on their fields before they grow a crop?**
A. No.
**Q. So there would be a universe of farms that use spent mushroom substrate as well that is separate from that 150?**
A. Yes, I would say a handful.
**Q. Have you ever developed a Mushroom Farm Environmental Management Plan for that type of facility?**
A. Yes, ma'am.
**Q. So part of that 65 would include --**
A. Yes, ma'am.
**Q. Approximately how many of those have you developed?**
A. Four or five.
**Q. And approximately how many farms out there would you say are in the county that use spent mushroom substrate?**
A. I have no idea.