# EXHIBIT "E"

Cont'd

Page 170

Q. I mean, --
A. No idea.
Q. Can you --
A. I don't even know how many farms are in Chester County and southern Chester County.
Q. Do you know how many -- so you say you don't know how many farms are in Chester County?
A. (Nods in the negative.)
Q. Do you have any ballpark idea?
A. No, ma'am.
Q. Would you think that there were at least as many farms as there are mushroom facilities? I mean, you had estimated 150.
A. I have no idea. One farmer might have 3,000 acres and the next might have 50 acres. So I don't know. I honestly don't know.
Q. Would anybody have that information in your office?
A. Not in our office but possibly FSA could give you that kind of information.
Q. And who is that FSA?
A. Farm Service Agency.
Q. And why would they have that type of

Page 171

information?
A. They deal directly with farms and agriculture. It's a federal office so they would probably keep a better count than a county office would keep.
Q. Would NRCS have that information?
A. I don't know.
MS. HUMMEL: That's all the question I have.

* * *

EXAMINATION

* * *

BY MR. HOWELL:
Q. Good afternoon. You had stated earlier in your deposition that you were the mushroom farm resource conservationist, correct?
A. Yes.
Q. That part of your duty as a resource conservationist for mushroom farms was to examine the mushroom farms and mushroom waste treatment facilities like Rick Masha's property?
A. Yes, sir.
Q. What authority -- from what authority do

Page 172

you derive the ability to examine these farms?
A. Pennsylvania Department of Environmental Protection and the Chester County Conservation District.
Q. Have these two governmental agencies determined that you -- that the Chester County Conservation District and you as a representative of that district have the authority to examine the farms?
A. Yes.
Q. This authority that you have at -- under whose discretion does this authority lie to go out and examine the farms and see what is going on on the mushroom farms?
A. Pennsylvania Department of Environmental Protection, Water Quality Department.
Q. Is that a discretionary authority?
A. Can you elaborate?
Q. Under Pennsylvania law the Department of Environmental Protection is charged with examining these properties, correct?
A. Yes.
Q. Do you as an examination officer under these laws have discretion as to how certain

Page 173

laws are implemented on the properties, certain environmental laws?
A. They all have to be applied equally. Every farmer gets an equal -- you either work with us and don't pollute or if you are a polluter, we can't work with you. You have to hire your own consultant and deal with the DEP on those issues. It is at our discretion to prioritize sites from a serious site to a less serious site.
Q. I would like to turn your attention to the Mushroom Farm Environmental Management Plan --
A. Uh-huh.
Q. -- that was discussed earlier.
A. Uh-huh.
Q. In that plan -- on page 3 of that plan -- let me get that for you. Page 3 of that plan.
A. Uh-huh.
Q. There is a heading title, Requirement - Storage Pond/Storage of Wastewater in Impoundments.
A. Uh-huh.

Page 174

Q. Directly under that heading there is a bullet point that states, "Must have a valid permit from PADEP for storage of wastewater."
A. Yes, sir.
Q. Does the Rick Masha property have a valid permit for storage of wastewater from the PADEP?
A. No, sir.
Q. Why not?
A. They deemed it agricultural.
Q. Who deemed it agricultural?
A. Water Quality and Waste Management Departments of Pennsylvania Department of Environmental Protection.
Q. So within the DEP, within the DEP's discretion, determined that the Rick Masha property did not have to have a valid permit from the PADEP --
A. Yup.
Q. -- as required in the Mushroom Farm Environmental Management Plan?
A. Correct. They felt that the MFEMP in lieu of a permit.
Q. I am sorry. They felt that the MFEMP --

Page 175

A. Yes.
Q. -- would take the place of the permit?
A. Yes, sir.
Q. So, therefore, a permit was not required?
A. Yes.
Q. So then in essence the PADEP has used their discretionary authority in reference to the Rick Masha property --
A. Yes.
Q. -- for issuing permits?
A. Uh-huh.
Q. You had stated earlier that involvement with the Chester County Conservation District was on a voluntary basis --
A. Yes.
Q. -- by the mushroom farm waste treatment owners?
A. Yes.
Q. Correct?
A. Yes.
Q. If a waste treatment owner of a property similar to Rick Masha does not become involved with the Chester County Conservation District and is within Chester County, what would be

Page 176

the consequences to that owner?
A. DEP could cite them and force that they need a permit for the site and enforce that they need a system installed. They could go as far as saying you need to hire your own consultant. The district has too many cooperators. You must do this and you will need a permit because you have made no voluntary compliance. Or they could send an NOV like they have, I believe, to Rick's and several other sites and say, "Contact the district. You have 30 days to make contact."
And if they do so, then I call Steve Piller or Steve O'Neil and say Joe's Fertile Soil over here, he called me and got a Notice of Violation.
And they say great, when can you get out there.
And I will say, I'll see them by next Tuesday and then I start the process from there.
Q. Is Rick Masha -- you stated was one of the owners that was voluntarily involved in contacting the Chester County Conservation

Page 177

District?
A. Yes, he and Mike Cutone together. I believe Mike was the initiator and then when Rick came into play, he made contact. Mike said call these guys and they will help you do this.
Q. You also stated that several NOV's were issued on behalf of the Department of Environmental Protection against the RMS property, correct?
A. Yes.
Q. Are you the party responsible for notifying the Department of Environmental Protection that such NOV's were needed at times?
A. No, that was usually on behalf of DEP. The DEP would do an inspection and make contact with me by phone, E-mail, or I will get a copy of the letter within a couple days. Usually, it's a phone call saying, we were there. Here's the NOV. Do you guys have time to get to this person? Here's the problem.
Q. Have you ever noticed a violation on the

Page 178

**Rick Masha property that needed to be**
**corrected?**
A. According to the NOV's, yes. Such as he had a little bit of SMS falling over the berm, so it was cleaned up.
But I have never gotten one with a direct discharge or a discharge from runoff. It's always been an improvement of the grass standing or a recommendation or we want to inspect the berm. They were all the types of NOV's.
I would have to go through them to really refresh my memory on them.
**Q. Okay. When you informed Rick Masha or Mike Cutone of any deficiency in the property, --**
A. Uh-huh.
**Q. -- what did they do in response to the information you have given them?**
A. Either that day or within 24 hours they sign the sheet, the response sheet, and have somebody out there. Usually, I'd have the sheet and they'd sign it and I know they would have usually a local contractor or somebody

Page 179

small come in and fix whatever the problem was. Whether it would be with the backhoe or frontend loader or -- but they were very quick to reply. They were probably one of my best as far as getting to something and not saying, I will wait three days, as many have.
**Q. So you would classify their response as immediate --**
A. Yes.
**Q. -- for all problems encountered on the property --**
A. Yes.
**Q. -- that you were aware of?**
A. Yes.
**Q. You had stated earlier that there were only two approved sites for SMS.**
A. Yes.
**Q. You also stated that approval means that the MFEMP created for the site owner had been fully implemented?**
A. Yes.
**Q. But you had also stated earlier that the MFEMP's, there were a number of MFEMP's, implemented for other waste storage owners**

Page 180

**like the Rick Masha property, correct?**
A. Yes. The difference between -- Rick's is a larger -- Nutra Soil is a little larger than a private farmer that has his own composting pad. That's why they are considered the same but there is a slight difference there and they are the approved sites to bring it in and deliver it and set it, as opposed to a farmer that just has a small wharf in his backyard with a collection system and is just coming right out of his house and he's putting it right there for temporary. A lot of fine lines down there.
**Q. You had stated that Earthgro took the soil from Rick Masha's property and was located directly across the street from the Rick Masha property?**
A. Yeah, 100 yards up the street across the road.
**Q. Would Earthgro have a direct connection to Trout Run of Pennsylvania, a stream, lake or tributary to your knowledge?**
A. No, they are on the Red Clay which Trout Run is part of the White Clay, two separate

Page 181

watersheds.
**Q. Do they store soil compost?**
A. Soil, yes.
**Q. They do store soil?**
A. They probably have -- it's 11 stories tall.
**Q. And this is fully treated soil that they store?**
A. Yes, it's an all encompassing site that collects all the water.
**Q. So how do the responsibilities of the unapproved owners differ from that of the RMS property that is approved under the MFEMP?**
A. One follows the lines to the best of their ability -- follows the lines -- follows the laws to the best of their ability and the other one doesn't understand the laws so he does whatever he wants to.
**Q. Now, what would your office's response to the people who haven't fully implemented the MFEMP's be?**
A. You better get your ass in gear. Sorry.
**Q. So you would tell them to comply as quickly as possible?**

Page 182

A. Yeah. I would ask them -- I would go visit them and suggest that we make a move immediately to start cleaning up their mess to gain them as a cooperator for the conservation district and be willing to do what we ask them to do as fast as possible.
**Q. And if they did not comply?**
A. I would make a few attempts and if they did not comply, then it would go to DEP and DEP would have to deal with them in an enforcement fashion.
I hate to stop but I have to eat because I am starting to get dizzy. And I will start to get giddy and you all will want me to get out of here.
**Q. I realize you have a sugar deficiency.**
A. Yeah, I'm hypoglycemic, so my sugar level --
MR. BURCAT: You should have told us that. Let's take a short recess.
* * *
(Whereupon, a brief recess was taken.)

Page 183

* * *
BY MR. HOWELL:
**Q. When we last talked we were talking about the only two approved sites for the treatment of SMS under environmental management plans in Chester County --**
A. Yes.
**Q. -- through your office.**
A. Yes.
**Q. We stated that Rick's Mushroom Service is one of those sites.**
A. Yes.
**Q. Correct?**
A. Yes.
**Q. Are there any sites that are unapproved under environmental management plans where compost -- adjacent to or connecting to Trout Run, the Reynolds' farm property, the Reynolds' stream or any sites like that?**
A. That have compost on them?
**Q. That have compost or anything else.**
A. Warren Reynolds has two windrows on his property.
**Q. Windrows -- and we defined windrows**

Page 184

**earlier as lines of compost?**
A. Yes, sir, spent mushroom substrate.
**Q. We will get back to the Reynolds' property in a minute.**
**But other than the Reynolds' property are there other locations upstream that have connection with Trout Run that you know of not -- that are not mushroom waste facilities, but just --**
A. That would have storage on them or compost on them?
**Q. Might have compost or storage.**
A. The Bertrando property used to. They used to make casing out of the topsoil on that property. Strip off the topsoil, it was an older process that was used, where you stripped the topsoil off the property and used it as casing to grow mushrooms and then you bring the old compost and you mix it back in the soil, the subsoil, and let it break down for a couple years and then you strip it again and use it for casing another time and you could do that every two years if you would like to. They were the -- they are the only

Page 185

two places that I am aware of.
**Q. And where are the Bertrandos located in reference to the RMS property or the Warren Reynolds' property?**
A. The Bertrando property comes up between Calvarese, Ianieri and the Reynolds' property in here on the top of the hill. It's an odd shaped parcel. (Indicating.)
**Q. Where would runoff of any compost located on the Bertrando property flow towards?**
A. That would be between two watersheds so half would go towards the lake and half would go towards the Calvarese and Ianieri site from what I remember. (Indicating.)
**Q. You are indicating the Warren Reynolds' pond or lake.**
A. Yeah, the lake -- the pond, yeah.
**Q. If it's possible -- could you tell me any parties who may possibly contribute to the pollution of Trout Run, lake or stream?**
A. Possibly?
**Q. Possibly.**
A. Rick's Mushroom Service prior to the implementation of the MFEMP, the Bertrando

Page 186

site and that portion of Trout Run. They would be the only two.
**Q. Isn't it true that any party with a property located on Trout Run stream could conceivably contribute to the pollution of that stream?**
A. Absolutely, yes.
**Q. Why -- why would that be the case?**
A. Possible failure of septic systems, sewage runoff from septic systems, overflow sewage septic systems. If you dump your battery on the side of a hill and it leaches down, it could reach. I mean, there is a junkyard over there.
**Q. Where is that?**
A. It's called Bittenhofs, B-I-T-T-E-N-H-O-F-S.
**Q. Where would that be located?**
A. To the north of Rick's Mushroom Service.
**Q. Is it adjacent or connected to Rick's Mushroom Service?**
A. Adjacent.
**Q. Adjacent. So then in essence what you are saying is even residential property owners**

Page 187

**that have properties located along Trout Run stream could contribute to pollution of the stream and the Reynolds' farm pond?**
A. Absolutely.
**Q. About how many years does it take for a pond to be -- a pond the size of the Reynolds pond to be fully polluted or contaminated as the Chester County Conservation District defines pollution?**
MR. BURCAT: Objection to the form of the question.
BY MR. BURCAT:
**Q. What standards are measured for pollution by the Chester County Conservation District? What standard do you use to determine whether pollution exists?**
A. Any runoff whatsoever, running into a stream, lake, tributary. That would be considered pollution. Soil is a pollution if it gets into a stream and is loose and free. That is considered erosion of the sediment and that can be considered pollution also.
**Q. Are you familiar with the size of the Reynolds' pond?**

Page 188

A. Pretty much so. I have a pretty good idea.
**Q. Do you know how deep the Reynolds' pond is?**
A. No, I do not.
**Q. We will get back to the Reynolds' pond. Let me ask you. You stated earlier that the timing for construction of the implementation of the sediment basin and the impoundment on the RMS property was done ASAP?**
A. Yes.
**Q. What did you mean by that?**
A. Usually we would give a farmer three to five years to completely implement a system like this. In this case I believe it was done as little as 9 to 12 months.
**Q. Who gives the farmers the opportunity, the three to five year window, to implement these sort of controls?**
A. NRCS.
**Q. And in the RMS property case how quickly were controls implemented?**
A. I think that Rick's was completed within a years time.

Page 189

**Q. What was the motivation for completing Rick's within a years time if most other properties were given three to five years?**
A. It became a high priority site, one because of complaints from the Reynolds' property and this site has been there for over 50 years. So when somebody did take the opportunity to contact the district and said, I would like to clean it up, I can say we were as ready to work with them as they were with us. So like you know it's there and you are waiting for something -- and once it started to happen, we wanted to get it done as fast as possible but the complaints really kept us moving at top speed as fast as we could.
And Mr. Masha had voiced concern just to appease his neighbor. And when I first went out there he just said, I don't know what you want to do but teach me how to do it. I'm not looking to pollute the stream, so tell me what you want me to do out here, just educate me.
**Q. Who were the -- who did you receive complaints from about the RMS property?**

Page 190

A. I believe Warren Reynolds was the --
**Q. Any other party that you are aware of?**
A. No, sir.
**Q. How often did -- withdrawn.**
**Earlier you had referenced that there was some sort of a five acre rule in reference to the mushroom treatment facilities in the Best Practices for Environmental Protection of the Mushroom Farm Community Manual, --**
A. Yes.
**Q. -- correct?**
A. Yes.
**Q. And earlier you had stated that you were unable to locate where that provision exists.**
A. Yes.
**Q. I would direct your attention to page 23, number six of the Mushroom Farm Environmental Management Manual.**
A. Would you like me to read it?
**Q. Please.**
A. "The SMS composting facility, excluding any areas used for storage of bagged product or bulk product under cover, cannot exceed

Page 191

5 acres in size. (Facilities of greater than 5 acres are not prohibited, but will be subject to additional requirements and review.)"
**Q. Is this the provision you were referencing earlier when you described the five acre limitation?**
A. Yes.
**Q. Thank you.**
**You had stated earlier that there was clay on the Reynolds -- or excuse me, on the Rick Masha property.**
A. Yes.
**Q. Where does this clay exist on that property, could you tell me?**
A. Clay -- that whole watershed is based on clay. The majority of all topsoil within southern Chester County has been scraped for peat moss for probably 80 years. So what you are left with, when you remove compost is usually a thin layer of topsoil with predominantly clay underneath. In which case we would recommend a small amount of SMS to be applied to a field and incorporated into the

Page 192

soil to stimulate organic matter for roots to grab a hold of and grow plants and different types of vegetation.
**Q. What effect does the clay have on any water that comes in contact with the clay?**
A. Clay is very absorbent with water but it can been very impermeable once it's saturated because it swells and it's cohesive between clay particles.
**Q. Okay. Controls are in place to prevent runoff --**
A. Yes.
**Q. -- on the Rick Masha property, correct?**
A. Yes.
**Q. What sort of controls are in place?**
A. There is a berm.
**Q. I am sorry. Besides the HDPE lined pond, --**
A. Outside.
**Q. -- the sediment basin, outside of those areas.**
A. Multiple types of grasses with various types of sod on the spray irrigation fields, heavily grassed waterways to control CFS,

Page 193

cubic feet per second of flow of stormwater. They also can add in the removal of nutrients and a buffer. And additional buffers were placed at Rick's Mushroom Service on the perimeter of the spray fields. There is an additional portion of grass so if anything would exceed it, it would reach in there and absorb it within the grass system of the sod that's present.
**Q. So you are saying that the different types of grass effectively absorb any runoff from the Rick's Mushroom Service property?**
A. Yes.
**Q. And who has decided that these grasses are effective in preventing a runoff?**
A. NRCS and Penn State.
**Q. Referenced earlier was a document listing the application of spray irrigation to the fields surrounding the Rick Masha property.**
A. Yes.
**Q. And reference was made to the fact that it was impossible to determine whether or not this was appropriate application to the fields. Do you remember -- do you recall?**

Page 194

A. Yes.
**Q. And it was stated that you would need to know the rainfall in order to decide whether or not this was appropriate application to the field. What is the method that the Chester County Conservation District endorses for determining what is a proper application to a field for spray irrigation of SMS?**
A. We would use the standard specification, I can't think what item it was, that NRCS provides for us to make that recommendation.
**Q. If it is possible to determine rainfall for each of the dates listed --**
A. Yeah.
**Q. -- or prior to or after the dates listed, would that then give a more accurate depiction as to the spray irrigation schedule?**
A. Yes.
**Q. So then you could determine accurately whether or not these were reasonable applications to the field surrounding the Rick Masha property?**
A. Yes. And I can verify some of the longer ones. If I am present and he runs the system

Page 195

for 10 minutes and stops and the moisture didn't even make it to the root system because the grass is so tall, to me it's obvious that he could run it for another 10 minutes and we have yet to even get to the ground.
To reach a saturated point in that sod, he might have to run it, you know, realistically an hour but, again, I wouldn't say -- you never go longer. You always go shorter. You always want to play it safe. But I have been there before and we ran it 10 minutes and not an ounce even touched the ground because the grass was so tall it grabbed it's and it's evaporating off the leaves and very much -- or very minimal amounts even made it to the root system.
**Q. On the sheet here 4/19/01 it was listed 40 minutes was the application time to the fields.**
A. Uh-huh.
**Q. Is that proof that Rick Masha was, in fact, running this spray irrigation of the fields in contravention of the Mushroom Farm Environmental Management Plan?**

Page 196

A. I don't think so.
**Q. You had said earlier that you were aware of the hose being used by Rick Masha on the Rick Masha property -- or excuse me, the connection of the hose to the spray irrigation system, correct, the blue hose referenced in the photographs?**
A. They are in the photos. I would have to look at them again but I didn't see the hose actually attached to anything.
**Q. Do you have proof of the use of the hose at any time?**
A. I have never seen it happen so I can't say that I have actual proof that he ran those hoses.
**Q. Do you know whether he used the hoses or not then?**
A. You would have to ask Rick.
**Q. You had mentioned earlier that you were aware of possible contamination of the Reynolds' farm property, --**
A. Uh-huh.
**Q. -- correct?**
A. Yes.

Page 197

**Q. Are you aware at all of compost stored or used or manure or anything else that would pollute a stream held on the Reynolds' farm property?**
A. Yes. The compost that's on his field and the composting operation that has occurred on that field for 10 years. The only reason I know that there is a 10 year agreement is that I have seen the contract provided by Nick Ianieri to Warren Reynolds and I have seen compost on the operation when we originally went to clean up the Calvarese-Ianieri site which is north of Rick's and east of the Reynolds' property.
As I am standing there working with the guys to clean up the site, I asked myself, "Why am I cleaning up this site when there is compost on the other property right down here and this guy is complaining about this guy's property?"
**Q. Be more specific when you are talking about the people. Who are you talking about? What -- could you say that again with labeling who we are talking about exactly.**

Page 198

A. I was with Nick Ianieri and Mario Calvarese and I am explaining to them we need to clean up this site. DEP is coming in. They want this --
**Q. I am sorry. Which site?**
A. The Calvarese-Ianieri site. And I am looking downstream, which is Warren Reynolds' property, his northern most field was covered in compost.
And Nick Ianieri says, "Well, that is a my compost --" because he has a very strong Italian accent. And he says, "That's mine. I am working with him. I am trying to clean it all up right now but he wants me to clean all this up right now." So he was trying to do two things at once.
**Q. Warren Reynolds wanted you to clean up the Rick Masha property?**
A. Warren Reynolds wanted the Calvarese property cleaned up.
**Q. I see.**
A. Because it was polluting his water.
**Q. I see.**
A. But he had compost on his property which

Page 199

made me confused as I am standing there looking -- but I was told to go clean up this site, so that was my --
**Q. But whom were you told to clean up the Calvarese property?**
A. The district and DEP.
**Q. Okay. Well, could you tell me -- could you tell me what -- did you have the opportunity to observe the Reynolds' property then in reference to the compost stored on that property?**
A. Yes.
**Q. Tell me what controls, if any, were present on the Reynolds' farm property to prevent the compost stored on the property from entering the Reynolds' pond or Trout Run?**
A. It would directly impact Trout Run because Trout Run runs through this property here, which is, I guess, Wilmington Trust and Reynolds. There is a swale between the fields and on the northern field, any leachate could possibly run, you would have to survey to see which way the water is going to go. But it can run and leaching can go either way

Page 200

underground so it can reach the tributary this way.
It has train tracks, excuse me, on this side and every train track has a six foot stone fill underneath it when they build train tracks so all water flows through that and then it could outlet just west of there on the other side of Penn Green Road where it would daylight.
**Q. The area indicated by you is that upstream or is that uphill or downhill from the Reynolds' farm pond?**
A. That's downhill.
**Q. It's downhill. So it would have to run upstream to go into the pond; is that what you are saying?**
A. No. This property did not directly effect the pond but it directly effected Trout Run.
**Q. And you are indicating the property where?**
A. Calvarese-Ianieri.
**Q. The north property?**
A. And Warren Reynolds' field over here.

Page 201

(Indicating.)
**Q. To the -- to the what -- northwest of the Warren Reynolds' property; --**
A. Yes.
**Q. -- would that be correct?**
A. Yes.
**Q. So what would directly effect Trout Run? What would be located uphill from Trout Run?**
A. That would split the watershed right there. When I say watershed, all water that lands here would flow in here towards the pond. (Indicating.)
**Q. Any water located -- any land located on the south side of the Warren Reynolds' property?**
A. Yes. On this side would all flow to the pond from this -- there is a -- the watershed is encompassed in a circle like this. (Indicating.) So anything here could run into the pond. Anything down here could run into Trout Run in this direction.
Does that make sense?
**Q. So from either side of the Warren Reynolds' property then there could be**

Page 202

**directions to contribute to Trout Run.**
**Let me ask you this. Do you know where Warren Reynolds received the compost he had on his property from?**
A. Well, I don't directly know who. I know he worked with Nick Ianieri and Nick Ianieri contracted that parcel of land for whatever payment, you know, down there they call it a gentleman's agreement but he is one of the first I have ever seen with a contract with somebody to compost on somebody's property.
Q. **Prior to the time Nick Ianieri contracted with Warren Reynolds was the property -- did the property ever store manure or compost at any time; do you know?**
A. Warren's father has a pamphlet called -- I can't think how it goes, An Ecological Blueprint for Tomorrow, which states and demonstrates that he had worked with Penn State directly to collect cow manure on this property and spray irrigate it year round each season with crop output, dissolved oxygen content and several other parameters. It's a public document that was published in the 70's

Page 203

or the late 60's.
Q. **What sort of business did he conduct on the Reynolds' farm property?**
A. I believe he was a dairy farmer and a crop grower or cash grain and dairy, that is how we would refer to it.
Q. **So that would imply that he had dairy cows on the property?**
A. Yes.
Q. **Would those cows produce manure?**
A. Absolutely.
Q. **And do you know what was done with the manure produced by those cows?**
A. It was mixed in a lagoon and spray irrigated year around on all fields of that property.
Q. **So the manure was directly applied to areas that would, in fact, leach into Trout Run?**
A. Very possibly, yes.
Q. **And it may have also been pushed directly into Trout Run by -- or the Reynolds' farm pond by Mr. Reynolds?**
A. Honestly, I don't think he could get to

Page 204

the pond because the pond sets so high. Unless he sprayed up on this side but I am not real familiar with this property. So if he had any fields up here, yes, it could infiltrate or, you know, overflow or infiltrate.
And anything downstream, absolutely, there is four or five small ponds down below. So any irrigation that's going -- or any irrigation that possibly could run off or cow manure.
And I don't know where the pastures where or things like that so that can be kind of ambiguous without seeing the layout of the property as to how it was functioning back then.
Q. **Have you ever been contacted by Warren Reynolds on a voluntary basis to help with any conservation or environmental treatments on his land?**
A. No.
Q. **Do you know of any agency that has been connected -- contacted by Mr. Reynolds?**
A. Not that I am aware of.

Page 205

Q. **If Mr. Masha wanted to acquire a permit, any sort of environmental permit for his land, issued by any governmental agency and the governmental agency refused to provide such a permit, would he still then be able to acquire such a permit?**
A. It would be entirely at their discretion, whatever the government agency is.
Q. **So you are saying Mr. Reynolds -- or Mr. Masha could acquire a permit?**
A. If the agency felt it was necessitated.
Q. **And if the agency didn't feel it was necessitated, could Mr. Masha then acquire a permit?**
A. It would be pretty hard.
Q. **Why is that?**
A. If they decided you don't need a permit for this operation, you know, it's just not necessitated then the office itself or the agency could deem it, as I said earlier, agricultural, because you don't need a permit because it's considered an agricultural site or you have an MFEMP in lieu of a permit so we are not going to necessitate a permit for

Page 206

that. It really decides up to the -- it really comes down to the agency and at their discretion.

**Q. In your opinion, in your official capacity for the Chester County Conservation District, what is the status of the Rick Masha property right now?**

A. Excellent, the best its ever been.

**Q. Why?**

A. Because that site has been a known pollution site for 50 years and the last four years, a complete collection system with a spray irrigation system has been designed and implemented to the fullest of the farmer's ability and of my ability.

Rick said to me the first time -- I said, "I am here to help you manage your system."

He said, excuse my French, "I am a shit farmer. I know nothing about this but if you educate me, I would run this the best I possibly can."

And he is one of the few guys that calls and asks me questions on a weekly

Page 207

basis. He is one of the few cooperators that call and say can you do a routine inspection. I want to know what I am doing and make sure I am not doing this wrong.

He has called me on several occasions this summer to come out and watch me run the spray irrigation system and walk the perimeter and I would walk it a couple times to make sure there was no runoff. I don't get that type of cooperation from too many farmers.

I think the site is 190 percent better than it was when I first walked down there. When I first walked down there, I got -- we know this is a problem. The guy who owned it just stacked it with compost. What can you do to help us?

And to me I thought that was a big step instead of just ignoring it and carrying on what has been going on for 50 years on that location. To see somebody do something in four years like that as opposed to 46 years of pollution, that is a pretty big difference to me. So I think it's running

Page 208

very well, very efficiently, and we haven't even had any rain, so it's really hard to spray the fields. It's hard to really get any pollution without enough rain to cause any kind of pollution.

**Q. Would there be any instances where an overflow of the pond may happen?**

A. Anything is possible. The world could blow up tomorrow. I mean, that's worst case scenario.

**Q. Well, let me ask this. Do any environmental agencies provide for the fact that at one time the pond may overflow?**

A. When the plan is written through NRCS in our office and the engineer designs a pond or a tank like this, automatically you accommodate the one in 25 year storm which is 5.6 inches in a 24-hour period. So we always give room on that pond as a courtesy measure. Here's an additional foot or two feet, whatever it takes to collect all that water. And that's the enforcement measurement that is used.

If you had two of them back to

Page 209

back, you try to catch them the best you can. But if you had six of them in a row, six days in a row, and your manure storage is floating down the stream, all the water is contaminated. When you get a flood three feet deep, everybody's septic system comes up and picks up in the water. So when you walk outside you are walking in the septic. That is the measurement, the one in 25 year storm that's accommodated.

**Q. So for stream flood conditions then governmental agencies provide that there is no -- there is a special exception for flood conditions of that magnitude?**

A. Yes.

**Q. And do you know what document, if any, states that this -- that these flood conditions may occur?**

A. It would be with DEP. They would have that standard. That is a standard that they would carry. I don't believe -- it is not in the Mushroom Manual but it is with DEP and that's NRCS courtesy to accommodate ponds and tanks with that number.

Page 210

Q. I realize this may be before you were employed but do you have any knowledge of any such flood conditions occurring on the Reynolds or the Rick Masha property?
A. The Floyd storm was the only one that I am aware of at least while I am alive. I have been to seven other tanks that day and four out of seven had overflowed. And you should have seen people's hair on the back of their neck stand up when we showed up and said there is no violation. Anything over one in 20 -- it was a one in a thousand year storm for that area, so sewage treatment facilities they overflow in a one in 25 year and they are not in violation. There is no illegal discharge for anything above that. That was the only one that I was aware of was Floyd.
Q. Hurricane Floyd then?
A. Yes.
Q. Do you know approximately what date Hurricane Floyd occurred?
A. No, I do not.
Q. Do you know who ordered the blue hose to be attached to the spray irrigation system? I

Page 211

am not sure if I asked you that or not.
A. No.
Q. To your knowledge has Rick Masha ever done anything in direct contravention of the edicts issued to him by any governmental agency, the directives given to him by any governmental agency associated with environmental protection of his land?
A. No, not that I'm aware of.
Q. He has never directly gone against anything they have said to do something else?
A. No.
Q. So let me ask this then. The Mushroom Farm Environmental Management Plan and the MFEMP, in your opinion are both of these documents strictly adhered to or to be followed or are they both discretionary?
A. They would be strictly if a farmer becomes a cooperator and has a plan, you want to follow it.
Q. You want to strictly follow both of these as the farmer?
A. Yes.
Q. In the government's -- in the

Page 212

government's eyes, may the government interpret these documents strictly or do they have a discretionary?
A. There is discretion used.
Q. So the government may interpret certain provisions of both --
A. Yes.
Q. -- that should be applied or should not be applied?
A. Yes and yes.
Q. Okay.
A. There could be some in there that because so many operations are so diverse and there is a lot of gray areas that are not even covered in that book as we become more educated so, yeah, there are some things that we say definitely do this and other things contradict, so you do not want to do them. And, again, that comes through the discretionary of our office, DEP and NRCS.
Q. Okay. You also stated that Rick's Mushroom had compost on the land when he first acquired use of the land, correct?
A. Yes.

Page 213

Q. Do you know from whom that compost was put on the land?
MR. BURCAT: I object to that question.
BY MR. HOWELL:
Q. Who put the compost on the land when -- before Rick acquired the property?
A. Joe Frezzo.
Q. And about how much was there when Rick acquired the property?
A. I would say approximately between 150,000 to 250,000 tons of SMS.
Q. Currently, do you know how much compost is on the property roughly?
A. Boy, I don't know off the top of my head. Maybe a 10th of that.
Q. One 10th of what was there --
A. Yeah.
Q. -- when Rick Masha first had use of the property?
A. Yes. It could be anywhere from 15 to 25,000 tons of it -- or thousand tons of it.
Did I say that right?
Q. Do you know how the compost is brought

**onto the Rick Masha property?**
A. At this point in time?
**Q. Yes. How is it delivered onto the property?**
A. By triaxle, an oversized dump truck.
**Q. Do you know how much compost each one of these triaxles holds?**
A. This is a real great question because they approximately hold if they are dry material, I think -- what does dry material come out to? 20 tons.
But if you take that same dried material and it rains while you are loading it on the truck you now have 40 tons. Or if it's raining really hard you'll have 60 tons. If it's old material, maybe it's very dense, maybe you will have 50 tons from the start. But if it starts to rain and your truck fills up, you now have 100 tons on the back of your truck.
And they have certain weight limits and capacities so they have to use their best judgement when they are loading them. And they are covered, tarped trucks, so



to try to prevent the water from getting in there. But it could take you 15 minutes to load a truck and if you're getting, you know, three inches of rain in that hour, well, you just picked up an inch of rain on top of the compost. Compost is super absorbent so you are doubling or tripling the weight if it's raining while you are doing it.
**Q. Okay. Let me ask you this. Do you know if the Chester County Conservation District considers the Reynolds' farm pond to be polluted as defined under Pennsylvania statutes?**
A. I don't believe we have ever evaluated it.
**Q. If it were, in fact, polluted do you know what entity would be responsible for such pollution or entities?**
A. Everybody in the watershed including Mr. Reynolds, including every development that has a settling basin where everybody's car battery leaks or they have antifreeze on the road and it goes to the settling basin.
MR. HOWELL: All right. No



further questions.
THE WITNESS: Can I ask a question?
MS. HUMMEL: Sure. Off the record.
* * *
(Whereupon, a discussion was held off the record.)
* * *
EXAMINATION
* * *
BY MS. HUMMEL:
**Q. Does Mr. Howell represent you?**
A. No.
**Q. Did you talk with Mr. Howell regarding your testimony here today?**
A. Not regarding my testimony.
**Q. Have you talked to him on other occasions?**
A. Yes.
**Q. And what did you talk about?**
A. Just the operation and management of Rick's Mushroom Service and a general idea of what BMP's have been installed out there.



**Q. So he was asking you what the operation at Rick's is like?**
A. Yes. Like what does he actually do there.
**Q. Anything else that you can recall?**
A. No. No.
**Q. So he was asking you about the operations that were going on at Rick's?**
A. Yes.
**Q. And, I am sorry, did you say something else in addition to that?**
A. Maintenance, management, his management style.
**Q. Okay. And was he asking you specifically what he does in terms of maintenance?**
A. It was a general -- does he do a decent job or, you know, kind of what is your opinion of the situation? What is your opinion of the site?
**Q. And how many times have you talked to Mr. Howell about this?**
A. A few times.
**Q. Do you know approximately -- a few is that two, three?**

A. Maybe three or four times.
**Q. And do you know approximately when these conversations took place?**
A. I would say after the suit had been filed, certain papers came to our office.
**Q. When was the most recent conversation you had with him?**
A. When we were in the field the one day when everybody was out there. We did a routine inspection. DEP came out and did a routine inspection. I think that was the day that we had conversed about what was going on.
**Q. Are you referring to the day that we did the inspection, that the plaintiffs did the inspection, site inspection at the facility?**
A. Yes, ma'am.
**Q. And why were you out there that day?**
A. General inspection.
**Q. Were you aware that we were going to be out there that day?**
A. Rick had mentioned it to us.
**Q. Did you ever make any measurements regarding the compost on the Reynolds' farm?**
A. No, I did not take personal measurements.



**Q. Did you ever take any water samples?**
A. No, I did not take water samples.
**Q. Did I understand you to say when you had the conversation with Mr. Calvarese that he was complaining because Warren was trying to get him to remove the material that was on Warren's field at the same time?**
A. Actually, it was Nick Ianieri.
**Q. I am sorry.**
A. And Nick was contracted with Warren and he was also contracted with the Calvarese family and he was to my -- from what I got from him, he wanted to clean that up first because it was a lesser amount but he was told he immediately had to go clean this up and he didn't even know if that material was ready to be sold and removed and excavated, so it didn't make any sense to him. He is a very old farmer and to him -- I have been doing this for 35 years. I don't know why I got to do it this way when I am used to doing it this way. And now all of a sudden I have got to come over here. I don't think he understood



the legal aspect of what was going on. He just knew that he had to go over and clean up this field and he wasn't quite prepared yet, I don't believe.
**Q. Why did you see the article written by Warren Reynolds' father?**
A. It's a public document. We have a copy of it in our office.
**Q. And why do you have a copy of it?**
A. I don't know why we have a copy of it. We have just a lot of agricultural literature. Benjamin Reynolds was one of the forefront runners in developing spray irrigation and it would be located with our spray irrigation information.

MS. HUMMEL: That's all the questions I have.

MR. HOWELL: Nothing further.

* * *

(Witness excused.)

* * *

(Whereupon, the examination concluded.)

* * *



INSTRUCTIONS TO WITNESS

Read your deposition carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any change in form or substance which has been noted on the following errata sheet, along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to the deposing attorney, KIMBERLY A. HUMMEL, ESQ. Promptly! Court rules require filing within 30 days after you receive the deposition.

ERRATA SHEET

PAGE LINE # CHANGE REASON THEREFOR



SIGNATURE PAGE
OF
JESSE W. DAVIS

I hereby acknowledge that I have read the aforegoing deposition, dated March 14, 2002, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

SIGNATURE: ____________________

WITNESSED BY: ____________________

DATE: ____________________



SANDRA E. ROSIEJKA, C.S.R.
Registered Professional Reporters
19 West Second Street
Media, Pennsylvania 19063
(610) 566-2011

March 28, 2002

Mr. Jesse W. Davis
529 West Marion Street
Lititz, Pennsylvania 17543

RE: Warren Reynolds, et al v.
Rick's Mushroom Service, et al

DOCKET NO. 01-CV-3773
DATE TAKEN: March 14, 2002
WITNESS: Jesse W. Davis

Dear Mr. Davis:

Signature of this transcript is required within 30 days of this notice. Since you did not order a copy of the transcript to be sent to you or counsel for your employer, it will be necessary for you to please call our office to arrange for an appointment to come to our office to read and sign the transcript of your deposition.

The original transcript, with original signature and errata pages, will be available in our office for 30 days, at which time if it has not been read or signed, they will then be forwarded to Ms. Hummel.

Please call if you have any questions. Thank you in advance for your cooperation.

Sincerely,

Sandra E. Rosiejka, C.S.R.



REPORTER'S CERTIFICATE

I, SANDRA E. ROSIEJKA, a Certified Shorthand Reporter, (State of New Jersey, License No. XI 00746), with offices in New Jersey and Pennsylvania, do hereby certify that the foregoing is a true, complete, and accurate transcript of the deposition of JESSE W. DAVIS who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am not related to or employed by any of the parties to the action in which this deposition was taken, or any attorney or counsel employed in this action, nor am I financially interested in this case.

SANDRA E. ROSIEJKA, C.S.R.
Certified Shorthand Reporter
Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)