# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
* * *

WARREN REYNOLDS, : Civil Action
JOHN REYNOLDS, : No. 01-CV-3773
through his Guardians, :
JACKLEN E. POWELL and :
WILMINGTON TRUST COMPANY, :
WILMINGTON TRUST COMPANY, :
as Trustee :
:
Plaintiffs :
:
vs. :
:
RICK'S MUSHROOM SERVICE, :
INC., M.A.Y. FARMS, INC., :
and RICHARD MASHA :
:
Defendants :

* * *
Media, Pennsylvania
Friday, March 15, 2002
* * *

Deposition of PETER JOHN VANDERSTAPPEN, taken pursuant to notice in the law offices of Kassab, Archbold and O'Brien, L.L.P., 214 North Jackson Street, Media, Pennsylvania 19063, on the above date, commencing at approximately 9:05 A.M., before Sandra E. Rosiejka, a Certified Shorthand Reporter and Notary Public.

APPEARANCES:

JOEL R. BURCAT, ESQUIRE
and
KIMBERLY A. HUMMEL, ESQUIRE
of Kirkpatrick and Lockhart, L.L.P.
Payne Shoemaker Building
240 North Third Street
Harrisburg, Pennsylvania 17101

Counsel for Plaintiffs

WILLIAM E. HOWELL, III, ESQUIRE
110 East State Street
Kennett Square, Pennsylvania 19348

Counsel for Defendants

* * *



INDEX


| WITNESS: | PAGE |
|---|---|
| PETER JOHN VANDERSTAPPEN | |
| BY: Ms. Hummel | 8, 171 |
| BY: Mr. Howell | 122, 173 |


* * *



EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Vanderstappen-1 | Photographs, 2 pages | 29 |
| Vanderstappen-2 | Long Term Contract for NRCS Cost Share Programs, 13 pages | 33 |
| Vanderstappen-3 | Application for Payment, 41 pages | 34 |
| Vanderstappen-4 | Sample Location Diagram, 1 page | 39 |
| Vanderstappen-5 | Drawing, 2 pages | 45 |
| Vanderstappen-6 | Agricultural Waste Storage and Collection System, 3 pages | 74 |
| Vanderstappen-7 | Document, NRCS 0029, 1 page | 85 |
| Vanderstappen-8 | Irrigation Field Layout, 4 pages | 106 |
| Vanderstappen-9 | Detailed Operation and Maintenance Requirements for Settling Basin, HDPE Lined Storage and Spray Field, 2 pages | 110 |
| Vanderstappen-10 | SMS Irrigation Field Sizing Table, 1 page | 110 |
| Vanderstappen-11 | Additional Conditions and Construction Notes, 2 pages | 137 |
| Vanderstappen-12 | Photograph, 1 page | 146 |


* * *



EXHIBITS (CONTINUED)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Vanderstappen-13 | Memorandum dated 11/19/99, 1 page | 157 |


* * *

Distribution of Exhibits:

Original exhibits attached to the original transcript; copies in all others.

* * *

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| (None) | | | | | |

Request for Production of Documents

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| 119 | 1 | 135 | 5 | | |

Stipulations

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| 7 | | | | | |

Question Marked

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|
| (None) | | | | | |



(It is hereby stipulated and agreed by and among counsel for the respective parties that the sealing, certification and filing are waived; and that all objections, except as to the form of the question, are reserved until the time of trial. The transcript will be read and signed by the witness.)

* * *

....PETER JOHN VANDERSTAPPEN, 820 Melody Lane, Lebanon, Pennsylvania 17046, having first been duly sworn, was examined and testified as follows:

* * *

THE REPORTER: Read and sign and usual stipulations?

MR. HOWELL: Sure. Yes. Usual stipulations.

MS. HUMMEL: Fine.

MR. BURCAT: Yes.

* * *

EXAMINATION

* * *

BY MS. HUMMEL:



Q. Could you state your name.

A. Pete Vanderstappen.

Q. My name is Kim Hummel. I am the attorney for the plaintiffs in the matter that has been captioned Warren Reynolds and others versus Rick's Mushroom Service and others.

Are you generally familiar with that litigation?

A. Yes.

Q. I am going to be asking you questions here this morning and the reporter is going to be taking down those questions and your answers, so it's important that you say all your answers verbally as opposed to nodding your head and that sort of thing --

A. Right. Correct.

Q. -- so that she can record the answer.

I'd also ask that you wait until I have completed the question that I am asking before you start to answer so, again, it just makes it easier for the reporter to get the questions and the answers down.

If at any time you don't understand a question that I have asked you,



just let me know, and I will try to clarify it. The same way if you find something that I have asked to be confusing and you don't understand, just let me know and I will try to, again, clarify that.

Would that be all right?

A. Yes, sounds good. I understand.

Q. If you don't ask any questions, I am going to assume that you did understand what I am asking and that the answer that you will be giving will be correct, accurate and honest.

You do understand that your testimony today is under oath?

A. Yes, I do.

Q. I suspect that during our discussions this morning there may be quite a few technical terms or acronyms and so I may be asking you to explain those. Again, just so that it's clear for the record what those things are from time to time. So even though I may understand what it is, the reason I am asking is just so it's clear for the record.

If you need a break at any time, just let me know and we can accommodate

**that. I would ask that you not ask to take a break if there is an outstanding question that you haven't answered. In other words, that you answer the question first and then take a break.**
**Is that everything --**
A. Everything sounds okay to me.
**Q. Are you under the influence of any medication or drugs this morning that would possibly influence your testimony?**
A. No.
**Q. Could you state the name of your employer for the record.**
A. National Resources Conservation Service.
**Q. What is your position there?**
A. My position is an agricultural engineer at the Lebanon Technical Center in Lebanon, Pennsylvania.
**Q. And what is the address there?**
A. 2120 Cornwall Road, Suite 4, Lebanon, PA.
**Q. And your home address.**
A. 820 Melody Lane, Lebanon, PA.
**Q. Have you ever testified at a deposition before?**



A. No.
**Q. Have you ever testified in court?**
A. No.
**Q. I would like to begin this morning by asking you a few questions just generally about the work you do and your responsibilities at the NRCS. Could you just describe generally what you do.**
A. Okay. As an engineer with NRCS at this location, I work with dairy farmers, dairy groups doing Best Management Practices. We deal with environmental concerns on dairy operations, hog operations, all kinds of farming aspects. We also deal with conservation on the land for diversions, waterways and different practices like that.
I also spend part of my time in providing training to other employees and other agencies. Those are my primary duties.
**Q. And you said you were an engineer?**
A. Correct. I am a Registered Professional Engineer in Pennsylvania.
**Q. And so, obviously, your educational background is in engineering?**



A. Right. I have a four year degree from Penn State. Graduated in '97 -- '77. Excuse me. 1977.
**Q. Did you specialize in any particular aspect of engineering?**
A. Soil and water.
**Q. Soil and water. And have you had any other types of training since that time?**
A. As an agency we do go to training courses all the time. I mean, over the years I have gone to many different training courses in the agency.
**Q. Have you ever been involved in designing wastewater treatment systems or anything along that line?**
A. What is your definition of wastewater -- as in sewer or in -- we do wastewater treatment or designs in agriculture, not in the sanitary or municipal or human waste type stuff. We don't deal in that stuff.
**Q. Okay. And you said that you deal primarily with dairy farmers and those kind of --**
A. Any kind of AG industry.



**Q. What area do you cover in Pennsylvania?**
A. My primary area is in southeast Pennsylvania with major emphasis in Chester, Perry, Lebanon, Dauphin counties. Those four counties are my prime counties that I do most of my work in.
**Q. What area does -- is covered by your office?**
A. We cover 17 counties in the whole southeast and we kind of divided the work load up but I primarily take care of four or five counties.
**Q. So there are other engineers in your office --**
A. We have several other engineers in the office.
**Q. So -- I am sorry. You said Chester County?**
A. Correct.
**Q. And what were the others again?**
A. Dauphin, Perry and Lebanon.
**Q. In Chester County what are the primary kinds of things you get involved with?**
A. Okay. My primary job in Chester County

Page 14

has been working on a PL566 which is a special land treatment watershed project that the NRCS and conservation district have worked together to get to this county and we work in the, I guess, it's Delaware -- not Delaware, Chesapeake Bay. It's a drainage area for the red and white clay and for the last five or six years we have been able to get $500,000 more or less of cost share money to work primarily on mushroom growers, mushroom operations, and I have been the lead engineer on doing those designs, formulating the designs, the plans, whatever.

**Q. Do you provide other services in Chester County outside of that?**

A. Yes. We also work in some dairy farmers that are not related to this particular program. We have other cost share programs that I deal with. And we also deal with some noncost share farms, too.

**Q. And then the other counties that you mentioned, what type of work do you primarily do there?**

A. Primarily in the other counties, dairy,

Page 15

AG waste type systems is most of my work. And we do have another watershed project in Lebanon County which we do a couple jobs there a year, too -- very similar, though.

**Q. Generally, about how much of your time would you say you spend working on the Chester County watershed project?**

A. I spend about 40 percent of my time on that.

**Q. Now, you work in what is referred to as the Lebanon area office; is that correct?**

A. They have changed the name as Lebanon Technical Office.

**Q. Okay. Lebanon Technical Office. Now, there is also an NRCS office in Chester County; is that correct?**

A. Yes, they have an office in West Chester at the County Municipal Building -- County Office Building Complex.

**Q. And what is the relationship between those two offices?**

A. That office has the -- is where the district conservationist is who is responsible for everything that goes on in the county.

Page 16

And my relationship with them is to provide technical assistance, engineering support for any of the work that they need engineering support on.

**Q. And so they would request you to come down and work on a particular project?**

A. Yes. They request I come down and work on a project.

**Q. And how is it determined when you would get involved and when you don't?**

A. It's, I guess, it's on an as needed basis. They come up with a -- several jobs to do and we take a look at the workload and see if I can schedule that workload in my time to do that. But I am required to take care of all the engineering workload we can in that county.

And if the workload is too much, then we prioritize who we are going to work on.

**Q. When you talk about engineering workload, could you explain what types of things that the engineers do versus things that other folks in the office do?**

Page 17

A. Engineering workload deals with going out and doing inventory and evaluations on different sites, trying to determine if there is a problem, a resource need or something that's out of skew that needs some work on it and we are the ones that make the technical determination as to what the solution is to that problem.

These guys in the office they might do more general planning, general conservation planning, general resource planning, versus engineering is more focused on the BMP's, Best Management Practices, that relate to some environmental issues, water runoff, whatever.

**Q. So is it mostly the structural type of practices then that you would get involved with?**

A. Yes, it would be structural practices. We do the surveying, test pits, anything related to coming up with a design for that particular site.

**Q. Just generally speaking, is there any particular types of practices that you spend,**

Page 18

**you know, more time on than others?**
A. Primarily the waste storage structures, barnyard runoff controls, filter areas, spray fields. That is the primary ones -- diversions, waterways.
**Q. And when you say waste storage structures, what kind of structure is that?**
A. A waste storage structure could either be an earthen lined, concrete lined facility. It could be a concrete tank. It could be an HDPE lined facility which is an earthen storage with a liner in it.
**Q. Could you state what HDPE is?**
A. HDPE stands for high density polyethylene.
**Q. And is there any type of waste storage structure that's more typical than another?**
A. The current prevalence is either concrete tanks or for the larger facilities due to economics would be the HDPE liner.
**Q. Now, did you design these kinds of structures for dairy operations, those type of operations --**
A. Yes.

Page 19

**Q. -- as well?**
A. Yes, both for dairy and the mushroom industry.
**Q. How frequently do you design those types of structures for those two different operations?**
A. I don't know what you mean by frequently but if I get involved in a situation where a dairy operation or a mushroom operation, typically, there is going to be some type of storage involved, whether it's a 500 gallon tank or a three million gallon HDPE liner. It varies all over the place.
**Q. In terms of the lined facility like the one that you were involved with, correct, at Rick's Mushroom Service?**
A. Correct.
**Q. Have you designed lined facilities like that for other types of operations?**
A. Yes, I have designed several other ones involving HDPE liners.
**Q. And what types of facilities were they?**
A. They all have been some sort of either dairy operation or hog operation.

Page 20

**Q. And in those dairy or hog operations what type of -- how did they deal with the waste that was stored in the structure?**
A. Typically, in the dairy operation, they would pump out and haul it to a field and spread it. And in the hog operation they may do some hauling and also they may take and pump it and irrigate it and land apply it through an irrigation system.
**Q. Do you know approximately how many of these waste storage structures you have designed?**
A. I couldn't really give you a fair number. I would guess for HDPE at least 10. For the other liners it could be 50, 100. I am not sure.
**Q. How long have you worked as an engineer for NRCS?**
A. I have worked for NRCS and SCS for 25 years, almost 26.
**Q. And has that been in the Lebanon Technical Center?**
A. I have been in the Lebanon Technical Center for -- since 1992.

Page 21

**Q. And where were you before that?**
A. Prior to '92 I was in State College from '84 to '92 as an area engineer doing very similar things to that.
**Q. And would that take you back to the beginning?**
A. If you want the complete resume, if that's what you are asking. I started in Virginia with NR -- the Soil Conservation Service in Culpeper. I was there for one year as a trainee engineer.
Then I went to Warsaw, Virginia for about three years as a shore line engineer working on Chesapeake Bay erosion problems.
Then I got transferred to Pennsylvania. I worked on a large damn construction project in Chester County. Then I got transferred to Snyder County and probably three years on another large damn project.
And then I got transferred to State College where I was an engineer there also working on -- back on mostly dairy operations.

Page 22

And then I spent six months in Crawford County as a project engineer for about six months and then I took the position as an area engineer in State College in 1984 and I was there until 1992 and I got transferred to Lebanon.

**Q. NRCS does like to move people around, don't they?**

A. Moving is the old days, not anymore. That used to be the modem, the way to go.

**Q. The damn projects that you talked about, you are talking about flood control damns. Is that -- I know NRCS is involved in that type of work.**

A. When I was on the site, yes, we did large flood control damns, talking three, four million dollar projects at both locations. Flood control is the primary function.

**Q. You said you had been involved in one in Chester County?**

A. Yes, in Chester County -- I can't think of the location. It was a large damn with -- I remember it's -- I don't know the details now but it was a four million dollar project.

Page 23

Has a very large -- over 5,000 cubic yards for the spillway. I remember that, just for the concrete. It was a very large facility.

**Q. Was it on the Brandywine, if you recall?**

A. Yeah. I am trying to think of the name of it though. I can't recall the exact name of it right now.

**Q. So, basically, since about 1984 it sounds like you have been focusing primarily though on Best Management Practices and that type of engineering; is that correct?**

A. Correct.

**Q. Now, you mentioned that the work that you are doing in Chester County for the mushroom operations related to a watershed project for the Red and White Clay Creek area?**

A. Correct.

**Q. Could you just describe what that project is?**

A. That project was a -- developed out of a need, I guess, by the conservation district and local public whatever to acquire extra monies to accelerate conservation practices for an identified need as into runoff issues

Page 24

and whatever in that particular watershed. And that took several years to develop and they finally got funding. I am not sure which year it was. Probably '94 or '95, something like that.

**Q. Did they have to develop a plan to acquire this funding?**

A. Yes. There was a Red and White Clay Conservation Plan, environmental assessment, several processes. I wasn't involved in that aspect of it but that was started to develop this plan to request funding from our national office.

**Q. So NRCS would have been involved in putting that plan together?**

A. Right. Correct.

**Q. But you weren't involved?**

A. I might have been involved in the tail end when the final draft was getting put together. I had some input in making some estimates on the need, what kind of workload we anticipated, how many practices we were going to put in and those kinds of things.

**Q. Who would have been working on that for NRCS?**

Page 25

A. The local staff would have provided some resource information and probably Jeff Mahood in our state office would be the facilitator to put all the stuff together to put this request for funding together and make it into a project.

**Q. So Mr. Mahood would have been putting the plan together essentially?**

A. Correct.

**Q. And folks from -- when you said the local office, this would have been the Chester County, NRCS office would have been involved?**

A. Right. They would have put some inputs into -- and like I said, my involvement was we tried to do some watershed assessment as to how many operations there were, how many mushroom operations, how many dairy, how many beef, and what kind of work we would be doing.

We would also try to project what kind of benefits and all those kind of things to make this a viable project.

**Q. Is that plan available to the public?**

A. Oh, yes, very available.
**Q. Because I don't believe and that may just not have been -- we did request, you know, certain documents from NRCS related to Rick's Mushroom Service but I don't think we specifically asked for that plan but we could then get a copy of that plan?**
A. Yeah, that would be -- you could get one today if you call the right people.
**Q. And who would the right people be?**
A. Call Sam. He could probably bring you a copy. I mean, you know, --
**Q. Okay. So Sam High, he --**
A. Yeah, he could bring you a copy of the other watershed. It's a --
**Q. -- could get us a copy of the plan?**
A. It's about like this. (Indicating.)
**Q. And just to finish that out now, once this plan is prepared, then it goes to -- did you say Washington has to approve it?**
A. Washington has to approve it and then on a yearly basis they make a money allocation to our state and we have several of these projects across the state and then somebody



divvies it up to decide how much money is going to go to the Red and White Clay Project. And that typical has been 500 to $700,000 that we have obligated per year.
**Q. To this specific project to Red White Clay Creek?**
A. To Red White Clay Creek, correct.
**Q. And you -- but you said there are others throughout the State of Pennsylvania?**
A. Yes, there are other land treatment watersheds.
**Q. Do generally all of these get funded that are submitted?**
A. No, not all the projects that are submitted get actual national funding and even once you get approval, there is no guarantee that you will get funding every year.
**Q. And how do they determine who gets funded and --**
A. I don't know.
**Q. -- and what projects get selected?**
**That's all done out of the -- out of Washington, correct?**
A. Washington, correct.



**Q. Turning to Rick's Mushroom Service, the facility there, when did you first become involved at that particular facility?**
A. I started -- excuse me. I am going to answer that question with a statement. When you guys requested information, we had a meeting the other day with our -- Nick Mamone.
**Q. Yes. Your counsel.**
A. Our counsel. Counseling us on this deposition stuff and in the process it came to my attention we forgot to give you guys something.
**Q. Okay.**
A. So I am going to pass this over. We had some digital photos taken and there's two sets.
MR. HOWELL: They would need a set.
THE WITNESS: Yeah, that's why I made two sets.
MR. HOWELL: Thanks. Same thing, right?
THE WITNESS: Yes.
MR. HOWELL: Okay. Great.



Thank you.
A. (Continuing.) Anyway, I forgot all about all these digital photos and never printed them out, so I thought I better get the photos and print them out for you guys to look at.
* * *
(Photographs, 2 pages, was received and marked as Vanderstappen-1.)
* * *
BY MS. HUMMEL:
**Q. I have asked the court reporter to mark the document that you just gave me as Vanderstappen Exhibit-1.**
**Could you just take a look at that and explain is this the document that you just handed me --**
A. Yes.
**Q. -- that you brought today?**
**Could you just describe what it is.**
A. This particular document shows the digital photos that were taken or some of the digital photos that were taken over the years from 1990 -- well, it started -- the photos

actually start in 1999 through 2000 -- I guess through the year 2000.

**Q. And we will get into discussing some of these structures. Now, I do notice here on the top of this, if you can see there, it says request and then there is a date there?**

A. Right. The date on top -- when I was putting this together, the request of 3/12/97 was when, I guess, at that time it would be Custom Casing had put a request into the Red and White Clay Program for technical assistance. And you should have a copy of that in your stuff. That was the first contact that they made with the conservation district, I guess.

**Q. And that would have triggered then your NRCS's involvement with that facility?**

A. Right. That triggered the whole -- the start up of the whole process.

The request came in and at some point in time we probably had a meeting in the office and we ranked them and prioritized them and then some time that summer, I don't know exactly when, we would have gone out to the



site.

**Q. So at that time the Red and White Clay Creek Watershed Project had been approved and was in effect?**

A. Was in effect and we had money available to obligate.

**Q. And I believe you also note on there contracts signed. It looks like September 26, 1997; is that correct?**

A. Correct. Yes.

**Q. And what would that be referring to?**

A. The contract is the document between us and the landowner to do various conservation practices, Best Management Practices, that we have basically agreed on after several meetings and discussions.

**Q. And would you have been involved in that process of developing that contract?**

A. I was the primary person coming up with final plan on that project.

**Q. Could you just describe that process and what you did to come up with the contract?**

A. To come up with the contract for this site, I think we were out there at least two



or three times. We would go out there and take a look at the site, see what is there, see what is going on and come up with some options as to what the landowners option was on this particular project. What could he do if he wants to keep doing what he is doing there and meet environmental issues, those kind of things. So we come up with several options.

And after discussing the options with the landowner, back and forth a few times, we came up with a final plan and that final plan had a whole list of different practices that needed to be installed in order to accomplish that plan.

At the same time that plan would also show the times and dates we think we are going to anticipate doing these things. All that's put in a contract support -- well, contract support document and you should have a copy of that.

**Q. Do you recall when you first went to Rick's Mushroom Service?**

A. I don't -- I do not recall the first date



I went out there. I know it was some time during the spring of 1997 but I don't know which exact date.

**Q. And I believe you mentioned that you referred to it as Custom Casing?**

A. Custom Casing, yes.

**Q. Now, is this the facility that's located along Newark Road in New Garden Township?**

A. Custom Casing at that time was a partnership with Andy Ciuffetelli, I think, -- and I don't know how to spell that name. But there was different -- Rick and him were a partnership and that was called Custom Casing at the time. So our original contract was with Custom Casing and then the partnership dissolved and became Rick's Mushroom Service and we transferred the contract over from Custom Casing to Rick's Mushroom Service.

**Q. And who did you work with initially when you were -- when you started at the site?**

A. When I started at the site, primarily Rick Masha.

* * *

(Long Term Contract for NRCS

Cost Share Programs, 13 pages, was received and marked as Vanderstappen-2.)

* * *

(Application for Payment, 41 pages, was received and marked as Vanderstappen-3.)

* * *

BY MS. HUMMEL:

**Q. I have asked the court reporter to mark one document and actually a set of documents. The first one is Exhibit-2 and the second as Exhibit-3. And I would like you to take a look at these.**

**First, take a look at Exhibit-2 there. Do you recognize that document?**

A. Yes, I recognize Exhibit-2 as a copy of the long term contract commonly called LTP-2. It also includes the special provisions, verification of ownership, the lease agreement from M.A.Y. Farms to I guess at that time Custom Casing. Our attachment "A" which is the violations, etcetera, and a copy of the initial preliminary request form.

**Q. Now, is that the -- we were just talking**



**about the request and the contract date. Now, is this the contract that was referenced on the photographs that you had produced?**

A. The date of 3/12/97 would be the initial contact date, which is this document here at the back of this pile, number two. And on the front the long-term contract 002.

9/26/97 is our contract date. When the contracting officer calls our state offices to note there is money available, he signs and dates, and that's when the contract begins. At that point in time we have authorization to obligate money.

**Q. Now, I would like you to take a look at Exhibit-3 and you will see that this is actually a whole package of documents. And what I -- my question is, this contract, Exhibit-2, doesn't appear to have any specific practices or details in terms of what would be required out at Rick's Mushroom Service included with it. Would there have been something like that that would have been part of the contract?**

A. Okay. The LTP-2 is the contract and it



is tied to the contract support document which you have a copy of here.

**Q. There are actually page numbers on the bottom right.**

A. Okay. That would be page number --

**Q. Can you tell us what page that is?**

A. -- D-0257 through D-0259.

**Q. Okay. And so that -- could you describe what that is starting on D-0257 of Exhibit-3?**

A. D-0257 it lists the actual practices, the anticipated amount, unit cost, percent cost share and the anticipated dates that we plan and the landowner plan to get them installed.

**Q. And this would have been part of the contract?**

A. This is part of the contract, right.

**Q. Now, you were involved in developing this support document?**

A. My involvement in developing the support document was the quantities and units to be inserted into that document. Another gentleman, John Magagna, in our field office would actually have done the data entry into the computer program to generate this



document.

And then I would verify that what he put in was okay and had met the intent of what we were planning to do.

**Q. Now, you said you would have been involved in determining the quantities. Would you also have been the person who actually determined which practices themselves should be included in this plan?**

A. Yes, I would be the primary person on determining which practices would be included.

**Q. And how is it determined -- how is it determined when the various practices would be installed?**

A. The contract is written that we have probably three to five years to implement these practices. So we talk to the landowner and come up with an estimate of what it is going to cost and then the landowner needs to look at their financial capability.

So we typically try to schedule the work over several years to allow implementation of the project. And we kind of negotiate with them the time line on how that

is to be done and the proper sequence. Certain things have to come before other things can come into play.

**Q. In this case when you first went out to Rick's Mushroom Service, can you describe what the facility -- what was going on there? What the facility looked like?**

A. At the time we came out there the first time, it was probably a one acre concrete pad that tons of spent mushroom substrate had been stacked up and was either getting hauled in or hauled out and the rest of the site was just an open field with some stuff piled around here and there. It was just a typical SMS stock pile location for Chester County.

**Q. And can you -- you said there were some other locations other than the concrete pad where there was some material stored?**

A. Correct.

**Q. Can you describe approximately how much was in those other areas?**

A. I can't really tell you how much was there. I don't know. We did not measure it. So I don't have any clue as to the amount.



* * *

(Sample Location Diagram, 1 page, was received and marked as Vanderstappen-4.)

* * *

BY MS. HUMMEL:

**Q. I have asked the court reporter to mark a drawing Vanderstappen Exhibit-4. Do you recognize what is in that drawing?**

A. Well, I recognize that I didn't do the drawing. It looks like it's an attempt to show what is at Rick's Mushroom Service but I can't really -- there is not that much information here. So I really can't -- it does show some of the key features but whether it's right or wrong, I don't know.

**Q. Is there a feature on there that's labeled concrete slab?**

A. Yes, there is.

**Q. And assuming that that feature generally represents what was at Rick's Mushroom Service when it would have been Custom Casing when you were there in 1997, could you indicate where -- what other areas around that concrete slab**



**there was spent mushroom substrate stored?**

A. If this was correct, I would describe it --

**Q. You can actually mark them on there if you could.**

A. Generally in the area to the -- well, there is no north/south on this map but I guess to the west and south of the concrete pad. I really can't tell you the extent or the amount.

**Q. Is there anything that you see on the map that doesn't appear to be accurate from your knowledge of what you saw on the site?**

A. The map has no scale. I can't tell anything really. It's unknown to me there.

**Q. As far as the general location of the features and things that are there, does it appear to approximate what was at Rick's Mushroom Service?**

A. It may or may not approximate it. I don't know.

**Q. Could you just put inside the area you have drawn there a letter "A" and initial and date it.**



A. What is today's date -- 3/15.

**Q. 3/15.**

A. (Witness complies.).

**Q. So when you went to the facility the first time and looked at what was there, what was the process that you went through then to determine the practices that are listed in this contract support document that would be needed at Rick's?**

A. The first thing we tried to find out was what the landowner wanted to do. What his -- maybe try to get his thoughts -- what he planned to do there.

**Q. And what did he tell you?**

A. I don't know what -- at this point in time I can't remember exactly what he said but my impression was he wanted to do some things to improve the situation there. For some reason -- well, I don't know what he really thought, but for some reason -- something had to be done or he felt there was a need to ask us whether anything needs to be done.

**Q. Okay.**

A. And our determination was you should do

something and we looked at primarily two different options. The first option was to use part of the area like he has been doing and take a lot of the area and convert it to grass to make a filter area so that if there was runoff off of the concrete pad, it could be redistributed over a grass filter area and taken care of. That is one method that we do use.

**Q. Before you move to the second. So if I understand you correctly, so he would basically limit his storage to the concrete pad area primarily and then there would be below perhaps this area where you have shown there was material stored, that would be converted to some type of grass filter area?**

A. Before we knew how -- before we knew the extent of what he could do, we had done a preliminary survey to see exactly how much area he had, the type of slope, etcetera, and then we went back to the office, plotted this stuff up and then we looked at how much grass area we needed for as relative to the concrete area he wanted to use and based on this lay of



the land, we tried to figure out what that would be.

And I don't recall at this time what that was but typically the ratio of concrete to grass is one to three, one square foot of concrete and maybe three square feet of grass. So we worked with that in those parameters to show him what kind of area he could use.

**Q. And that ratio, where does that come from?**

A. That is just a rule of thumb. There is a design parameter it goes through and all that kind of -- there is designs you would follow. That's kind of a starting point for planning.

**Q. And you said now there was another option that you -- that was one option that you looked at. There was a second that you were considering?**

A. The second option we considered was he indicated he wanted more area to do his processing, stock piling, etcetera. And in order to use a greater amount of area, we developed option two.



And option two was to put -- collect the runoff for up to three months, plus the 25 year 24 hour storm, plus freeboard into a storage facility and that would allow him to now collect this water and spray irrigate. And when you spray irrigate, you need less land to take care of these liquids.

**Q. And why is that?**

A. Because you can spray irrigate when it's not raining. There is different criteria involved. It just works out that you need less area to take care of the runoff than you would taking care of the runoff during the actual rainfall event.

**Q. So if I am understanding you correctly, if you just had runoff from the concrete pad running on to a grass filter area as opposed to collecting that runoff and then spray irrigating it, there is a different process that would be involved in figuring out the area that you need?**

A. There is a different process in figuring out how much area you would need to treat this water for, contain it, whatever.



**Q. And that determination is something you would do?**

A. Yes. We would determine what the two options are, how much area it would take for this option versus the other option.

* * *

(Drawing, 2 pages, was received and marked as Vanderstappen-5.)

* * *

BY MS. HUMMEL:

**Q. I have asked the reporter to mark another document as Vanderstappen Exhibit-5. Do you recognize that document?**

A. Yes, I recognize Exhibit-5 as some of my handiwork.

**Q. Could you describe what it is?**

A. It's a topo, topography of the site and it shows some different preliminary ideas for where practices may be installed or could be installed. It is not a final design.

**Q. And what is this document dated?**

A. It's dated 9/17/97.

**Q. So when you mentioned earlier that you would have gone out and done a preliminary**

**survey and gone back to the office and plotted that information up, is this probably what was generated?**
A. This document represents the results of going out and doing a survey, plotting it up and coming up with a preliminary plan or idea at that time and when we develop a contract document, we do not develop a complete design at that time. We say here's the general things we anticipate doing. We put them in the contract and then once the contract schedule dictates we are going to start doing that work, we actually finalize the design, because between the time we initially conceive the idea and the actual construction, things may change or whatever. So we do the final design just prior to installation. So this was a preliminary plan.
Q. **And would this preliminary plan have been the basis for what is shown in the contract support document?**
A. I can't verify that but probably.
Q. **Could you just describe what some of the features are that are on this map? Why don't**



**we start with the existing pad. It looks like there's some proposed changes there.**
A. On the existing pad on the second page of number five, the one item that we got involved with was a -- it shows on there a 50 foot wall/pushoff and we actually ended up cost sharing the installation of a retaining wall to facilitate loading trucks. And also cost shared on an access road to allow better truck traffic in and out of the site so it would not be in the mud hauling, you know, mud onto New Garden Township, whatever township road. So that was one of the things the landowner was interested in doing.
And we also show on that page adding some additional concrete to the wharf and a proposed rock filter damn.
Q. **A proposed rock filter damn?**
A. Right. All these --
Q. **That's at the bottom there of the page. Is that what you are referring to?**
A. Correct.
Q. **And what was the purpose of that structure?**



A. That particular structure would have been a temporary structure to filter any runoff that was coming off the property during the interim prior to getting the final installation of the large liner installed.
Q. **There is -- are you -- you are familiar with where these spray fields are located currently at this property?**
A. Right, I am familiar with that.
Q. **There is one that's just -- they have been referred to as the north and south spray areas. One is a little bit northwest of the impoundment and one to the southeast of the impoundment. Do you know what I am referring to?**
A. Yes, I know what you are referring to.
Q. **The spray area to the south, could you indicate on this figure where that is?**
A. On this preliminary sketch it's in the general area where it shows 650 linear feet. That was an approximate location for an irrigation line.
Q. **So you are on page 1?**
A. Correct, I am on page 1.



Q. **The -- the line with the crosshatching on it, that is what you are referring to?**
A. Yes, the crosshatch line is a general location of a preliminary plan.
Q. **Was there spent mushroom substrate in that area at the time when you went out there in 1997?**
A. That particular location, yes, there was. The entire field was full.
Q. **Now, -- well, let's go finish up with this. If we could go back to the second page where the rock filter damn is, it looks like there are some sort of half arrows leading over to that and it says 300 feet DIV period. Do you see where I mean?**
A. Yes, I see where you are indicating. The DIV stands for diversion.
Q. **Okay.**
A. And at that time we were thinking of constructing a cross channel to collect any water off the steeper site and run it over through this rock filter damn.
Q. **It looks like there is an another one of those. It would have been down gradient from**

Page 50

**Q. that on the front page, the first page of the drawing; is that correct?**
A. In the preliminary plan we did show a second 350 foot diversion located down, downstream from that.
**Q. That would have also flowed into one of these rock filter damns?**
A. Yes, it was anticipated to run into a rock filter damn.
**Q. And then you also show the HDPE lined pond on that figure?**
A. On page 1 of this Exhibit-5 we do show a rough sketch of the proposed HDPE lined pond.
**Q. So at this point would there have been any storage of waste material in the areas between the diversions, below the wharf or the concrete pad?**
A. You are asking for storage at what time -- in 1997?
**Q. No, as part of your plan did you envision that that area would also be used for storage of the material?**
A. Our vision would have been not to have much storage there at that time once these

Page 51

things were installed. There may have been but the idea was to minimize the amount of storage there.
**Q. And so I am just trying to clarify my understanding of what was the preliminary plan but there still would have been an impoundment to hold the runoff off of the concrete pad then. Was that what was envisioned?**
A. Okay. The vision was we knew that the landowner, for whatever reason, was not in a hurry to go to ultimate design of a containment facility and it was going to be one or two years until he got to that point. So in the interim we felt we had to do something so we put these rock filter damns in. So once the facility -- this is a preliminary plan. But once the facility is put in, we would be diking around the entire complex and running all the water into the liner and then irrigating out of that. So these are kind of preliminary steps that would help us out until we get to the final goal in a few years.
**Q. So there still would have been some**

Page 52

**storage in that area in the preliminary -- until he had that whole area bermed?**
A. There may have been, yes.
**Q. If the preliminary plan had been carried out, do you know approximately how many tons or cubic yards of material he would have been able to store at the facility?**
A. I don't know how many tons he would have had there at any given time. We never really measured that.
**Q. Would it have been less than what was there when you went to the site or what was there in 1997?**
A. We advised him once we got involved with him to change his method of storage. The typical mushroom operation stacked it just everywhere helter skelter. And we advised him to start putting it in rows or ricks mounds, R-I-C-K-S, up and down the hill or windrows would be a better word for that -- to stockpile it in a different method to reduce the amount of runoff off the site and these practices would have, you know, obviously, if they were installed would have reduced the

Page 53

amount of area he had available, too.
**Q. So the objective of your plan was to reduce the amount of runoff from the facility?**
A. Eventually, the plan was to contain all the runoff in his composting quote "stacking storage area" and contain it all and collect it. But the plan we developed was a phase in thing, that would take several years to get to the ultimate goal.
**Q. So just in general, I mean, when you go out to the property like this to work with the landowner, what are NRCS's objectives?**
A. Our objective is to eventually get the landowner to, in this particular site, if he wants to maintain the current operation would be to collect all the runoff and properly dispose of it. And the option chosen was to go irrigation but we don't have any legal law. He is volunteering to work with us, so we can't tell him once we come up with a plan you have to implement it immediately.
We give them several years to implement these plans. If there is things going wrong on the site, they have been going

on for several years. If it takes us two years to get to that point, we are willing to do that for the ultimate goal.
**Q. So you are saying NRCS doesn't have any regulatory authority in terms of its working with landowners?**
A. The landowner works with us in cooperation with us to generate these Best Management Practices. We as an agency don't have regulatory power, that is local county conservation district. Department of Environmental Protection, the EPA, they have the regulatory power. We just provide technical support for the landowner.
**Q. Do you interact with the regulatory agencies when you go out and attempt to make recommendations to control basically pollution from facilities like this?**
A. I don't know what you mean by interact with them. We -- landowners get involved with us and we come up with a design and on occasion we do cross DEP personnel on these sites. They are always happy that we are working with them because they know if they



are working with us, eventually we will get the thing resolved.
**Q. But as a matter of routine then, that is not something that you would do -- you don't have someone you would typically coordinate with at DEP?**
A. No. We try to maintain, I hate to say, white hat mentality, but we are the good guys. We are going to go out and help these owners versus a regulatory agency which basically says you have to do something and you must take care of it.
**Q. So I guess just to follow up on that. To maintain that good guy white hat image then and maintain the cooperation -- you want to work cooperatively with the landowner. How do you do that in a situation like this?**
A. Well, like I said, our mission is to get -- we know there is -- there may be issues at a site and we come up with a plan and the plan still has to meet standards and specs. Our Pennsylvania field office technical guide, we make sure that everything that we plan meets those specs and at the same time we want to



make sure that the landowner, you know, we want to work with the landowner to accomplish that goal. As long as he is willing to work with us and meet the specs we can accomplish that.

* * *

(Whereupon, a discussion between Ms. Hummel and Mr. Burcat was held off the record.)

* * *

BY MS. HUMMEL:
**Q. So if you initial recommend something that the landowner for whatever reason doesn't feel he can do or wants to do, what would happen?**
A. If the landowner doesn't like our plan, we try to work up some options and if none of those options are available to him, we basically, it's a volunteer program, we can walk away. We are not required to do anything. It's a volunteer -- you ask for assistance. If you don't like what we come up with, we part ways.
**Q. Is that typically what would happen? I**



**mean, do you frequently just walk away if you develop a plan and somebody doesn't agree with everything that is in the plan?**
A. Our success rate is probably about 90 percent that we end up cooperating with them. But we do have some landowners that they don't want to implement the plan. They don't like the plan. They just can't agree to anything and we walk away.
**Q. In the preliminary plan that you developed for Rick's Mushroom Service, you obviously have diversion structures and a holding pond here and so you, obviously, had some sense of the operation that you envisioned would be going on to design all those structures; is that correct?**
A. We had a general idea of what the operation was going to be but no specific knowledge of how it was actually going to run in the end.
**Q. And in your preliminary design how many tons or cubic yards of SMS was the facility designed to hold at any one time?**
A. In our planning process our main function

Page 58

was to see how much area he could operate in and still have enough area left over for his spray fields. So that's what we worked against. We really didn't deal with how many tons of spent he had on the operation. That wasn't something I really looked into.
**Q. I guess I am not clear on how you could do your design without factoring that information in.**
A. On this particular operation typically -- the landowner may have grand plans of doing a lot of things, but we looking at the site, the lay of the land, there was only so much area he could work in and still have enough area left to take care of the runoff that we would collect. So that was kind of a limiting factor and how he managed his spent mushroom substrate in that area really didn't effect my answers or how, you know, the size of the storage or anything else. Whether he piled it one foot deep or 20 foot deep, that wasn't really an issue with our end.
**Q. But wouldn't the amount of material that he had stored there influence what would end**

Page 59

**up in the holding pond?**
A. The amount of runoff into the holding pond was based primarily on the area that he was encompassing or that he could encompass and we assumed basically so many inches of runoff per month off the site based on a curve number and the 25 year storm which was based on basically almost 100 percent runoff. So whether he had empty or full didn't really effect the answer. We design for the worst case scenario.
**Q. In terms of -- what you are describing is just runoff volume. Am I understanding you correctly?**
A. Right.
**Q. As far as the issue of the content of the wastewater, however, wouldn't -- I mean, if he had 10 cubic yards of material stored in that storage area or if he had 100,000 cubic yards of material stored in that area would certainly change what the content of the wastewater would be in terms of the nutrients and the -- all the things that were in that wastewater, wouldn't it?**

Page 60

A. The amount of material may effect that but it depends on how much rain you get for dilution. So you don't know what the final N-P-K amount is going to be depending on rainfall and the amount of material he has there and how he stockpiles it.
A lot of material if it's stockpiled in one big pile it sheds the water off. You don't get the penetration. You don't get as much coming out of the pile as you would if you spread it all over the place. So there is a lot of variabilities in there.
But back to the key thing. We were designing this as an AG waste facility with the runoff being an agricultural type by-product. The amount of material didn't really matter that much because we assumed the worst case scenario. All this water would run -- or a certain amount would run off and we would have enough storage for that. And we would have enough land to irrigate it back on the land.
**Q. Do you -- are you familiar with the**

Page 61

**composting process that goes on at facilities like this?**
A. Yeah, I am familiar with the composting process.
**Q. And how does that work?**
A. Typically, -- and I am not stating this facility in general -- but typically in the past composting was done passively. They just piled it out in a five acre field, let it sit for a year or so, let nature takes its course and then they would pick it up two years later and haul it off to a processing plant to be bagged and processed.
**Q. And when you say, let nature take its course, what specifically --**
A. Well, it was piled out there --
**Q. -- was happening?**
A. What was happening was they would just pile it four or five feet deep and let it get rained on. I guess there was issues with salt but I am not sure what it exactly was but in that two-year period, the material would compost into a stable product. And then once it became a stable product, they could load it

Page 62

up and take it to a bagging facility and become compost or mulch or whatever. That was passive.

The active type of composting would be whether they speed this process up to maybe six months. You would take the material and windrow it, piling it in long piles and then you would turn it with a turning machine and speed up the biological activity to break the material down and then it would be a saleable product in a much shorter time period.

**Q. And is pen -- was -- is penetration of rain water into and through this material part of that process?**

A. That may be part of the process but I am not an expert on how it actually happens.

**Q. So you are not really familiar with the chemical make-up of the spent mushroom substrate and how that breakdown process works?**

A. I don't really have the details on that. No, I don't.

**Q. So when you designed the holding pond,**

Page 63

**then the content of the wastewater, the substances that came out of the waste material and into the runoff, really wasn't an issue that you were concerned with?**

A. It is an issue. We had some preliminary assumptions on what the values of these -- or nutrient values were like N-P-K and that was factored into the runoff to make sure we had enough filter area based on normal situations to take care of those nutrient values.

**Q. I want to get into that discussion further but I guess just to back up a few steps and go back to our -- the preliminary plan and the drawing that you had here. I want to make sure that I understand what was envisioned at the time the contract was entered into and are the structures that were on here the additions you mentioned to the concrete pad. These diversions over to the rock filters and the lined impoundment with the spray areas, was that generally the concept that was agreed to?**

A. At that time that was the general concept that we had come up with. And, subsequently,

Page 64

since then, we did install the diversion and in one of these settling basins temporarily and then we went and changed things since that time. We put a concrete settling basin in. We put an HDPE liner facility in. We've diked the entire facility. There is a grass waterway now.

**Q. No, I understand that this is not exactly, you know, what is out there today. I am trying to understand what was envisioned at the time that the contract was entered into.**

**So if I looked at the contract and the, for instance, on page D0257 of Exhibit-3, the plan conservation treatment practices that are listed there, I see things like compost stacking and handling, critical area planning, diversion, access road. Basically, what is listed in this plan, is that what is reflected on this drawing?**

A. It should be. I can't verify that 100 percent without really looking into it but typical procedures, we come up with a preliminary plan, come up with estimates of quantities and write up a contract based on

Page 65

that with the knowledge that things may change over the time of the implementation and that's why we have the ability to modify contracts and make improvements, deletions.

**Q. And I believe the date that the contract was entered into was September 26?**

A. September 26, 1997.

**Q. 1997. So it would seem that this plan, if it was done on September 17, 1997, would probably reflect the thinking at that time?**

A. It probably does reflect the thinking at that time.

MR. BURCAT: Can we go off the record for a second?

* * *

(Whereupon, a discussion was held off the record.)

* * *

BY MS. HUMMEL:

**Q. You started to describe some changes that have occurred from what the preliminary design was as to what was actually implemented and what is out there today at Rick's Mushroom Service.**

Page 66

A. Correct.
Q. **Can you describe how those changes took place and the types of changes that occurred?**
A. Okay. The changes that -- well, I guess in -- some time in November of 1998 we actually did install the -- one of the sediment traps and basins in a diversion. That was done. Probably the lower one on your Exhibit-5, first page.
Q. **This diversion and this rock filter dike?**
A. Right. Somewhere in that general -- it wasn't in the exact area there. It definitely wasn't in that area but that was installed in November of 1998. (Indicating.)
Q. **Could you just explain to me how that -- how that system works, what it did? What its purpose is?**
A. At that time the general idea was that if there was runoff coming off the steeper areas, it would be directed to this rock filter damn to slow the water down and if there was any particles, sediment, compost, whatever, that was in it, it would slow it down enough to drop it out and filter it out. So we at least

Page 67

wouldn't have the volume of solids moving off site. If they were, we would at least reduce that significantly. It was a temporary stop gap measure.
Q. **So was there in this damn -- was that damn across -- I know there is a like a natural drainage way that flowed down through that portion I guess of the site. Would this have been a damn across that natural drainage area?**
A. Have you marked this exhibit which -- what number is this?
Q. **Yes, I think that is Exhibit-1.**
A. On Exhibit-1, the lower left picture shows the view of that sediment basin that was installed and cleaned out at that point in 1999. So that basin was a little bit of a damn.
We ended up building more of a damn across the, shallow damn, across the entire drainage pattern. And you can barely see it but I can tell there is a concrete -- or I mean a pipe riser structure with stone around it.

Page 68

Q. **And that damn you said would have been across the natural swale --**
A. Swale of the site.
Q. **-- that was there?**
A. That's right.
Q. **All right. And then the idea was this diversion was -- and the diversion was constructed as well; is that correct?**
A. There was a diversion constructed to the right of this photo that flowed from right to left into this sediment basin.
Q. **So when it rained, the rain water would have come down the slope and been diverted by that diversion over to this structure and then you said the purpose, if I understood you correctly, was to let the solid material settle out so that if there was any sediment or any waste material itself that had been carried with the runoff water, it would settle out in that structure?**
A. That is the general idea of what is to happen, yes.
Q. **And then what would happen to the water?**
A. The water would still be going downhill

Page 69

from there, still being discharged downhill.
Q. **And how would it get out of this damn?**
A. In this damn there is a perforated pipe and the water goes through stone, through the perforated pipe and out the main pipe that goes underneath the damn to the outlet.
Q. **And the piece of pipe that sticks up in the air, I know it's hard to see in that little photograph, but I think there is a piece of pipe that sticks straight up in the air; is that correct?**
A. There is a piece of pipe that sticks up and it's the riser and it's perforated. It had holes in it.
Q. **So that the water would -- oh, it had holes in it. So the water would still get into there and go out through the damn.**
A. Right. The riser pipe has holes in it to allow the water to flow out and drain all the way down.
Q. **So, again, this structure wasn't designed to stop the water. It was designed to allow the solid material that might be carried with the water to drop out before the water would**