# EXHIBIT "F"

Cont'd

Page 70

**go off site?**
A. That's a good representation, yes.
**Q. To the extent that you have, you know, nutrients or salts or bacteria or whatever that have dissolved or gotten into that water because it's flowed down over the waste material, would this structure have in any way dealt with those things in the water?**
A. It would have dealt with it somewhat, not completely, by taking out the solids which would contain a lot of those material you are discussing. It would not have taken them all out, obviously, but it would take out the solid portion of that runoff.
**Q. Was that -- is that something that you typically deal with when you are designing these kinds of structures looking at the things that get dissolved into the water and coming up with ways of dealing with that material as well?**
A. I am going to reiterate my initial statement. This particular sediment basin was a stop gap measure to reduce the amount of solids moving off the property. It was an

Page 71

interim practice because in the final practice was to put in an HDPE liner and collect it all.
**Q. And why did you have to go with an interim practice instead of just putting -- why didn't you just put the HDPE, the lined impoundment in right away?**
A. The negotiated process of coming up with this contract was that he didn't -- the owner, for whatever reason didn't want -- did not want to implement everything right away or couldn't afford -- whatever. I don't know why. And we planned for it several years down the road from signing the contract.
**Q. So that particular issue really was a decision made by the landowner in terms of the timing of when the lined impoundment would go in?**
A. It could be. Yeah, it was his decision.
**Q. Now, I am sorry, you were going through the process of the changes that had been made and I interrupted you on the diversion. So could you go ahead and finish describing the changes from the preliminary plan to what is**

Page 72

**actually out there today.**
A. After we installed the basin in November of 1998, we came out to the site, I don't know which time, but I was out there, obviously, when I took a picture on November 9 of 1999 and that shows that they cleaned out the basin.
**Q. So I am sorry. When did you say the basin was put in?**
A. In November of 1998.
In the picture you see at the bottom of the page shows about a year later after it was cleaned out. Some time between there I designed a new plan for the facility and you should have a copy of that here somewhere. That would give you some dates when that design was approved.
**Q. Well, just before we get to that, why would they have cleaned this out?**
A. Any type of sediment basin that's operating correctly and is trapping sediment needs to be cleaned out once it gets full to a certain level, you need to clean the sediment out so it can start working again. If it gets

Page 73

too full, it's just going to -- the effect is going to be lost.
**Q. So, eventually, over time the stuff that is settling out fills the thing up?**
A. Over time the sediment basin if there is sediment coming into it, it will fill up and part of the maintenance of that basin is to clean it out, put new stone around the riser pipe and start over.
**Q. How frequently do you have to do that?**
A. I can't answer that. It depends on the site. The frequency depends on how much sediment you have coming down there.
**Q. And would you instruct the landowner what to look for -- or how would he know when to -- that that needs to be done?**
A. I would think somewhere in our drawings that were provided to him that it would indicate that once the sediment got to a certain height or a certain volume, he needs to clean it out and remove the material out, replace the stone and start over again.
**Q. Now, you said you thought that probably there was a new design that would have been**

Page 74

**developed, that you would have developed, probably by around that time, November of '99. Did you mean a new whole site plan like this or a new design for a particular structure? I am not sure what you were referring to.**

A. I believe that you should have documentation for a brand new complete site plan that was developed at that time.

* * *

(Agricultural Waste Storage and Collection System, 3 pages, was received and marked as Vanderstappen-6.)

* * *

BY MS. HUMMEL:

Q. **I asked the reporter to mark this document Vanderstappen Exhibit-6. Do you recognize this document?**

A. I recognize Exhibit-6 as a photocopy of the, I guess, detailed plan for the operation that was developed in November of 1999.

Q. **So would this be what you were thinking of?**

A. Yes. This shows the final plan layout.

Page 75

Q. **And how did this final plan layout differ from what was envisioned initially?**

A. The final plan layout had several additional features that we developed. One feature was a concrete settling basin that was to presettle solids out from the runoff prior to it going into the HDPE liner. We also finalized the area of the work area with a dike. We also show a waterway along one side.

Q. **So it looks like instead of having those two diversions cutting across this area between the concrete pad and the impoundment and discharging to those rock damns in the natural swale there, that that material would now be contained in this bermed area; is that correct?**

A. There are a couple things to talk about there. If you look on that page 2 of Exhibit-6, you can barely see an outline under the embankment labeled existing basin. Do you see that arrow there?

Q. **Yes, I see it.**

A. That there represents the same picture as

Page 76

on whatever this exhibit is. (Indicating.)

MR. HOWELL: Exhibit-1.

BY MS. HUMMEL:

Q. **Exhibit-1.**

A. So in the process of putting in this HDPE liner, we took out that temporary sediment basin.

We also found out that as time goes on where the exact property lines were. So that kind of effected our layout a little bit, too, and made it a little smaller, I am sure.

* * *

(Whereupon, a discussion between Mr. Burcat and Ms. Hummel was held off the record.)

* * *

BY MS. HUMMEL:

Q. **So can you describe where the property line is on the new plan?**

A. On the second page of Exhibit-6 the approximate location of the property line is defined by a line with a PL on it.

Q. **And that looks like it's -- is that the line just north of the impoundment and then it takes a sharp turn and heads north, I guess, along the dike there. Is that what you are referring to?**

A. Yes. The line that's north of the impoundment and parallels the dike heading northeast is an approximate location.

Q. **Actually, I noticed back on the preliminary design that there was also -- I also see there you have a line that's marked with a PL, so I guess that would be the property line, but there is also something that's marked with a WL it looks like.**

**Do you know -- do you see what I am referring to?**

A. I see what you are referring to on the drawing but I don't remember what it stood for.

Q. **Is it possible it could have been a water line?**

A. It may have been a water line.

Q. **I believe there is a water line that goes through that general area, although it's interesting -- because it looks like -- am I**

Page 78

**understanding this correctly. The WL line looks like it goes across the northern part then down the -- it would be the western side and then it also goes along the southern part of the property? It goes across above where the rock damns are. Is that --**
A. Okay. Now, I have an inspiration here. I understand what I wrote.
**Q. Okay.**
A. WL stands for work limit. I guess the working limits are what at that time we thought he was doing some activity in. It was an approximation of the area that he had been using for spent at some point in time.
**Q. Now, you had said that with your revised design in November of '99, you had to make some adjustments because you had a better understanding of where the property lines were at that point. Do you know what adjustments you had to make?**
A. When we got to the final design, we knew where the property lines were. We also did the final calculation for sizing. We added a concrete settling basin. We took a look at

Page 79

the spray field areas and so we had to, you know, adjust everything to make sure it all fits and meets our criteria for construction and specifications and practices.
**Q. Are the dotted -- the dash lines that show up on this page 2 of -- which exhibit are we on? Page 2 of Exhibit-6. What do they represent?**
A. The dash lines on page 2 of Exhibit-6 represent the contour lines for that particular site.
**Q. So it appears that the impoundment, the lined impoundment, was located basically in the swale, the natural swale that went down through that area; is that correct?**
A. That's correct. The impoundment was located in the swale to catch the runoff from above it.
**Q. Now, the changes that have -- that were made, how did that change the ability of the plan to control runoff from the facility?**
A. The changes allow for several things. In the time from the design of the plan or the preliminary plan in 1997 to this point in time

Page 80

we had also worked with other mushroom operations that were doing composting and we had come to find out that there was enough solid material moving off the site or into their storages causing a build-up of solids and best available technology at that time was to put a settling basin in above the HDPE liner to drop the solids out so that we would only get mainly liquids into the storage. We would still contain both solids and liquids. The solids could then be recycled back into the operation and it would be easier to deal with the liquids in an irrigation system.
**Q. Now, you said you had gained some experience working with other mushroom facilities?**
A. Correct.
**Q. What facilities were you working with?**
A. Modern Mushroom.
Where else did we do this?
I can't really remember any names right now but just -- we knew that that was going to be a problem so we designed this element into this practice during this

Page 81

project.
**Q. So you had designed some impoundment, storage impoundments, for these other facilities and you had had a problem with the build-up of sediment in those structures?**
A. I think we had looked at some other facilities and they were having problems. We didn't design anything for those other facilities but we knew that they were having problems so we were anticipating the same thing happening here. So we, in turn, tried to avoid that by putting in a concrete facility to settle out the solids.
**Q. So was this, in fact, the first impoundment that you had designed for mushroom wastewater?**
A. It would be the first one for -- using HDPE, yes. We had worked on Modern Mushroom for a concrete containment. We had also worked at HMR, Hudson Farms. They built several large processing areas and we did settling basins on them prior to getting into their existing storage. So we had some experience with other sites.

Page 82

**Q. So at Modern Mushroom then you had been involved in providing assistance to that facility?**
A. Right. Over the years NRCS had been involved with several different storages over there but that site is different than this site. So there is different things to look at.
**Q. And the structures at that site were to collect wastewater like here?**
A. At Modern Mushroom the tank was involved in a wharf operation where they were making active compost or new compost. And that was where the tank was involved. They also have a facility that takes care of very similar to this a composting operation, active composting, and they had a -- just an earthen storage there.
**Q. And had you designed that?**
A. Our agency had designed it and one of the problems that were addressed was solids moving into the storage. And, subsequently, we have designed a concrete settling basin for that site that has yet to be implemented.

Page 83

**Q. And at that site was the wastewater also spray irrigated?**
A. I believe that the water from that site was pumped to several other lagoons and they have several, 10 acres, I don't know how many acres of spray fields. If they don't need the water for making compost, they can irrigate it.
**Q. So they actually can recycle the water back. This was a compost, fresh compost production, facility?**
A. Modern Mushroom has both fresh compost production and spent mushroom substrate processing and bagging. So they collect water from both operations and depending on the needs, they can either use it to prewet the new compost or if they have excess water, they will irrigate that into several different spray field options they have over there.
**Q. But you said you weren't involved yourself in that facility?**
A. I was involved in the concrete tank part of the project under this same particular program, PL566. The earthen facility that had

Page 84

the composting -- spent mushroom substrate composting, we have a plan put together but they have yet to implement it so I was involved in that part.
**Q. Had you actually designed a facility like you have at Rick's Mushroom Service to collect and spray irrigate wastewater previous to this?**
A. Not to this scale, no.
**Q. You had described that one of the changes was putting in the settling basin so the solids would settle out and the water would go into the lined impoundment. Did this plan also alter -- did this plan allow for the storage of a greater amount of material at the facility than the prior plan?**
A. I can't specifically answer that question because I don't know but my feeling is this layout probably allowed for less storage but, like I said, I don't know how much storage was involved in either case.
**Q. And why do you say it would have allowed for less?**
A. I think when we finally figured it out we

Page 85

needed more area to build the facility and everything else so that left less area for storage but that is not a specific.

* * *

(Document, NRCS 0029, 1 page, was received and marked as Vanderstappen-7.)

* * *

BY MS. HUMMEL:
**Q. I have asked the court reporter to mark this document as Vanderstappen Exhibit-7. Do you recognize this?**
A. Yes. Exhibit-7 is a stage storage curve for the HDPE liner. It indicates the capacity of the facility based on the depth of liquids.
**Q. And does this reflect -- I noticed in parentheses on the right there is the word "As Builts", what does that mean?**
A. As builts means that this chart was based on what was actually installed. The actual -- close to the actual dimensions of what the facility was installed. So this reflects what the storage capacity is for what was actually

Page 86

installed.
**Q. And could you just describe what this shows? For instance, the normal storage range, the volume of the -- for the facility.**
A. Okay. What this chart shows is several key things. It shows that the total depth of liquids is at 12 feet and from zero to 10 feet is what should be the maximum normal operating range under normal conditions.
And from zero to eight feet would be the normal range of conditions which we call wet storage which is the runoff coming off the lot. On top of this 8 feet between 8 and 10, we allow for the 25 year 24-hour storm that lands right on top of the lagoon which is 5.6 inches and at the same time you are going to get that runoff event coming from the lot, the three acres of this pad area flows in here, too. So we allow for that storage in there also and that's how we come up with the theoretical maximum operating, worse case scenario should be about 10 feet deep, which leaves us another two feet of freeboard for other problems or opportunities

Page 87

that come along.
**Q. Over to the left above the curve, I believe it says that you have estimated the 25 year 24-hour runoff amount to be approximately -- is that 390,298 gallons? Is that what that -- can you read that?**
A. My estimate was that for the 25 year 24-hour runoff for 3.2 acres was 390,298 gallons.
**Q. And you said that was approximately 5.6 inches of rain?**
A. 5.6 inches of rain with a correction factor, a curve number to reduce that a little bit. There is some infiltration and soaking in that may occur during that rainfall event. I don't know what that number was. It's probably 5.2. I am not sure.
**Q. So then you said there is an additional two feet above of what you refer to as freeboard. So, in fact, if you had gotten another storm like that -- actually, if you got back to back 24 -- 25 year storms, theoretically the impoundment could actually handle it probably without overflowing?**

Page 88

A. There is a lot of theoretical stuff here. The regulatory agencies like EPA, they require us to be able to handle for any kind of waste impoundments, agricultural waste impoundments, we must design for all the runoff we are going to collect plus the capability of handling a 25 year 24-hour storm.
If the storm event would exceed that and we were at full and the storm event came on the last day of storage and we had a 100 year storm, theoretically you would be legally allowed to discharge over the top. Not that you would want to see that happening but it could happen. But that's the criteria that we have to go by is the 25 year storm.
**Q. If there is sediment that accumulates in the bottom of the HDPE lined impoundment, how would that impact the volume of liquid that the impoundment can hold?**
A. Basically, the way these HDPE liner facilities are constructed 12 foot depth is at the bottom inside slope and from the bottom inside slope to the center of the facility

Page 89

there is another one or two foot of drop to allow for the proper installation of the liner and that's the area where you are going to have sediment accumulation if any. So that was our -- so, basically, we felt there would be no impact on the storage capability.
If per chance sediment would build up above that level, then the owner would be directed to use some means to get that material out of there not --
**Q. How would you do that with the lined impoundment?**
A. Basically, you would have to add water and flush the solids towards the intake pipe and pump it out that way. Instead of irrigating it, you would add some water and move the solids over to the intake pipe and suck it out of the impoundment that way as a more concentrated material instead of a more liquidy material.
**Q. Now, I have noticed on this drawing that you have -- is that your signature there --**
A. Yes.
**Q. -- that says approved by?**

Page 90

A. Yes.
**Q. So when you say there is a certain amount of capacity that's been, I guess, built into the system for sediment accumulation?**
A. That's correct.
**Q. And if it exceeds that, then it would impact the volume of what could be stored in the impoundment?**
A. It could impact it but then the owner is given an operation and maintenance plan that says if it gets above a certain level, you are supposed to be irrigating it out providing that conditions are correct. So they may lose some time period they can't store but I think it's a resolvable issue. It's not detrimental.
**Q. There is maintenance involved?**
A. There is maintenance involved in any facility.
**Q. And is that true with the sediment basin, too, as well? I mean, obviously, there will be sediment accumulating in the sediment basin so is there maintenance associated with that structure?**

Page 91

A. Yes, there is and whatever exhibit this was --
**Q. Exhibit-1.**
A. Let me write that on there. Exhibit-1 does show the settling basin after installation, I guess, January of 2000 with -- you can see some sediment deposited on the concrete there.
**Q. Are you referring to the photograph at the top --**
A. Top of -- yeah.
**Q. -- of the first page?**
A. Yeah, top of page 1, Exhibit-1.
**Q. And how frequently does that need to be removed?**
A. It depends on the rain and the amount of rain, the duration, how hard it rained. Whenever he needs to do it, I guess.
**Q. Is there a certain amount of sediment that can accumulate there before it needs to be removed?**
A. I am -- I have no set guidelines on that. Probably six inches to a foot would be the most he should get in there. And then

Page 92

it's material he can just recycle anyway. It is not a big issue, just going in there and scooping it out and hauling it back up the hill and dumping it into an existing pile.
**Q. How does the water get from this structure into the impoundment?**
A. If you look on that picture you will see five concrete, short concrete walls, and between each one of the concrete walls, those are actually screens so that we have three quarter inch screens and half inch screens. So the water actually flows through the screens and then there is a pipe which is shown at the bottom of that same page in its construction phase. That's where this water discharges out of the pipe.
**Q. So that pipe is in the base of the -- behind these screens -- well, in between these screens and the sedimentation basin?**
A. Right. If we look at the drawings, I could show you where it is at but yes.
**Q. So if sediment starts to accumulate in the sedimentation basin, how does that effect the quality of the water that gets into the pipe?**

Page 93

A. Again, the basin was designed to slow the water down to drop the solids out. I think we designed on a two year storm frequency, 15 minutes of a two year storm.
And our intent here is to keep the solids out to reduce the maintenance on the HDPE liner. As for the quality of water, the benefit is less solids makes it more pumpable, less problem with pumping, less plugging with the nozzles, etcetera.
**Q. So if this structure starts to fill up, what is going to happen is you are going to get more sediment getting into the impoundment?**
A. Right. If more sediment gets in the impoundment, it just becomes more of a maintenance issue down the road. And the way we set this thing up was if the rainfall then was so high that it would fill this basin to the top of the screens, it would still overflow and the pipe would have capacity to take the entire storm straight into the liner because one of our functions is to make sure

Page 94

we don't overtop at least at a 25 year storm.
**Q. And you said this was designed for a two year storm.**
A. The settling basin concept was designed for a two year storm with 15 minutes of capacity. All it does is slows the water down enough to drop the solids out. It really doesn't have any storage capacity per se because it just stays in there temporarily and drains down into the main storage facility.
**Q. So if you have something greater than a two year storm event, then that water will probably just flow over the top, fill this up and flow over the top and go into the impoundment?**
A. I don't think that would be -- the two year storm event is a concept used to size the thing just to get some settling out of it. If we have a five year storm or 10 year storm, it is not going to overtop this facility. It is still going to flow out. There is a pipe capacity to handle those larger frequencies. It's just that you are going to have less -- you are still going to have the settling time

Page 95

no matter what the storm frequency is. It's just a tool we use to come up with a size.
**Q. Well, wouldn't there be less settling capacity the larger the storm?**
A. I can't -- as for your question on that, I can't say specifically what it is. I know our standard says for settling basins two year storm -- two year, 24 hour storm, 15 minutes. I am pretty sure that is what we designed this on.
**Q. But you don't know if you had like you said a 10 year, five year or 10 year storm if that would result in probably more sediment being transfer into the impoundment during that type of a storm event?**
A. It may or may not. I don't have an answer for that.
**Q. Now, the runoff curve, Exhibit-7, you said it was designed based on a storage area of 3.2 acres?**
A. That's correct.
**Q. How was that determined?**
A. The 3.2 acres was determined from the final plan layout on page 2 of Exhibit-6.

Page 96

More than likely this preliminary -- I measured that area and come up with that acreage.
**Q. And that would have been the area -- well, actually, could you take your -- could you just outline the area on that map with the pen there that probably you would have measured.**
A. I hate to do that because I don't know what I measured at this point in time. But, approximately, I am sure we came up along here, somewhere around here and like that. (Indicating.) Something like that was the area.
**Q. Had you -- now, again, this figure has the -- I am talking about Exhibit-6, page 2, the drawing, has the word "As Builts" written on it there to the right and it has I believe it says -- was that date January 5, 2000; is that correct?**
A. The date shows there January 5, 2000, completed work on sediment basin. That's correct.
**Q. And what does that mean in terms of this**

Page 97

**drawing and that notation on it?**
A. That notation indicates that the concrete settling basin or sediment basin was completed and reported to me as being complete on January 5, 2000 or some time prior to that. That's the date that probably Lester Jiles has gone out and looked at the site and determined that they had done everything they needed to do to build that basin.
**Q. Do you -- is Lester the person, Lester Jiles, the person that would go out and verify when something is completed?**
A. Yes, he would.
**Q. So you don't do that?**
A. Lester Jiles was the primary inspector to try to implement this plan and follow the designs and drawings that I put together and he had worked with the contractor working towards that goal. If there was any questions or problems or interpretations, then he would give me a call and we would discuss it over the phone or if I happened to be on the site, we would take a look at it.
**Q. And the various other notations there**

Page 98

over to the left there is HDPE liner completed June 29, 2000 and it looks like the initials LGJ. So would that again be Lester Jiles?
A. Lester Jiles.
Q. And so the lined impoundment was completed on that date?
A. That's correct.
And to add to that, the other -- original existing basin was still in operation from the time this concrete basin was installed until the HDPE liner was installed and obliviated that, I guess, or took that out of commission. So now we have two basins in line for that duration. I guess six months or so.
Q. Well, I -- didn't this lined impoundment, wasn't it built right on top of the old one?
A. Yeah, but remember in January we completed the concrete basin and it wasn't until June of that year that we actually completed the HDPE liner. And then when we did that we took out the sediment basin.
Q. So in January when the sedimentation basin was put in, the pipe would have just --

Page 99

A. Discharged into the previously installed sediment basin.
Q. So was this drawing adjusted in any way as a result of the actual construction? Were there any changes that actually occurred during construction that are reflected on this figure?
A. According to the information shown to me there was none. I am sure there is some slight adjustments but --
Q. I don't see any notation on here, at least I can't read it if it is there, regarding the berms or the three -- the dikes, I guess, you referred to them on here. Does that mean they were constructed or not constructed?
A. The dikes were -- some sort of dike was constructed and I can't tell you for sure whether we paid for them or not. I would have to look through the payment schedule to see whether we paid for any dike or had it in the plan to start with. I am not sure.
Q. Do you know what -- how those dikes -- would you have indicated even if you weren't

Page 100

paying for them? Would you have provided information, a design, on how to construct the dikes?
A. I know on the drawing it indicates a three foot height -- high dike which would be a minimum. I can't recall whether we indicated any specific details of building this dike or not. I would have to look through the drawings. We don't have them all here so.
Q. If you didn't cost share the structure, would there have been an inspection as to when it was completed then or did that only happen if it was a cost shared structure?
A. I am trying to think of what happened out there. I know the dikes were put in. I am not sure whether we paid for them or not. I am sure we were involved in the approximate location and where they were going to be put and stuff, but how they were constructed and whether they were constructed properly, I don't have personal knowledge of that.
Q. And you don't, I mean, but do you know whether you typically would have inspected a

Page 101

structure even if it is not cost shared?
A. I am not sure exactly what happened in this particular location.
Q. Well, I am just talking in general.
A. In general, if it's part of the grand plan, we would try to do some inspection but a side note to that is we don't provide continuous inspection on any of these practices. So if we go out there and it looks like he is doing something right, that only is a small peek at what's really going on. Whether they built the thing 100 percent right, we don't know. We assume that but we don't know that because we don't provide 100 percent inspection.
Q. So that is just the responsibility of the landowner then to ensure that it's constructed properly?
A. Right, the landowner and the contractor.
Q. Now, this drawing doesn't show the sprinkler system or the spray fields?
A. No, it does not.
Q. Do you know when that was installed?
A. Well, I know when the sprinkler lines

Page 102

were put in. And we have some pictures on Exhibit-1, page 2, showing the installed irrigation line which was done in October of 2000.
**Q. And are you referring to the two photographs on the right column, the second and the third photographs?**
A. Yes, right column, second and third photographs.
**Q. Can you tell looking at those photographs which spray field was involved there?**
A. I think the photographs in the picture show the spray field to the -- what is referred to as the south spray field toward the trailer park.
**Q. Okay. In the photograph on the bottom, the one that says upper end of installed line 9/22/2000 --**
A. Yes.
**Q. -- there looks to be a pile of material there between -- at the edge of the field in front of the trailers, I believe, that's in the background. Do you see what I am referring to?**

Page 103

A. At that point in time it clearly shows there was still some spent substrate still stock piled there at that time.
Now, I think if you go to another page, the next page, page 3 of Exhibit-1, I don't know if that shows the same thing but my recollection is all the spent was moved out of there at some point in time.
**Q. Are you referring to the first photograph there?**
A. Correct. The first photograph on page 3 of Exhibit-1.
**Q. That's a photograph of the south spray field as well. Is that what you are saying?**
A. I believe it is. I see it -- a building in the background there and that had to be the south field. It may not be the same angle though, so I don't -- that doesn't show the same spot.
**Q. Just looking at that photograph or that same page, the photograph beneath that, could you describe what that photograph shows?**
A. The second one down on the left?
**Q. Yes.**

Page 104

A. That's a view of the -- part of the final plan was a grass waterway that goes along the entire south side of the project and once the waterway got to the end of the west end of the HDPE lined facility, the grade -- it was determined the grade was pretty steep there and we need to stabilize it with something. So that just shows a view of the stabilized channel, rock channel, that was -- it was -- I am personally -- I'm not sure. It was probably a modification to add a steep rock lined channel.
**Q. And what is the purpose of that waterway?**
A. That waterway was to handle water coming from above the site to the, I guess, to the east of the site there were some houses and some yard and whatever. A couple acres -- I don't know how many acres but there was some drainage areas up there that we did not want to collect into our storage facility. So this waterway was to take the clean water around the site.
**Q. And what about the south spray field, would that flow run off from that field into**

Page 105

**the waterway as well?**
A. The runoff from the south spray field during a rainfall event, if it rained enough, would flow into the grassed waterway.
**Q. So I just want to make sure I understand the sequence of events that took place here. Now, you said you originally received the request for assistance in March of '97, right?**
A. That is correct.
**Q. And they entered into the contract to perform these structures in September of '97?**
A. That is correct.
**Q. And the actual lined impoundment was completed and I guess the spray field work for that was completed in the time frame of -- by September of 2000, the time frame of September/October 2000?**
A. The liner, the physical liner, was installed in June. The spray field was being installed in, I guess, in 9 -- August -- is it August, yeah, -- September.
**Q. September was the one picture but it doesn't look like it was --**
A. No, September and then it was mulched

some time in November.
**Q. In November. Okay. So approximately three years following entering into the contract then, from September '97 to --**
A. Implementation.
**Q. -- November of 2000 these things were installed?**
A. Yeah, in a three year period they finally were installed.

* * *

(Whereupon, a short recess was taken.)

* * *

BY MS. HUMMEL:
**Q. I would like to talk some about the spray irrigation system that is out at the facility and yesterday we had an -- oh, no, I guess we didn't use these yesterday. We had an exhibit that's previously been marked Masha Exhibit-5.**

* * *

**(Irrigation Field Layout, 4 pages, was received and marked as Vanderstappen-8.)**



* * *

BY MS. HUMMEL:
**Q. And the reporter has also marked it as Vanderstappen Exhibit-8. Are you familiar with that document?**
A. The document you have there is a combination of a sketch provided by Lee Rain, Incorporated to the landowner to represent their proposal on a layout for a spray system.

And the reason it was done by Lee Rain was, NRCS, we wanted to work with someone that was going to guarantee that the spray system would work, the pumping, the elevations and all that kind of stuff that was part of their design process to come up with the layout. And we were just going to cost share on the piping and the irrigation system but we required the landowner to get someone else to do the actually layout, I guess, of the site. So we took their sketch and threw our name on it and said, "Okay, it looks good."
**Q. So what was your actual involvement in**



**the design of the layout of the spray field?**
A. Well, we have -- we gave some criteria on where the spray field was to be in a general area in the coverage they are supposed to get. That was about it and they were to come up with an idea of how to get the water to the site.
**Q. And does the drawing that you see there generally approximate what is out there?**
A. The drawing generally approximates, however, it is not a scale drawing or ties directly to our survey or anything else out there but it gives a general idea of what was done.
**Q. Let's turn to the back page of this exhibit. There is a chart that shows different sprinkler heads and there seems to be one that is circled there. Is that what was installed out at Rick's Mushroom Service?**
A. I see what was written on this piece of paper. I am not sure which one actually was installed. I can't verify it one way or the other.
**Q. Would you have that information or have**



**known of that information?**
A. We probably have it. I would have to go back and double check to see whether I could really verify specifically which one it was.
**Q. Well, you said you had provided them information in terms of where the spray areas where to be located and the coverage, the area to be covered. Can you be more specific as to what in terms of coverage you would have directed them to do?**
A. We had a certain area that we wanted -- or an area that needed it to have spraying capacity on to. And when you do a spray field you have several choices. You can either put a bunch of small sprinkler heads out that cover smaller areas or larger sprinkler guns that cover bigger areas or one big gun that covers the whole thing. So we kind of left it up to the owner and Lee Rain to come up with what they felt would work best for his layout. That's kind of where we left it at.
**Q. Okay.**
A. We didn't get into much of the specifics, other than the fact that we gave the landowner

Page 110

a sheet, irrigation guidelines that indicated the maximum application rate for the irrigation system, what to do if -- to make sure that there was no runoff, you know, there is some guidelines we gave them to operate under, so it really -- what he chose didn't matter as much as the -- I see it on the back of that one handout. It didn't really matter because we had parameters he had to operate in and that was the -- that was -- we wanted the end product, how he achieved the end product was up to him and Lee Rain.

* * *

(Detailed Operation and Maintenance Requirements for Settling Basin, HDPE Lined Storage and Spray Field, 2 pages, was received and marked as Vanderstappen-9.)

* * *

(SMS Irrigation Field Sizing Table, 1 page, was received and marked as Vanderstappen-10.)

* * *

BY MS. HUMMEL:

Page 111

**Q. I am actually going to -- I had the court reporter mark two documents. One Vanderstappen Exhibit-9 and one Vanderstappen Exhibit-10 and I am going to hand you document nine first.**

**Do you recognize that document?**

A. Yes. It's Detailed Operation and Maintenance Requirements for Rick's Mushroom Service. It's two pages.

**Q. On the second page down at the very bottom right which says PJV 1/99 does that mean that you prepared this?**

A. I prepared both of these documents.

**Q. I am also going to hand you what has been marked as Exhibit-10. Do you recognize this document?**

A. Exhibit-10 was a spread sheet I put together for the initial sizing of the -- I guess for the spray field.

**Q. Now, down in the right-hand corner on that, it looks like there is another set of initials and the date November 15, 1999. What would they indicate?**

A. That would be my counter partner, another

Page 112

engineer in the office. When we put a project together, even though we are the project engineer and engineer of record, someone else in the office at least goes through and checks the fundamentals to see if they are all there. So that's all that is indicating. He did -- he checked.

**Q. And whose initials would that be?**

A. Walter Hosea Latshaw, L-A-T-S-H-A-W.

**Q. But you actually prepared this table?**

A. Right. This is my table, right.

**Q. Could you describe the relationship between Exhibit-9 and 10.**

A. Exhibit-9 is a -- page 1 of Exhibit-9 is a detailed operation and maintenance plan for the lined facility that was installed and talks about all the different scenarios they need to address during spraying, etcetera.

Exhibit-10 was a, I guess, a preliminary design based on some unknowns that I had used to come up with at least an area that they may need for spraying but it wasn't a finalized area. It's just an area that we projected depending on some unknowns and the

Page 113

unknowns being the actual N-P-K value of the material they are spraying.

**Q. Now, you said this was a preliminary table, so would there have been other documents that relate to the sizing of the irrigation?**

A. Probably not. This is probably the only one we generated.

**Q. So are the recommendations in Exhibit-9 ultimately based on the calculations that were done on Exhibit-10?**

A. I need to take a look at this for a second. (Witness reviewing document.)

**Q. Sure. Take your time.**

A. Could you restate your question now?

MS. HUMMEL: Could you read it back?

* * *

(Whereupon, the court reporter read back the pending question from the record.)

* * *

A. Exhibit-9 was put together to cover all the possible scenarios on any kind of

Page 114

irrigation operation and I tried to cover the situation where if the nutrient value was higher than we anticipated or exceeded the crop uptake -- we have it out here, "Under extreme conditions, other options include trucking or other means of land applying liquids on to other sites suitable for land application of agricultural wastes."
**Q. And you are reading from --**
A. Page 1 of Exhibit-9.
**Q. Item number five?**
A. Item number five.
Keep in mind, every site has unique characteristics on waste values and rainfalls and dilution may effect that waste quantity or quality. So the application rate would have to be adjusted to -- it has to be checked in order to make sure you don't exceed the rate that the land can take.
**Q. When you say has to be checked, what do you mean?**
A. Checked for nutrient value.
**Q. So you are saying there is -- there can be variability depending on how much rainfall**

Page 115

**that is there so you need to check the nutrient content?**
A. Of the water, right, of the liquid in the storage.
**Q. And the application rate would have to be adjusted?**
A. The application rate is adjusted for land conditions. The application rate can be adjusted for infiltration rate considerations on that particular site and also could be adjusted for nutrient value of the liquid. So there is several different things that could effect how much liquid you could apply to a given area.
**Q. And did you evaluate any of those things at the facility?**
A. We did not specifically evaluate those at the facility. We based on general history and guidelines the landowner was, you know, requested to require to check these things out to make sure that we -- he did not exceed any of these parameters we listed in this particular guideline.
For example, Exhibit-9, page 2,

Page 116

we talk about the different scenarios on the application rate relative to slope and reduction of application rate based on the slope.
We also talk about the maximum limit of no more than two inches per week excluding rainfall. And some other things like, "Total applications shall not exceed nutrient utilization needs of crop." No manure application after it rains. "Entire system must be monitored during operation to allow shutdown."
"In the event the liquid is moving beyond the spray area, shut the system down even if all other parameters are followed."
Basically, we wrote a fail-safe document to avoid the issue of having runoff coming off the irrigation site -- at least in the verbiage that we wrote for operation and maintenance. There is so many variabilities out there that we made sure that at least from our end and what we told the landowner, we'd try to avoid that situation.

Page 117

**Q. But this is based on just general guidelines -- you didn't do anything specific to the site to tailor it to what is going on at that operation?**
A. No, we did not. And that's typical for agricultural, even on nutrient plants for other AG industries like dairy, hog and stuff. We write a general plan based on general numbers and then the farmer is required to test his particular product and then adjust his applications based on that. So we are in the same kind of mode here.
**Q. And you said there are quite a number of variables that can influence what the appropriate application rate should be at any given time?**
A. Right. And we have outlined several of these in this document, under document, I guess, number nine.
**Q. So this needs to be an ongoing evaluation process to adjust your application rate to make sure you are doing it properly?**
A. I am going to agree with that. That's true. The owner needs to monitor what he is

Page 118

doing and what product he is putting out there
to make sure he doesn't violate any of these
parameters we have set up initially.
**Q. Now, at the top of that page you**
**mentioned a couple basic guidelines. You say**
**listed below are some of the basic guidelines**
**compiled from the Pennsylvania Irrigation**
**Guide, NEH Section 15 and DEP regulations.**
**Can you describe what you are referring to**
**there?**
A. The Pennsylvania Irrigation Guide
classifies soils into different irrigation
groups 1 through 10. And depending on your
soil group, there is a what they call a
maximum application rate that soil can take
without having runoff.
For example, soil group one,
the guideline says no more than .5 inches of
liquid per hour. If you apply more than that,
you may have runoff.
**Q. And who prepared -- whose document is**
**this Pennsylvania Irrigation Guide?**
A. Oh, it's NRCS, it's a conservation
service document.

Page 119

**Q. Now, had you produced a copy of that**
**document to us?**
A. No, we just -- this is what we had, what
was on here.
**Q. Do you have a copy of that in your**
**office?**
A. Yeah, we have a copy in my office.
**Q. So we could get a copy of that document?**
A. Right.
**Q. And what are these irrigation groups**
**based on?**
A. Based on different soil groupings.
**Q. Soil type?**
A. Soil type, yes.
**Q. So it's just based on the type of soil**
**that you have, they've classified different**
**soil types into these irrigation groups?**
A. Different groupings, correct.
**Q. Now, did you identify which group applies**
**to Rick's Mushroom Service?**
A. Probably not. I will be honest on that,
because here we are dealing with a site, too,
that has a history of how many years in that
particular site they were dumping spent

Page 120

mushroom substrate and hauling it out,
etcetera, etcetera. So the topsoil had
already been, you know, taken away or
whatever. So how it was classified --
**Q. So the soil classification for that area**
**would not necessarily indicate what is there**
**at the property today?**
A. I can't answer that 100 percent one way
or the other. But by writing this general
guideline here, we covered all the
possibilities with our primary concern being
limiting the application rate no matter what
to avoid runoff and the secondary part would
be to test your material to make sure that the
-- over the growing season, you don't
overapply for nutrients. So that was our
caveat is no matter what things are out there,
there are several unknowns. This particular
document and along with this page would cover
all the unknown scenarios out there that we
get into.
**Q. Do you know if under the Pennsylvania**
**Irrigation Guide if, in fact, you don't have a**
**-- if your soil hasn't been generally**

Page 121

**classified as something, is there a procedure**
**that you can go -- can you go out and test**
**your soil to figure out which category you**
**would belong into?**
A. We probably could. And we probably
looked at an old soil map to see what it was
classified beforehand and I did not do that to
my knowledge.
**Q. But the landowner could do some kind of**
**test to figure out what group would apply?**
A. I think we are focusing too much on what
group and the real issue of, regardless of
what the group is, the issue is the
application rate and zero runoff.
**Q. Okay.**
A. So from the landowner's point of view and
from what we are telling the landowner, the
application rate, regardless of what you think
the group is, it all comes back to we do not
want any runoff and that's why we give all
these parameters over -- the maximum you get
is .5, the least you could go is .25. But
then your slope could change that and you
could reduce it additionally so.

Page 122

Q. So did you actually develop a recommended application rate for Rick's?
A. No, we did not develop a specific plan because there was several variables in here. We gave him these guidelines to assist him in making the proper decisions to avoid runoff conditions.
Q. So this statement on both page 1 and 3 or 2, I'm sorry, of this Exhibit-9, that maximum application is two inches per week less rainfall, that wasn't to be used as an application rate, that was just a statement as to the absolute maximum?
A. The general guidelines we go by and our standards say that you are not supposed to apply more than two inches per week.
Q. No matter what the condition is?
A. That is what our guidelines say but -- that is what we say here.
Q. Okay. But is -- but is what you say here and was the landowner advised that that would be the application rate for his property, two inches per week less rainfall?
A. I don't know what he specifically thought

Page 123

we advised him because he was given all these documents. I don't know what he -- I don't know what he was thinking.
Q. You had said that this document was developed as a fail-safe because you do not -- you don't want any runoff?
A. Correct.
Q. Who developed the application rate information that is in here?
A. In answer to your last question, I am the author of this particular article, document number nine.
Q. Then who developed the actual application rate that Rick is using at the property?
A. I would have -- I don't know. We didn't specifically -- I did not specifically tell him how much his application rate was. We gave him the guidelines. Here is what you need to do. Here's things you have to avoid. That's where we left it. If he overapplied, that was an operation issue.
Q. Well, going back to Exhibit-10. Now, what was the purpose of this document?
A. The purpose of this document was to -- it

Page 124

was a planning tool on my end to come up with an estimation of what area we may need depending on some general categories for an irrigation system based on water infiltration.
Q. But this was not based on any specific information from Rick's in terms of the nutrient content of the wastewater --
A. No.
Q. -- for the field conditions, what the soil conditions or anything out there was?
A. Exhibit-10 was a preliminary estimate based on general knowledge, not site specific to what his actual operation was going to be or is.
Q. Well, then when you -- when you talked to Lee Rain, the contractor who installed the irrigation system, then when you said you gave him the general information about the location, where the spray field should go and the area approximately to be covered, was that -- what was that based on?
A. Probably based back on this original design because at that point in time we still wouldn't have any site specific information on

Page 125

what the nutrient value of what the site is going to be. We don't have that information. We have guidelines but we don't have any specific information.
Q. And then Lee Rain designed a system basically to fit the physical area that was available?
A. I think they fit most of the physical area that was available. I am not saying --- I don't know for sure how much. I never went out and actually checked that out specifically.
Q. But their system wasn't designed around any particular application rate or anything that you had developed then?
A. I am sure it wasn't -- the application rate -- we gave the guidelines in here and the maximum would have been, you know, half an inch per hour. Whether he accomplished that with his irrigation system in 15 minutes, I don't know.
Q. So you could adjust whatever system was put in out there to match whatever the appropriate application rate would ultimately