# EXHIBIT "F"

Cont'd

**be?**
A. Right. The key to irrigation systems is if soil conditions aren't optimum or whatever scenario is out there, they just run the system less. You might have to do it more often to get one inch a week but if you're to get runoff for some event every time you go more than 10 minutes, you just run it 10 minutes at a time and you might do it five times to do that but with the ultimate goal being not to have a discharge going off the site.
**Q. What would you expect would happen if Rick exceeded the application rate that was developed for his facility?**
A. I don't know what to expect because I don't know what the conditions were on that particular day when he did that. And I didn't see any -- I was never out there when he was or when I saw any, you know, runoff coming off the site so I don't know.
**Q. Speaking in general terms, if he developed following your guidelines an application rate for his spray fields and he**



**exceeded that application rate, what could be the effect?**
A. Using those general terms it would depend on how much time he ran it beyond the application rate because the spray field probably does not go out to the edge of the spray, the spray diameter, the distance that the guns spray to, probably does not go out to the edge of the filter area. So there is probably some safety factor in that. Now, if he went obviously way beyond that, water could come off of that site but I don't know.
**Q. Do you understand -- can you explain to me just what is supposed to happen in the spray field, how a spray field works?**
A. The general concept of a spray field is that you spray water out on the site and with established grass out there, the soil infiltrates the water but the vegetation, and I am not an ergonomist, but the vegetation is supposed to take up the nutrients. So you can take up the nutrients that way and then the rest of the water percolates down through. So you cleanse out the nutrients, pollutants,



whatever you want to call it, in the root mass, I guess, or root section and infiltrated water just goes down like groundwater. And I am not an ergonomist so, you know, I am not specific.
**Q. So but your understanding is that the key to making this system work then is applying enough wastewater that the plant can use it up in the roots to grow the plant?**
A. Right. You are applying wastewater for -- you may apply -- you are going to apply more water that the vegetation needs but not more than the nutrient uptake it can handle.
**Q. Say that again.**
A. Depending what your nutrient value is of your water --
**Q. Right.**
A. -- that could change several times over the year.
**Q. Right.**
A. You -- if the nutrient value is very low, then your limitations to irrigation provide you don't exceed runoff, is just the ability to absorb the water in the ground and recharge



groundwater. So that would be your, I guess, best scenario out there is you just keep watering as often as you can without runoff and the grass is really green.
**Q. So if you have -- you are saying if the nutrient level was low enough that the plants could use up everything that's being applied, then the only limiting factor would be what the ground will absorb --**
A. Infiltration.
**Q. -- so you don't have runoff?**
A. Right. So you don't have runoff, right.
**Q. But if the opposite is true -- if, in fact, you have more nutrients in the wastewater than the plants can absorb, what would happen?**
A. Then you'd have to either increase the amount of filter area you had available would be one option. Or I guess the worst case scenario is if that was found out that you would only be able to apply so much on that particular land area, then the rest of the liquids from that site would have to be trucked away and spread somewhere else. I

Page 130

don't know but that's --
**Q. And you didn't do any analysis along that line --**
A. No.
**Q. -- to determine which -- what would happen out there?**
A. No.
**Q. Is there a way for a landowner like Rick to measure compliance with an appropriate application rate to make sure that he is not having a problem one way or the other?**
A. In the guidelines we indicate about the idea of doing some sampling, to get a -- I think -- let me see where it is.
Under Exhibit-9, item eight, page 1, number eight, "Test the liquids on a yearly basis. Suggest sampling from various elevations in the storage or setting cans in the spray field to collect sample."
So we give some ideas of how to actually take samples and then he can take them to any kind of certified lab to get the N-P-K values, you know, to get an idea of what he is actually applying.

Page 131

**Q. Do you know if Rick ever tested the wastewater from his impoundment?**
A. I have no knowledge of that. I don't know.
**Q. And you said you -- NRCS had never tested the wastewater there?**
A. No, we did not.
**Q. So you have never reviewed any application rate that has been developed by Rick for this property?**
A. No, we haven't.
**Q. Would you typically do that?**
A. No, we do not. That's kind of an operation item for the landowner because things change and we are not -- we develop a plan to contain it and some options of proper disposal but things can change and so the landowner needs to keep on top of that and make sure that what he is doing is okay because rules can change, you know.
**Q. Do you know what the basis would be for a recommendation that he spray 10 inches, no more than 10 minutes an hour at the facility?**
A. I don't know what that basis was. It

Page 132

might be a good one. I don't -- I can't say it's right or wrong.
**Q. But you don't recall ever advising anybody that that was an appropriate application rate, 10 minutes per hour at this facility?**
A. I will have to say I recall that someone had mentioned that but I'm not sure who came up with that decision or gave him that idea that that would avoid problems if he did that. I am not sure. I really can't say.
**Q. But you didn't recommend that?**
A. I don't recall that I did.
**Q. Just to finish our discussion on Exhibit-9, I had mentioned the Pennsylvania Irrigation Guide. It also mentions the NEH Section 15.**
A. Uh-huh.
**Q. What does that refer to?**
A. NEH-15 is our National Engineering Handbook and Section 15 is our very thick volume, one inch thick volume, that considers all kinds of irrigation across the country, that kind of thing.

Page 133

And the only thing I think I got out of that was this NRCS slope designation with application reduction. I might have used that information out of that just to indicate -- I had an inkling that on steeper sites you can't follow these maximum application rates because you will get runoff. We put that in there as another safety factor.
**Q. Now, you said this is a one inch thick document that deals with irrigation. Does it provide specific recommendations as far as developing application rates?**
A. It may have specific -- yes. It may have some guidelines in there. I am not sure.
**Q. And it also mentions DEP regulations?**
A. Right. The DEP regulations in our practice standard for filter areas talks about limiting the application rate to no more than two inches per week less rainfall.
**Q. Could you be more specific as to what you are referring to?**
A. We have a filter standard or filter strip standard, that refers to this concept of no

Page 134

more than two inches per week less rainfall. And that is in our standard. I don't have a copy of it here so.

**Q. And you think that that standard is based on a DEP requirement?**

A. I think that's part of the DEP requirement to limit the application to no more than two inches per week.

**Q. Did you specifically review any DEP requirements?**

A. At one time I looked at -- there was a wastewater for residential wastewater spray fields and I looked into there to get some idea of what the minimum storage periods would be for a facility like this and I think it indicated 72 days. That's why I got this idea that we need at least 90 days of storage.

They had done some statistical study that indicated that there was like 72 days in this part of the state where you couldn't spray apply because of frozen conditions, wet conditions, whatnot. So we -- I had to come up with some idea of what is the minimum storage period I needed to cover all

Page 135

those scenarios. So I looked at that and they also talked about the two inch limit per week.

**Q. And this was a DEP guidance document?**

A. Yes. Of some sort, yes.

**Q. And you thought it dealt with, I am sorry, residential?**

A. Wastewater, right.

**Q. This is a document you have in your office?**

A. Yes.

**Q. Would you be able to get me a more specific reference to that document?**

A. I can get you -- yeah, I can get you names and everything if you want that. That is no problem.

**Q. That would be helpful.**

A. But it wasn't a primary guidance, you know. It's not one of our standard documents we use. I just happen to use what resources I could to make sure of the general direction here.

**Q. Now, have you developed these types of guidelines for other facilities?**

A. Probably not as detailed as the one -- as

Page 136

this one is here -- as into the operation specifically. We do a lot of manure storage facilities that are millions of gallons of storage for hundreds of cows and we go back to this N-P-K testing and land application and they hire consultants to do the nutrient management plan.

**Q. So you -- it sounds like you generally don't get involved in that part of the process?**

A. We don't get involved in the detail end of it. We know it exists. It's a concern of ours and it needs to be addressed. We are not -- it's the landowner's responsibility to make sure he follows the guidelines that we give him.

**Q. So you were just trying to outline the guidelines that Rick needed to follow to develop his own nutrient management plan?**

A. I would say that's a fair statement.

**Q. Again, I just want to go back to that two inches. The statement in here, a limit of application rate to two -- no more than two inches per week less rainfall. Is it your**

Page 137

**view that that would be the absolute maximum that could be applied to the fields?**

A. Following our guidelines and standards, that is what our standard says.

* * *

(Additional Conditions and Construction Notes, 2 pages, was received and marked as Vanderstappen-11.)

* * *

BY MS. HUMMEL:

**Q. I asked the reporter to mark this document Vanderstappen Exhibit-11. Do you recognize this document?**

A. Yes, I do, it's the Additional Conditions and Construction Notes for the design.

**Q. And what generally are these?**

A. When we develop a plan, we have some standards and specifications we attach with that plan and at the end of any standard, there's some specific or site specific things we look for or want them to do and we outline those in this particular part of the plan under these additional conditions -- some

Page 138

specific things we want to happen or feel critical or whatever.

**Q. If you turn to the second page, the last item listed, number 18 it says, "The owner is responsible to obtaining any local, state or federal permits." Could you explain that statement?**

A. That statement is what it says. In the end the owner is responsible to obtain any local, state or federal permits.

**Q. Do you get involved in that process at all or advise the landowner in any way regarding possible permits?**

A. We tell the landowner that he is responsible to do that kind of thing, get the permits, but we avoid doing those kind of permits.

**Q. Did Richard Masha ever ask you if any permits were required for this facility?**

A. I -- personally, I don't recall that he did or didn't. I don't know.

**Q. Did you ever advise him as to whether any permits were required for this facility?**

A. I can't remember specifically whether we

Page 139

did or didn't. I am not sure. Probably we said something but I am not sure.

**Q. If you did, what might you have said?**

A. Probably that he is responsible to get any permits he needs to do this operation.

**Q. Have you been involved in any facilities like this that have required permits?**

A. We have had involvement with several cases in the whole issue of permitting composting facilities in Chester County has been a hot potato. And we were involved with the HMR Hudson facility over there that had a major lawsuit. I guess they finally won that thing in the end but -- I know there is some guidelines. And I am not the guideline person. You have to ask DEP about that but there was something said that existing operations less than five acres are kind of waived for permits. That's my interpretation and it's up to the landowner to verify that or check with the conservation district or whoever else you can to make sure that is not going to be an issue.

Plus there is building permit

Page 140

issues, grading plan issues. All those things the township -- he is responsible to make sure those are received in time.

**Q. Do you have -- did you have any interaction with the Department of Environmental Protection concerning this project?**

A. Not initially, no. I know they were on site for whatever reason with the district but I didn't have any interaction with them really.

**Q. So did you ever discuss permitting requirements for this facility with anybody from DEP?**

A. My recollection is I did not specifically talk to them. Maybe someone from the district had talked to them but not myself directly.

**Q. Would you typically get involved with DEP if permitting is required at a facility that you are working on?**

A. Our typical guidelines, the way we operate as an agency, if the situation gets to be a quote, "required DEP permit" of some sort. And I will give an example. Laurel

Page 141

Valley, they were talking about putting a 10 acre site in. And they actually -- we did the planning but then they had to hire a consulting firm to actually put the plan together to represent them to go for this permit application, those kinds of things.

So we -- if it requires a major permit of any sort, we are going to tell the landowner to get his own consultant to do that. It is not a good situation to be in for a federal agency that's trying to assist landowners and also have to represent them in a permitting process, so we try to avoid that.

**Q. So when you are representing a landowner in a project like this, are you guaranteeing in any way that your plans or your recommendations are going to avoid the need for a permit?**

A. No, we aren't and we have that statement -- 18 is in there and also on the cover sheet of Exhibit, -- what exhibit is it? Cover sheet of the drawing, cover sheet Exhibit-6 upper right-hand corner, it does say under

Page 142

regulations, "All Federal, State and Local Laws, Rules and Regulations governing the construction of this facility shall be strictly followed. The owner or operator is responsible for obtaining all construction permits." Oh, construction -- I guess it says permits.
**Q. So this statement that the landowner is required to obtain whatever permits are required is a pretty standard statement you put in most of your documents?**
A. Right. We do that because we work in so many counties, so many townships, there is so many local rules and regulations and the rules and regulations change. We can't be up to date on all of those, so we put the burden back on the landowner to check up on these things and make sure they are aware of them.
**Q. I wanted to talk for a minute about the underdrain in the lined impoundment. Could you describe that feature -- is there an underdrain in the lined impoundment?**
A. The HDPE lined impoundment has a couple unique characteristics that have been

Page 143

developed over the last couple years and the one thing is it has a leakage detection system. Basically, if the liner were to be punctured, leaked, somebody took a shotgun and shot at it and put a hole in it, whatever, and the liquid would leak under the liner. It would go down to the bottom and there is a drain underneath that liner which there are pictures of the installation in Exhibit-1, page 2, left side. There is a picture of a backhoe and they are digging the actual leakage detection line where any liquids that would leak through the liner would go into that line eventually.
Also, the soil that we have there, we make sure that it's recompacted so that it won't leak straight down. It goes to the liner, then there is a geotextile, which is a fabric material. It hits that fabric and then flows in the fabric line and drops into this leakage detection line and flows out.
**Q. So there is, if I am understanding you, there is a secondary liner?**
A. There is an HDPE liner, a geotextile,

Page 144

then the soil underneath has some compaction so it is not a -- it is not a permanent liner but it has enough density to it so the water will travel to the leakage detection system.
Because what we want to happen is if there is a discharge coming out of that pipe, we can -- if it's clear discharge, check and see if it's just maybe groundwater, if the groundwater would have moved up.
Or if it's colored water, it indicates that something has gone wrong in the liner and you need to shut the valve and pump it back in and get the facility empty -- get the facility empty and repair the liner.
**Q. Now, the photograph looks like it's a straight line?**
A. Yeah, it goes across the bottom. The entire slope from the bottom of the slope on both sides slopes at two percent grade to this low spot in the middle.
**Q. If you could flip to Exhibit-6, the second page, the drawing of the lined impoundment.**
A. If you go to the third page of Exhibit-6,

Page 145

you will see a typical cross-section A-A on page 3, Exhibit-6.
Hard to read but where you see the dimension 116 feet -- do you see that?
**Q. Uh-huh.**
A. About a quarter inch to the right, you can just barely see it there but that is where that -- it's a four inch CPT pipe surrounded with 2B stone. That's the low spot of the entire facility. So if you would develop a leak, it goes to the liner and leaks downhill underneath the liner over to this drainage collection system.
**Q. So does this actually run north/south under the liner?**
A. In this particular -- what is represented right or wrong, I can't verify that but it should -- it basically -- I know for a fact it runs from the west -- or the east to the west and there is a pipe down below the embankment. So we can examine the outlet of the pipe and verify that there is no liquids flowing out or what is flowing out.
* * *

Page 146

(Whereupon, a discussion between Ms. Hummel and Mr. Burcat was held off the record.)

* * *

BY MS. HUMMEL:

**Q. So you said it flows east/west?**

A. I believe relative to this picture it would probably -- the pipe comes out to the west, somewhere to the west side of that.

* * *

(Photograph, 1 page, was received and marked as Vanderstappen-12.)

* * *

BY MS. HUMMEL:

**Q. I asked the reporter to mark this photograph Vanderstappen Exhibit-12. You will see it's also marked Davis Exhibit-16.**

**This was a photograph that was provided to us by the Chester County Conservation District. They had conducted an inspection at the facility and this was some material that they had removed from the end of the outlet pipe. Is that typical that there**

Page 147

**would be material like that in the end of the outlet pipe?**

A. Well, considering I don't know what date it was taken, do you have any clue on that?

**Q. I believe it was in the fall of this year.**

A. In the fall of this year?

**Q. Uh-huh.**

A. It would be very speculative. I can -- I can give you an answer but it's -- there is no basis for it.

It looks like sediment had built up in the pipe during the construction phase, which was a year or two prior, and had just for whatever reason, either came out of the pipe or the pipe got inundated. I'm not sure which.

You know, it doesn't look like any kind of liquid is coming out of the storage. It looks like sediment. When they -- when the liner is installed and you look at that picture on Exhibit-1, page 2, there is a time period while that pipe is in there before the liner goes in, if it would have

Page 148

rained or anything. There could have been some T-water come down and do that but I'm not sure. I can't really speculate because I don't know. It is not a discharge I would anticipate seeing. It's dirt. That doesn't make any sense but -- it doesn't make any sense to me.

**Q. Well, if what you just described had occurred during the interim before the liner was installed, there was rainfall and there was sediment that got into the pipe. Is it possible that the pipe could get clogged?**

A. There is always a possibility but I have no knowledge of that happening. I am not sure whether it did rain. We would have to ask Lester. I am not sure whether -- now, that I think about it, I am not sure whether -- I don't think it rained there during that time period. I am not sure what caused this.

**Q. Is there a way to inspect the pipe to verify whether there would be a clog in it?**

A. We don't have a normal means. I guess someone could run a rotor rooter up it and check it out but I don't have any means of

Page 149

doing that.

**Q. Would seeing that kind of material at the end of the pipe indicate to you that perhaps that should be done?**

A. It's an interesting thing. I don't know what the solution is at this point in time.

**Q. If, in fact, it had become clogged, how would that effect the functioning of the leak detection system?**

A. The leak detection line, which is this white pipe, extends clear to the inside toe of the damn, so it goes under the breast of the damn to the inside toe.

If it were plugged, I don't know what would happen. Good question. I don't know. I can't give you a speculative answer either.

**Q. Is it possible that it would interfere with the functioning of that system?**

A. It could but, you know, we never -- I have never seen this happen before so I don't know. We have seen -- I've seen other cases where we have had leakage detection systems in and the farmer messed up on his liner and we

Page 150

got a discharge out this pipe and we knew it was leaking and, therefore, they went and fixed it. It's rare but that's happened.

I don't know what the story was in this. I have no idea. It could have been -- who knows why it's plugged up.

The other scenario could be sediment from some other part during construction or whatever came around and filled the area up and they forgot to clean the end of the pipe out. I don't know. Very speculative.

**Q. If it would happen to be clogged, what would be the impact of that on the lined impoundment?**

A. Well, first off, if he dug this out and I'm not sure whether this is all of it or not. If it was all of it and there was a leak, it would be flowing out here like crazy and there is no indication of any water coming out but we don't know if it's clogged any further back or not. So I really can't speculate on that.

One of the solutions is for our

Page 151

temporary scenario is that if there is a discharge, to plug that pipe and close it off, so we eliminate any discharge going downstream while in the interim taking care of, you know, getting the liquids out of there and finding out where the leak is.

Or instead of plugging the pipe, we actually put a basin in, put a pump here and pump it back over the top so it can freely leak, I guess, if there is such a thing, and pump it back over top until we get the liquids out of there.

**Q. Are you aware of any leak that has occurred from this pipe?**

A. No. No.

**Q. Have you ever inspected the pipe yourself?**

A. I have -- no, not that close. I may have looked over the hill and saw the pipe was sticking out but I didn't go walk down and look up the pipe. That is not a typical thing we end up doing. Never had that situation happen so.

**Q. Did I understand you to say there have**

Page 152

**been situations you have been involved with where a pipe has become clogged during construction?**

A. No. I am just giving you some scenarios. I don't know. Not that I have been aware of on my jobs that we have ever clogged a pipe.

**Q. If the pipe was clogged, would there be any way for the liquid that gets into the pipe to come out?**

A. You are asking a million dollar question. If the pipe was clogged up and it had to be really clogged significantly because you would have a lot of head pressure, if the pond was leaking significantly, the build-up on the other side eventually, I guess, it could get through the fill and come out the toe of the slope. But I don't think this indicates anything like that is going on.

But very limited information here. And it would be easy to figure out if it's, you know, they could -- that can be checked out.

**Q. But, in fact, if it was a slow leak that**

Page 153

**was occurring, I assume that a leak necessarily doesn't start out large.**

A. I don't know what -- we have had very, very, very few problems with these liners where we have had leakage.

I was involved with one a year ago and the farmer was down in the bottom, a different type of scenario, but he actually hit the liner and ripped it. Well, he knew it was going to leak, so he fixed it right away. So I don't have any experience on what a slow leak is or a fast leak or what it would do if the pipe was clogged which we can't really ascertain from that. That may have been the entire plug for all we know.

**Q. It's possible, yes. I am just asking you if, in fact, for whatever reason would happen if that pipe had gotten plugged would that likely effect the functioning of the system?**

A. It may not. If the system doesn't leak and the groundwater is not an issue, it may never become -- it may never effect anything.

**Q. Well, it may not but could it?**

A. It could, too. I am not sure. I really

Page 154

couldn't tell you.
**Q. Do you know whether any of the individuals from NRCS that you have been working with on this project have ever been compensated in any way by Rick Masha or Michael Cutone for the services they have provided?**
A. To my knowledge, no. I don't have any knowledge of it.
**Q. Do you know if they have ever received any lunches or gifts or anything of that nature from either of those individuals?**
A. I don't know for sure whether they have or haven't. I think -- come to think of it -- that was his brother. No, because I ate lunch with Masha one time but I think I paid for my lunch. Now, he may have but our policy is that you can -- I think it's up to 20 dollars a year or something like that. And we always -- I try to avoid that like the plague, especially down in Chester County here to get lunches bought. But sometimes they will buy you, if you don't get a chance to pay, but you make the offer to pay but that's -- my

Page 155

knowledge of my personal experience, he might have bought a lunch for me but I'm not -- well, that's enough said.
**Q. Are you aware of whether they have paid any compensation or provided gifts or lunches to anybody from the Chester County Conservation District?**
A. I am not aware of any of that, no, not to my knowledge.
**Q. Anybody from the Department of Environmental Protection?**
A. I am not aware of any of those things.
**Q. Have you ever had any conversations with anybody from the Environmental Protection Agency regarding this facility?**
A. EPA?
**Q. Yes.**
A. No. I know they were on site once but that's the only thing I know.
**Q. Have you ever been on the Reynolds' farm downstream of this facility?**
A. Have I been on the Reynolds' farm? Let me think.
I think at one time I was at an

Page 156

adjacent property owner and we looked over on the Reynolds' property to the south side of the railroad grade and we noted that there was all kinds of spent mushroom substrate piled on that property, on the Reynolds' property.
**Q. And did you go down on the property?**
A. I don't think we walked out -- I can't remember whether we walked over there or not. I don't know whether we did or we didn't.
**Q. And you said you were on an adjoining property owner's land?**
A. Right.
**Q. Which property would that be?**
A. It's right in town there. I can't think of the name.
**Q. Would it possibly have been the Ianieri property?**
A. Ianieri Trucking was probably the property we were on, yes.
**Q. Other than observing the Reynolds' farm from that adjoining property had you ever been on the property?**
A. I don't think so. Not to my knowledge. And I am not sure whether we walked over that

Page 157

day -- whether we walked around and walked over to the Reynolds' property. I'm not sure whether we did or didn't. I can't remember at this point in time.
**Q. Have you ever heard of Benjamin Reynolds?**
A. I have heard the name Reynolds but I don't know any first names.

* * *

(Memorandum dated 11/19/99, 1 page, was received and marked as Vanderstappen-13.)

* * *

BY MS. HUMMEL:
**Q. I have asked the reporter to mark this document as Exhibit, Vanderstappen Exhibit-13. Do you recognize this document?**
A. Yes.
**Q. Could you describe what it is?**
A. It's a letter I sent to Sam High concerning, I guess, DEP -- and I forgot about that -- and NOV, Notice of Violation. I forgot that. And lists some -- apparently, well, I don't know what they were thinking but we came up with a plan to keep moving forward

Page 158

on this project and by December 23, 1999 was to clean out that sediment basin which we show on the pictures, Exhibit-1, and the proposed plan to install the concrete sediment basin liner by the year 2000 in June and the filter area somewhere in that time line.

**Q. If I could get you to turn back to that contract support document. It's Exhibit-3 and turn to page -- it would be D0258.**

A. Okay.

**Q. Now, item number seven on this support document it says, waste storage pond - flexible membrane?**

A. Correct.

**Q. Now, this support document indicates that that structure was to be installed in 1999; is that correct?**

A. Correct.

**Q. Now, in this plan in Exhibit-13, the plan here is to have it installed by June 15, 2000; is that correct?**

A. Correct.

**Q. So when you in your introductory paragraph there refer to this as an**

Page 159

**accelerated work plan it wasn't, in fact, this impoundment had been on -- in the contract to be installed prior to this point; is that correct?**

A. Reading the dates here you are correct in that statement. But I did say the conservation plan schedule of operation shall be amended to reflect the new time schedule -- which wasn't my function to do -- but it was very common for us to move practices a year later down the road. That was not a major issue. Remember this is a volunteer program, that kind of thing.

**Q. Right. But I just -- it's accurate that this practice had, in fact, been planned for some time at this point?**

A. Correct. Back in 1997 the projected time was 1999.

**Q. And the last statement that you make in this memo, "This will result in this site meeting the requirements of the Mushroom Manual." Could you explain that statement?**

A. There is a Mushroom Manual which is -- do you know what the Mushroom Manual is? You

Page 160

probably know more about it than I do. You probably read it more than I have.

There is guidelines in that and we are trying to meet the guidelines based on our specifications.

**Q. So you were using the Mushroom Manual in developing the plan for this facility?**

A. Probably not specifically, no.

**Q. So when you state that this will result in the site meeting the requirements of the Mushroom Manual, what analysis did you do to determine that?**

A. It was probably just some loose verbiage. I will leave it at that.

**Q. So you hadn't specifically reviewed the requirements under the Mushroom Manual for this facility and determined that all of those requirements would have been satisfied?**

A. I would say I hadn't but I think the conservation district had written a plan for him and they knew what we were planning so I would assume that everything we were planning would meet the guidelines of the manual. So it wasn't really a big issue for me to

Page 161

specifically check that out.

**Q. But you, in fact, personally then wouldn't have been the one determining whether the site was satisfying those requirements?**

A. I think the presumption is when we put this plan together it would meet that manual at that time based on what I knew about the manual and based on my interactions with the conservation district.

**Q. But when you came up with the preliminary plan and the structures that you were recommending for this property were you using the Mushroom Manual to determine those?**

A. The Mushroom Manual just gives you kind of general guidelines and some criteria. Our standards and specifications nail that down a little tighter so I was aware of what's in the Mushroom Manual and we would just come up with specific Best Management Practices to achieve that.

**Q. So there isn't any analysis you can point to that supports that statement that the site would meet the requirements of the Mushroom Manual if these things were implemented?**

Page 162

A. Probably not.
MS. HUMMEL: That's all I have.

* * *

EXAMINATION

* * *

BY MR. HOWELL:
**Q. Good afternoon.**
A. It is afternoon.
**Q. It's my understanding from your earlier testimony that the owner of a mushroom waste treatment facility like Rick Masha has approximately three to five years until actual full implementation of all BMP's are required to be completed on their site, correct?**
A. That's a good general statement of what we do.
**Q. Do you know how many years it actually took for Rick Masha to complete full implementation of all Best Management Practices on his site?**
A. I guess we can just review the -- well, the storage was completed in 2000. We started in '97. I guess it's three years, three

Page 163

years.
**Q. Three years. But we can look in the documents and find those specific dates. Roughly that's all I was looking for. Thank you.**
A. Three years.
**Q. You had stated earlier that the owner operator of the RMS site, Rick Masha's Mushroom Service site, did not, in fact, install the HDPE pond as quickly as possible, correct?**
A. The HDPE pond was proposed in '99 and wasn't installed until the year 2000 but from our point of view that wasn't a big issue. These things happen. These contracts where it's a voluntary participation program, we can't force -- we aren't a regulatory agency. We cannot force them to do something, you know, that kind of thing. So if he delays for six months or a year, that's what they have to do, you know.
**Q. Do you know the number of contractors that install HDPE liner ponds in southern Chester County or the surrounding areas?**

Page 164

A. My knowledge is only limited to what we do in agriculture. There was only one Manada Construction who actually did the liner installation.
**Q. Manada Construction?**
A. They actually installed the liner. Freddie, F and R Excavation, I believe, did the site work, the digging the trenches and building the embankment and then the lining company actually came in and put the liner in.
**Q. If the lining company was unavailable for the amount of time the owner decided not -- or was postponing installing of the liner pond, could that be an explanation for the postponement of the installation?**
A. That is a possibility because the liner -- we -- for whatever reason is we only have one guy that does AG liners in Pennsylvania it seems and if he would be booked up, that may delay the, you know. The idea of having the excavator and the liner, they need to work together, so if the liner guy is not available you have to wait until the liner guy is available to put the liner in because it has

Page 165

to be timed exactly within a couple days. So that may have happened. I am not sure.
**Q. So do you have any basis for stating or do you know of, in fact, the reason why the postponement of the liner pond would occur on the RMS property?**
A. Postponement from when? From 1999 to 2000?
**Q. From the first date it could have been installed until actually when it was installed.**
A. I don't think I understand your question.
**Q. I am sorry. Let me rephrase.**
**From the first date that the liner pond could have been installed to the date it actually was installed some time later, there was a postponement of time when the owner did not, in fact, install the pond, correct?**
A. Correct.
**Q. Do you know the reason why the owner did not install the pond for that time?**
A. A part of the reason could be the -- which exhibit has the actual design? The

Page 166

cover sheet for the design, that is what I am looking for.
What is the date on the front? That was exhibit -- which exhibit number was this?
MS. HUMMEL: Six.
A. (Continuing.) Exhibit-6. Yeah, we didn't complete the design until November of 1999, so the installation couldn't have happened until at least until the spring of 2000 and that would have been a matter a timing with the HDPE liner guy and everybody else. Masha did not have a design until then.
**Q. So you would have had more trouble installing it until he actually had the design for installation?**
A. That would be helpful, correct.
**Q. Assuming the facility on the Rick's Mushroom property and the BMP's installed were installed to your specifications as designed in your plan, what would you expect the amount of SMS runoff from the property into Trout Run Stream or any other areas to be?**
A. If the -- if it was maintained according

Page 167

to the original design and operated properly and all his activities were within the dikes and the runoff into the storage, we would expect zero discharge of that area.
And the spray fields which would be a separate type of an issue, as long as he manages the spray fields and didn't overapply resulting in runoff, and there should be no runoff off of that. So if those two things worked out, there should be zero discharge.
Unless, the only scenario could be is if we had a major storm event that exceeded the capacity of the storage like a -- more than a 25 year storm and he was full at the time, you might have a discharge at that level but that didn't happen to my knowledge.
**Q. That was going to be my next question.**
**Hypothetically, if there was no rain on the Rick's Mushroom Service property for a period of months and then an application to the field surrounding Rick's Mushroom property was made in excess of the two inches per week, would that mean that, in fact, the**

Page 168

**wastewater application rate design under your design had been breached?**
A. Your question is if he applied more than two inches in a week is he in violation of our guidelines?
**Q. Yes.**
A. Clearly, he would be -- whether it's a problem, I don't know. Whether it would cause a runoff, I don't know.
**Q. Do you know if according to the spray irrigation system that you designed and was installed, if the amount of spray irrigation to the fields could be adjusted by the owner or operator?**
A. I back up and say that the -- most design was done by Lee Rain for the piping size and the irrigation and selection of the materials and how to install it. As for adjusting the spray, the owner has an option of running it longer or shorter so he can adjust the application that is coming out of those nozzles and how long it goes out and the application rate. So he -- there isn't much -- there is a lot of flexibility there.

Page 169

**Q. In addition to running it longer or shorter, does he also have the option of pumping less out at a time through the pump?**
A. I guess he could adjust the pump so that it is not pumping as hard, therefore, the volume going out, the spray would be less. That's another way to adjust it. There is several ways he could adjust the amount of application. I am not aware of what he actually did.
**Q. Is making a visual inspection of the spray application fields a viable way to determine what would be proper application to those fields of SMS wastewater?**
A. Visually inspecting the field would at least allow one to determine whether you are going to have a runoff situation or not. So that would answer that question.
As for the other side is how much application can you put on based on nutrients or whatever, you couldn't ascertain that from doing that alone. You would have to have some testing to figure that part out.
**Q. If your directions were followed that two**

Page 170

**inches, a maximum of two inches a week should be applied to the spray irrigation fields, do you have any idea how many gallons of SMS wastewater we are talking about with that two inch scenario?**
A. I couldn't tell you off the top of my head. One could figure it out looking at the area and the application rate and how long he ran it, you could figure that out but I couldn't tell you off the top of my head what it would be.
Q. **You had stated -- you had stated that you had witnessed compost on the Reynolds' farm property?**
A. There was piles of SMS down in the railroad tracks and supposedly it was on Reynolds' property. That's the only thing I know.
Q. **That's your only understanding.**
**Have you ever personally designed any runoff controls for SMS wastewater to be used on the Reynolds' farm property?**
A. No.

Page 171

Q. **Has anybody in your office or your office?**
A. Not for that specific purpose, no.
Q. **Are you aware of any controls that exist on the Reynolds' farm property to prevent SMS wastewater from entering Trout Run or the Reynolds' farm pond?**
A. I have no knowledge of that.
Q. **I am sorry. What date did you say you witnessed the compost on the Reynolds' farm?**
A. I can't give you a date on that. We were there at probably Ianieri Trucking and I don't know what the date was.
MR. HOWELL: I am done.
MS. HUMMEL: Just a couple quick questions.
* * *
EXAMINATION
* * *
BY MS. HUMMEL:
Q. **As far as when you designed the liner impoundment do you know what would trigger design?**
A. What triggers a design is a couple of

Page 172

things. We have -- and at that time we might have had 30 or 40 contracts going plus other workload and we do designs just in time. We try to look at what the landowner is really going to do because I don't have time to put designs on the shelf a year in advance. So we kind of play it by ear. We keep in contact with these guys and we put this contract together and it's up to them to give us a call to -- maybe to remind -- we try to track it but they also call us to remind us that, "Hey, I want to put this thing in."
Obviously, in this particular case the DEP got involved and that might have -- I don't know what the date was on that, whether it came before or after my design was finished but I will have to take a look at that. But it's based on workload and the idea that the landowner is going to implement it.
Q. **So if Rick Masha had decided that the lined impoundment was one of the first things he wanted to do when he entered into the contract, for instance, he wanted to put it in in 1997, you would have designed it at that**

Page 173

**point?**
A. We would have designed it at that time.
Q. **Do you know whether there is any issues with salt content in the spent mushroom substrate?**
A. All I know is hearsay. I have no specific knowledge of what they are so.
Q. **So that's not an issue that you looked into at all --**
A. No, I did not.
Q. -- **when you did the design?**
MS. HUMMEL: That's all I have.
MR. HOWELL: Just some follow up to her questions.
* * *
EXAMINATION
* * *
BY MR. HOWELL:
Q. **The actual -- the actual installation and design of the impoundment is done by -- I am sorry. The design of the impoundment is done by your office; is that correct?**
A. That's correct.

Page 174

**Q. And your offices have a protocol to follow for installation of BMP's like the impoundment?**

A. Yes. We have standards and specifications which is 313 I think is the standard number and 425A is the other standard that shows how these are supposed to be installed.

**Q. Do you have protocols as to in what order certain BMP's are installed on the land, on the landowner's property?**

A. We have protocols we go by and in this particular case like installing the concrete settling basin first would be done prior to building the HDPE liner because it wouldn't make sense to have the liner in and then have all the solids flow into it. So we'd build a settling basin first and then the liner second.

**Q. So, in fact, if Rick had said hey, I want the pond in now, he would have to wait until the settling basin was built before he was able to install the pond correctly according to your specifications?**

Page 175

A. Correctly, yes.

MR. HOWELL: Thank you.

* * *

(Witness excused.)

* * *

(Whereupon, the examination concluded.)

* * *

Page 176

INSTRUCTIONS TO WITNESS

Read your deposition carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any change in form or substance which has been noted on the following errata sheet, along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. Have the witness sign in the space provided. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original errata sheet to the deposing attorney, KIMBERLY A. HUMMEL, ESQ. Promptly! Court rules require filing within 30 days after you receive the deposition.

Page 177

ERRATA SHEET

| PAGE | LINE # | CHANGE | REASON THEREFOR |
|---|---|---|---|
| | | | |

SIGNATURE PAGE
OF
PETER JOHN VANDERSTAPPEN

I hereby acknowledge that I have read the aforegoing deposition, dated March 15, 2002, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

SIGNATURE: ____________________

WITNESSED BY: ____________________

DATE: ____________________



SANDRA E. ROSIEJKA, C.S.R.
Registered Professional Reporters
19 West Second Street
Media, Pennsylvania 19063
(610) 566-2011

March 23, 2002

Roger F. Hager, Esquire
Natural Resources Conservation Service
Pennsylvania State Office
One Credit Union Place, Suite 340
Harrisburg, Pennsylvania 17110

RE: Warren Reynolds, et al v.
Rick's Mushroom Service, et al

DOCKET NO. 01-CV-3773
DATE TAKEN: March 15, 2002
WITNESS: Peter John Vanderstappen

Dear Mr. Hager:

Enclosed please find your transcript copy in the above-captioned matter to be retained by you.

Also enclosed are the signature and errata sheet to be signed by the witness and returned for insertion in the original transcript.

Should the witness desire to make any changes or corrections in accordance with the Rules of Civil Procedure, they should be listed on the enclosed errata sheet, listing the page and line number and the reason therefor.

Return the original errata sheet and signature page to KIMBERLY A. HUMMEL, ESQUIRE for insertion in the original transcript prior to the expiration of thirty days.

Thank you in advance for your cooperation.
Sincerely,
Sandra E. Rosiejka, C.S.R.



REPORTER'S CERTIFICATE

I, SANDRA E. ROSIEJKA, a Certified Shorthand Reporter, (State of New Jersey, License No. XI 00746), with offices in New Jersey and Pennsylvania, do hereby certify that the foregoing is a true, complete, and accurate transcript of the deposition of PETER JOHN VANDERSTAPPEN who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am not related to or employed by any of the parties to the action in which this deposition was taken, or any attorney or counsel employed in this action, nor am I financially interested in this case.

____________________
SANDRA E. ROSIEJKA, C.S.R.
Certified Shorthand Reporter
Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)