# EXHIBIT "A"

# In the United States Court of Federal Claims

No. 06-255C
(Filed April 10, 2007)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **RICK'S MUSHROOM SERVICE, INC.,** | * Contracts; breach of contract; motion to |
| | * dismiss pursuant to RCFC 12(b); subject |
| | * matter jurisdiction; ripeness; Contract |
| Plaintiffs, | * Disputes Act, 41 U.S.C. § 609 (2000); |
| | * contract for procurement of services; |
| v. | * procurement contract versus cooperative |
| | * agreement; Spearin doctrine; Anti- |
| **THE UNITED STATES,** | * Deficiency Act, 31 U.S.C. § 1341 (2000); |
| | * implied-in-law warranty. |
| Defendant. | * |
| | * |
| * * * * * * * * * * * * * * * * * * * | * |

David J. Taylor, Spriggs & Hollingsworth, Washington, DC, for plaintiff. Jeffrey A. Krawitz and Jonathan J. Bart, Silverman, Bernheim & Vogel, Philadelphia, PA, of counsel.

Joan M. Stentiford, U.S. Department of Justice, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Troy B. Mouer, U.S. Department of Agriculture, Harrisburg, PA, of counsel.

## OPINION

**MILLER**, Judge.

This case is before the court after argument on defendant's motion to dismiss pursuant to RCFC 12(b)(1). Rick's Mushroom Service ("Rick's" or "plaintiff") filed its Complaint in the United States Court of Federal Claims March 29, 2006, and an Amended Complaint on October 23, 2006. Thereafter, defendant moved to dismiss on July 31, 2006. Supplemental briefing ordered by the court was completed on January 19, 2007.

## FACTS

The following undisputed facts are drawn from the complaint, subsequent briefing, and argument. Chester County, Pennsylvania, is "one of the primary areas in the United

States . . . for the production of mushrooms." Am. Compl. filed Oct. 23, 2006, ¶ 5. Mushroom farming requires use of an organic base termed "mushroom substrate," which is comprised of agricultural wastes, manure, and other substances. After harvesting the crop, the mushroom substrate must be disposed of, as it has expended its nutritive content. The spent mushroom substrate ("SMS") traditionally was disposed of in fields and in the woods. Disposal of SMS using this method, when rained upon, can result in discharge of ecologically-harmful liquid nitrogenous waste materials and other contaminants ("leachate") into local streams and rivers.

In 1996 M.A.Y. Farms, a landowner and mushroom grower, sought to purchase and lease a piece of property, approximately twenty-five acres in size, that had been used as a SMS dumping location (the "SMS Transfer Facility"). "[T]he property . . . was nearly completely covered by SMS ranging from 10 to 15 feet deep from the property line all the way down to a nearby stream, known as Trout Run." Am. Compl. ¶ 7. M.A.Y. Farms and Custom Casing, Inc. ("Custom Casing"), 1/ consulted the Pennsylvania Department of Environmental Protection (the "PDEP") and the United States Department of Agriculture, National Resource Conservation Service (the "NRCS"), on March 12, 1998, concerning environmental conservation needs. On September 26, 1997, M.A.Y. Farms and Custom Casing entered into an agreement denominated as a "Long-Term Contract for NRCS Cost-Share Programs" with the NRCS (the "NRCS Agreement"). The terms of the NRCS Agreement provided that "the NRCS would design an SMS transfer facility, together with a storage area, leaching field, waste water impoundment and spray system to be constructed at the facility and that [plaintiff] would have no right to deviate from the specifications provided by the NRCS." Am. Compl. ¶ 11. The NRCS Agreement required plaintiff to "strictly follow without deviation design specifications provided by the NRCS, utilize only contractors approved by the NRCS, operate the facility pursuant to NRCS standards and supervision, as well as to follow equal opportunity and non-discrimination provisions dictated by the NRCS." Pl.'s Br. filed Oct. 4, 2006, at 2. The NRCS designed and provided specifications for construction of the SMS Transfer Facility in accordance with the requirements of the NRCS Agreement.

On July 26, 2001, neighboring landowners, Warren Reynolds, John Reynolds, and the Wilmington Trust Company (collectively, the "Reynolds"), filed a civil suit against plaintiff in the United States District Court for the Eastern District of Pennsylvania. See Reynolds v. Rick's Mushroom Serv., No. 01-3773, 2004 WL 620164, slip op. (E.D. Penn. Mar. 29, 2004). The Reynolds alleged that Rick's and M.A.Y. Farms operated the SMS Transfer Facility in violation of the Clean Water Act, 33 U.S.C. §§ 1251-1387 (2000), and the

---

1/ Rick's is the legal successor to Custom Casing, Inc. Am. Compl. ¶ 2.

Pennsylvania Clean Streams Law, 35 Pa. Stat. Ann. §§ 691.1-691.1001. Reynolds, No. 01-3773, slip op. at *1. The Reynolds argued that the SMS Transfer Facility was not designed to contain all the waste water generated and that leachate necessarily would be discharged into Trout Run. The district court entered a permanent injunction on March 29, 2004, and found Rick's and M.A.Y. Farms were operating a "residual waste disposal or processing facility without required permits" under the Clean Water Act. Id. at 12. 2/ The court denied the Reynolds' request to enjoin completely further operation of the facility, stating that this was against the public interest and that "an injunction against [the SMS Transfer Facility's] continued operations is not the only way to achieve compliance with the Pennsylvania Clean Streams Law and applicable regulations." Reynolds, No. 01-3773, slip op. at *7. Instead, the court held that Rick's and M.A.Y. Farms are required to comply with the Mushroom Farm Environmental Management Plan, as developed by the Chester County Conservation District, and "apply for a permit for operating the impoundment and for operating a land application facility for residual waste." Id. at 14. Plaintiff has since made a preliminary settlement of $950,000 with the Reynolds, but this "settlement has not yet been fully approved." Am. Compl. ¶ 15. Plaintiff also states that "there still may be an award for penalties and, in addition to the settlement amount, [Rick's] has incurred substantial attorney's fees and costs and expert fees and costs all totaling approximately $2 million dollars." Am. Compl. ¶ 15.

Following the district court's finding that the SMS Transfer Facility required a permit from the PDEP, the NRCS drafted a rehabilitation plan and a plan for a roof structure to help eliminate some of the problems with waste discharge. Nevertheless, the NRCS did not "indemnify the Plaintiff for its losses in reliance on the plans and specifications prepared by the NRCS nor has it been willing to go forward with and pay for the roof structure it proposed as a 'fix' to the design error." Am. Compl. ¶ 16.

Plaintiff alleges that the Reynolds settlement occurred as a direct result of defective specifications provided by the NRCS and that defendant should be held liable for the costs incurred under the theories of: (1) professional negligence for the NRCS's design of the facility in question (Count III); (2) breach of contract under the Contract Disputes Act for violations arising out of the performance of the NRCS Agreement (Count II); and (3) "equitable inde[mn]ity . . . for all damages, costs, and fees awarded against the Plaintiff" in the related district court action based on an implied-in-fact warranty arising under the Spearin

---

2/ The district court "denie[d] Plaintiffs' motion for injunctive relief without prejudice to their right to renew it and seek an injunction for alleged discharges of pollutants into a navigable water from a point source without a permit in violation of the Clean Water Act and Pennsylvania Clean Streams Law." Reynolds, No. 01-3773, slip op. at *6 n.8.

doctrine (Count I), which allows a contractor to rely on government-mandated design specifications. Am. Compl. ¶ 22. Plaintiff argues that the Court of Federal Claims possesses jurisdiction under the Contract Disputes Act, 41 U.S.C. § 609 (2000) (the "CDA"), and under the Tucker Act, 28 U.S.C. § 1491(a) (2000). Defendant counters that plaintiff's claims should be dismissed pursuant to RCFC 12(b)(1) because (1) plaintiff's claim for professional negligence sounds in tort; (2) plaintiff has not exhausted administrative remedies in violation of an express statutory requirement; and (3) plaintiff's claims do not fall within the scope of the CDA or the Tucker Act.

## DISCUSSION

1. Standard of Review

Jurisdiction must be established before the court may proceed to the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998). Any party may challenge, or the court may raise *sua sponte*, subject matter jurisdiction at any point in a proceeding, even upon appeal. Arbaugh v. Y&H Corp., 126 S. Ct. 1235, 1240 (2006). If the jurisdictional facts alleged in the complaint are disputed, "the . . . court may consider relevant evidence in order to resolve the factual dispute." Reynolds v. Army and Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988); Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (holding that "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged"); see also Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993) (permitting review of evidence extrinsic to pleadings, including affidavits and deposition testimony). Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [plaintiff] to come forward with evidence establishing the court's jurisdiction. We agree that [plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds, 846 F.2d at 748; McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936) (holding that "[i]f [plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof").

The Tucker Act defines the jurisdictional reach of the Court of Federal Claims. See 28 U.S.C. § 1491(a)(1). It "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc); see also Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 220 (2001) (finding United States Postal Service to be "federal agency" within meaning of Administrative Disputes Resolution Act, and, thus, jurisdiction over it exists under Tucker Act), aff'd, 264 F.3d 1071, 1080 (Fed. Cir. 2001). The Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States

founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1); see also Trauma Serv. Group v. United States, 104 F.3d 1321, 1324-25 (Fed. Cir. 1997) ("Jurisdiction based on contract 'extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.'" (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996))).

2. Exhaustion of administrative remedies

Defendant argues that plaintiff's claims are not subject to review by the Court of Federal Claims because plaintiff failed to exhaust administrative remedies with the NRCS prior to seeking judicial review, as mandated by 7 U.S.C. § 6912(e) (2000). The statute provides: "[A] person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against--(1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department." Defendant asserts that the relevant administrative remedy is found in 7 C.F.R. § 614.1 (2006), which allows that, once "technical determinations or program decisions . . . [are] rendered final by the NRCS, participants may appeal to the National Appeals Division (NAD) as provided for under 7 CFR part 11." 7 C.F.R. § 614.3(a)(2)(v) establishes that adverse program decisions and technical determinations relating to the Watershed Protection and Flood Prevention Program are subject to the administrative exhaustion requirements of section 614.1. The NRCS regulations mandate a final determination from the National Appeals Division prior to judicial review. 7 C.F.R. § 614.17.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807-08 (2003) (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 148-49 (1967)). Ripeness limitations are "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993).

Arguing that the NRCS Agreement is a procurement contract under the Contract Disputes Act, plaintiff appeals the final decision of the NRCS dated November 14, 2005. See Def.'s Br. filed Nov. 9, 2006, Ex. 2. The NRCS took the position that "[t]he 'contract' (60-2D37-7-340) between the Government and your client is not a contract entered into for the procurement of goods and services for the benefit of the Government. It is a cooperative agreement . . . ." Id. The letter concludes by stating that, "[i]nstead of appealing to the

agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims." Id. Therefore, plaintiff has fulfilled the administrative exhaustion requirement by directing its claim to the NRCS.

Plaintiff sues on an implied-in-fact contract subject to the CDA that arises under the Spearin doctrine. According to plaintiff, its claim emanates from neither a program decision nor a technical determination and therefore is not subject to the administrative review requirements of 7 C.F.R. § 614.1. Section 614.2(o) defines "program decision" as "a written decision by NRCS concerning eligibility for program benefits, program administration or program implementation." A "final technical determination" is defined as "a decision by NRCS concerning the status and condition of the natural resources and cultural practices based on science and best professional judgment of natural resource professionals concerning soils, water, air, plants, and animals that has become final through the informal appeal process, the expiration of the time period to appeal, or waiver of the appeal process." 7 C.F.R. § 614.2(I). A "preliminary technical determination" is defined as "the initial written decision by NRCS on a technical matter concerning the status and condition of the natural resources and cultural practices based on science and best professional judgment of natural resources professionals concerning soils, water, air, plants and animals, which has not become final under this part." 7 C.F.R. § 614.2(n). Plaintiff's claim for damages resulting from a breach of an implied-in-fact warranty of design specifications does not fall within the boundaries of the definitions of technical determination or program decision and therefore is not subject to the administrative review requirements of 7 C.F.R. § 614.2.

Defendant also asserts that the NRCS Agreement is governed by the Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, 108 Stat. 3209 (codified as amended in scattered sections of 2, 5, 7, 16, and 18 U.S.C.), which provides for judicial review in the federal district courts, not the Court of Federal Claims. See 7 U.S.C. § 6999 ("A final determination of the [National Appeals] Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5."). Defendant states that "the cost-sharing agreement at issue here was signed under the authority of the Department of Agriculture Reorganization Act of 1994," Def.'s Br. filed Dec. 4, 2006, at 2. Jurisdiction over plaintiff's claim is committed statutorily to another forum, which would require dismissal by this court. Defendant cites to several cases in support of this assertion. See Folden v. United States, 379 F.3d 1344, 1356 (Fed. Cir. 2004) (holding claims fell within exclusive jurisdiction of Court of Appeals for District of Columbia Circuit); Amerikohl Mining, Inc. v. United States, 899 F.2d 1210, 1215 (Fed. Cir. 1990) ("Where 'Congress specifically designates a forum for judicial review of administrative action, such a forum is exclusive, and this result does not depend on the use of the word 'exclusive' in the statute providing for a forum for judicial review.'" (quoting Getty Oil Co. v. Ruckelshaus, 467 F.2d 349, 356 (3d Cir. 1972). The facts of this case are

distinguishable. With respect to its CDA claim, plaintiff seeks review of a final decision of the NRCS that can be appealed to the Court of Federal Claims – not a decision of the National Appeals Division – and that is not within the scope of 7 C.F.R. § 6999. Count I arises as an implied-in-fact warranty based on the NRCS Agreement, not as one based on the contract provisions executed under the Department of Agriculture Reorganization Act of 1994 and not subject to the requirements of 7 U.S.C. § 6999.

3. Professional negligence

Plaintiff alleges that the NRCS "is liable for professional negligence in its design of the facility," a claim sounding in tort. Am. Compl. ¶ 36. The Tucker Act, 28 U.S.C. § 1491(a)(1), specifically excludes tort claims from the jurisdiction of the Court of Federal Claims. Id. ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim . . . for liquidated or unliquidated damages in *cases not sounding in tort.*" (emphasis added)); see Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997) (stating that Court of Federal Claims "lacks jurisdiction over tort actions against the United States"). Therefore, plaintiff's claim for professional negligence is subject to dismissal for lack of subject matter jurisdiction.

4. <u>Procurement contracts within the scope of the Contract Disputes Act</u>

Count II is based on the CDA, which provides:

> [I]n lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

41 U.S.C. § 609(a)(1). Section 602 of Title 41 of the United States Code defines the scope of the CDA, which includes "any express or implied contract . . . entered into by an executive agency for– (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or, (4) the disposal of personal property." Id. Plaintiff argues that the NRCS Agreement, as a contract for the procurement of services or "construction, alteration, repair or maintenance of real property", is governed by the CDA and therefore is subject to the jurisdiction of the Court of Federal Claims. 41 U.S.C. § 602(a).

The NRCS Agreement provides: "Each of the . . . participants hereby agrees to participate in this NRCS cost-share program . . . ; hereby agrees (1) to carry out on the land unit . . . land adjustments . . . according to the time schedule . . . and in accordance with the

specifications and other special program criteria obtained from the local field office of the [NRCS] . . . ." NRCS Agreement, Part II. The facility was required to be "started within one year (12 months) of the signing of the contract," and "[a]ll required conservation treatment must be installed at least 2 years before expiration of the contract," and "[a]ll contract items must be accomplished prior to the expiration date of the contract." Id., Special Provisions 2. In return for carrying out the land operations as specified, Custom Casing is entitled to "[p]ayments . . . made at cost-share rates specified in the contract . . . . based on average costs . . . ." Id., Special Provisions 1(a). The NRCS Agreement defines noncompliance as "includ[ing] but not limited to failure to carry out the LTC as scheduled, failure to begin within a 12-month period, failure to meet specifications for establishing practices, failure to satisfactorily complete or maintain all contract items . . . ." Id., Attachment A, Causes (a). The terms of the NRCS Agreement required Custom Casing to construct facilities and operate the facility according to specifications set forth by the NRCS in return for cost-share payments. Deviation from the specifications would result in forfeiture of "all rights to further payments or grants under the contract and refund . . . all payments or grants received thereunder . . . ." Id., Part II.

The United States Court of Appeals for the Federal Circuit has held that the "unambiguous language" of the CDA "is limited to express or implied contracts for the procurement of services and property and for the disposal of personal property. It does not cover all government contracts." Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed. Cir. 1983). In addition, the "jurisdictional question" whether a "contract[] for the procurement of goods or services by an executive agency [is] a question of law." G.E. Boggs & Assoc., Inc. v. Roskens, 969 F.2d 1023, 1026 (Fed. Cir. 1992). Nevertheless, the Federal Circuit has cautioned that, "even where a statute is clear on a purely linguistic level, interpretation may be necessary if that interpretation does not do justice to the realities of the situation." Tex. State Comm'n for the Blind v. United States, 796 F.2d 400, 406 (Fed. Cir. 1986). The Federal Circuit stated:

> In determining whether [plaintiff's] contracts are within the scope of the Contract Disputes Act, we are mindful of the legislative intent behind that Act. Congress created the Contract Disputes Act to promote economy, efficiency and effectiveness in the government's procurement of goods. Accordingly, the associated regulations emphasize the buyer-seller relationship.

G.E. Boggs, 969 F.2d at 1027; see also Delta S.S. Lines, Inc. v. United States, 3 Cl. Ct. 559, 569 (1983) ("It is rather the conventional contract for the direct procurement of property, services and construction, to be used directly by the Government, which is the type of Government contract covered by the Act.").

31 U.S.C. § 6303 defines procurement contracts in the following context:

> An executive agency shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--
>
> (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or
>
> (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

Id. Defendant argues that "[t]he Government procured nothing[;] it merely provided design and technical assistance to benefit Rick's in hopes of avoiding adverse environmental consequences," Def.'s Br. filed Jan. 19, 2007, at 5, suggesting that no "direct benefit or use of the United States Government" was intended by the parties to the NRCS Agreement. 31 U.S.C. § 6303.

Instead, defendant asserts that the NRCS Agreement is a cooperative agreement under Title 31 of the United States Code, which is "by definition, not [a] procurement contract[],"and not subject to the CDA. Cooperative agreements are defined by 31 U.S.C. § 6305, which provides:

> An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--
>
> (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
>
> (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

Id. This assertion is supported by the final decision of the Contracting Officer for the United States Department of Agriculture, dated November 14, 2005, regarding a CDA claim which states:

> The "contract" (60-2D37-7-340) between the Government and your client is not a contract entered into for the procurement of goods and services for the benefit of the Government. It is a cooperative agreement entered into pursuant to 31 U.S.C. §6305 . . . . Accordingly there is no contract . . . upon which the claim asserted . . . may be made pursuant to section 605 of the [CDA], and the claim is denied on that basis.

Pl.'s Br. filed Oct. 3, 2006, Ex. D.

Plaintiff attempts to characterize the NRCS Agreement as a procurement contract that was created as a result of a cooperative agreement between "the local conservation authority, i.e., the [Chester County Conservation Department (the "CCCD")] and the NRCS pursuant to a program established jointly, . . . namely the Red-White Creek Watershed area." Pl.'s Br. filed Dec. 22, 2006, at 6. Plaintiff represented at oral argument that "[t]his is a service for the NRCS, which had a funding mandate to reduce the nitrogen runoff into this watershed." Transcript of Proceedings, Rick's Mushroom Service, Inc. v. United States, No. 06-255C, at 27 (Fed. Cl. Dec. 8, 2006) ("Tr."). Plaintiff highlights that the NRCS Agreement was entered into as a part of the Red-White Clay Land Treatment Program, pursuant to the Watershed Protection and Flood Prevention Act, 16 U.S.C. § 1003(6) (2000), which authorizes the Secretary of Agriculture of the United States "to enter into agreements with landowners, operators, and occupiers, individually or collectively, based on conservation plans of such landowners, operators, and occupiers which are developed in cooperation with and approved by the soil and water conservation district in which the land described in the agreement is situated." Id. Plaintiff cites to the deposition of Daniel J. Grieg, Director of the CCCD, who testified that the Red-White Clay Land Treatment Program "was a whole plan. As part of that we developed contracts and, again, a combination of the [CCCD] and NRCS would develop contracts with agricultural and other operators and landowners to implement Best Management Practices . . . ." Deposition of Daniel J. Grieg, Mar. 14, 2002, at 38.

The NRCS Agreement did not further a policy of the NRCS through a procurement for construction or services. Examination of the NRCS Agreement reveals that it does not contemplate transfer of goods or services directly to the Government; no evidence of a buyer-seller relationship is evident; and no direct benefit accrues to the Government as a result of the operation of the SMS Transfer Facility. The NRCS Agreement was entered into "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit

or use of the United States Government," 31 U.S.C. § 6305, and thus falls within the category of cooperative agreements, rather than procurement contracts. Because the CDA "is limited to express or implied contracts for the procurement of services and property and for the disposal of personal property," Coastal Corp., 713 F.2d at 730, and the NRCS Agreement does not exhibit characteristics common to these types of contracts, the NRCS Agreement does not provide the court with a basis of jurisdiction under the CDA.

5. The Spearin doctrine

Count I asserts that this court possesses jurisdiction for its equitable indemnification claim under the Spearin doctrine. See United States v. Spearin, 248 U.S. 132 (1918). According to plaintiff, the terms of the NRCS Agreement required plaintiff to "strictly follow the plans and specifications drafted by the NRCS. No deviations were permitted under the contract." Am. Compl. ¶ 19. Given this predicate, plaintiff asserts that, "[u]nder Spearin and its progeny, when the government provides a contractor with design specifications such that the contractor is bound by contract to build according to the specifications, the contract carries an implied warranty that specifications are free from design defects." Pl.'s Br. filed Oct. 4, 2006, at 25. The implied warranty was breached by the NRCS's negligent design of the SMS Transfer Facility, which caused waste water spillage. The spillage of waste water led to the suit filed by plaintiffs in Reynolds v. Rick's Mushroom Service, No. 01-3773 (E.D. Penn. filed July 26, 2001), and the finding by the federal district court that the SMS Transfer Facility was operating in violation of applicable regulations.

The Supreme Court of the United States set forth the rule that become known as the Spearin doctrine: "[I]f the contractor is bound to build according to the plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Spearin, 248 U.S. at 136. Under the Spearin doctrine, "[w]hen the government issues design specifications of a detailed nature . . . it warrants the sufficiency and efficacy of those specifications to produce the desired product in a satisfactory manner." Ordnance Research, Inc. v. United States, 609 F.2d 462, 479 (Ct. Cl. 1979); see also USA Petroleum Corp. v. United States, 821 F.2d 622, 624 (Fed. Cir. 1987); La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 1384 (Ct. Cl. 1970).

"[The Federal Circuit] has held that a *Spearin*-type warranty is implied only in design specifications, not performance specifications." Lopez v. A.C. & S., Inc., 858 F.2d 712, 716 (Fed. Cir. 1988). "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987). The NRCS

Agreement required plaintiff to "strictly follow without deviation design specifications provided by the NRCS, utilize only contractors approved by the NRCS, operate the facility pursuant to NRCS standards and supervision, as well as to follow equal opportunity and non-discrimination provisions dictated by the NRCS." Pl.'s Br. filed Oct. 4, 2006, at 2. This characterization falls within the category of "design specifications," as defined in Stuyvesant Dredging, and is sufficient to meet this requirement of a Spearin warranty.

Defendant argues that the NRCS Agreement is outside the scope of the Spearin doctrine because it is a cooperative agreement, not a procurement contract, and thus is distinguishable from the type of contract that has been held to imply a Spearin warranty. The Federal Circuit has held that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." Trauma Serv. Group, 104 F.3d at 1326; see, e.g., Die Casters Int'l, Inc. v. United States, 67 Fed. Cl. 362 (2005) (holding cost-sharing agreement subject to CDA). "[T]he law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." Total Med. Mgmt., Inc., 104 F.3d 1314, 1319 (Fed. Cir. 1997) (citing Spruill v. MSPB, 978 F.2d 679, 686 (Fed. Cir. 1992), and Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995)). "The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." Total Med. Mgmt., 104 F.3d at 1319 (citing Fincke v. United States, 675 F.2d 289, 295 (Ct. Cl. 1982)); see also United Pac. Ins. Co. v. Roche, 401 F.3d 1362, 1366 (Fed. Cir. 2005). Assuming, *arguendo*, that the CDA included the type of contract represented by the NRCS Agreement, the Anti-Deficiency Act prevents the NRCS Agreement from attaining the status of a contract.

6. The Anti-Deficiency Act

Defendant asserts that the Anti-Deficiency Act, 31 U.S.C. § 1341 (2000), precludes any employee of the NRCS from possessing the authority to bind the Government to "an open-ended indemnity contract in the absence of specific authorization for the undertaking," and therefore, plaintiff has failed to allege the "necessary 'bargained-for-promissory exchange' occurred." Def.'s Br. filed Nov. 9, 2006, at 20. The Anti-Deficiency Act provides, in relevant part:

> (a)(1) An officer or employee of the United States Government or of the District of Columbia government may not–

> (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;
>
> (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law . . . .

31 U.S.C. § 1341.

Defendant cites to Hercules, Inc. v. United States, 516 U.S. 417 (1996), in which the Supreme Court held that "the contracting officer's presumed knowledge of [the Anti-Deficiency Act's] prohibition, [is] strong evidence that the officer would not have provided, in fact, the contractual indemnification . . . claim[ed]." 516 U.S. at 427-28. The Court highlighted the fact that "statutory mechanisms existed under which a Government contracting officer could provide an indemnity agreement to specified classes of contractors under specified conditions." It concluded that "[t]hese statutes, set out in meticulous detail and each supported by a panoply of implementing regulations, would be entirely unnecessary if an implied agreement to indemnify could arise . . . . We will not interpret the DPA contracts as to render these statues and regulations superfluous." Id. at 428, 429. The Court also relied upon the fact that "the Comptroller General has repeatedly ruled that Government procurement agencies may not enter into the type of open-ended indemnity for third-party liability that petitioner . . . claims to have implicitly received." Id. at 427.

The court notes, in particular, that significant differences distinguish plaintiff's claim from the fact pattern in Hercules. Plaintiff has alleged that it entered into the NRCS Agreement contemplating the construction of an SMS Transfer Facility in compliance with state and federal regulatory authority. Successful performance of the NRCS Agreement included compliance with, *inter alia*, the Clean Water Act and the Pennsylvania Clean Streams Law, unlike in Hercules where the parties contracted for successful production of Agent Orange, not its safety. Also, in Hercules the victims of Agent Orange began filing their third-party claims in the late 1970's, over a decade following the contracts, which originally were signed between 1964 and 1968. In contrast, plaintiff entered into the NRCS Agreement on September 26, 1997, which was operational, according to its terms, until December 31, 2001, and the third-party claim was filed on July 26, 2001, during the period in which the NRCS Agreement was still operational.

The differences between the facts of the case at bar and those present in Hercules are not material regarding the effect of the Anti-Deficiency Act. The Contracting Officer for the NRCS Agreement was not authorized through appropriated funds to indemnify plaintiff. Plaintiff is unable to provide citation to any authority or other source that authorizes the

Contracting Officer involved in the NRCS Agreement to bind the Government to an open-ended indemnity contract. The deposition of Mr. Grieg, Director of the CCCD, stated that "it was a whole plan. As part of that we developed contracts and, again, a combination of the conservation district and NRCS would develop contracts with agricultural and other operators and landowners to implement Best Management Practices and we could pay up to $100,000 per operation." Grieg Dep. at 38. In addition, the NRCS stated in its letter to plaintiff dated December 23, 2005, that "[t]he assistance that we provide must be authorized and funded by Congress. . . . the NRCS national policy that covers the program in which [plaintiff] received funding, caps the amount of financial assistance to any entity at $100,000." Def.'s Br. filed Nov. 9, 2006, Ex. 5. Consistent with the Supreme Court's holding in Hercules, "the Anti-Deficiency Act, and the contracting officer's presumed knowledge of its prohibition, [is] strong evidence that the officer would not have provided, in fact, the contractual indemnification . . . claim[ed]." 516 U.S. at 427-28. Plaintiff has not plead the requirements of a valid contract, as no mutual intent to contract could have existed due to the preclusive effect of the Anti-Deficiency Act.

7. Warranty implied-in-law

Assuming that plaintiff had plead a valid contract, defendant alternatively argues that the NRCS Agreement only created an implied-in-law warranty, not an implied-in-fact warranty, the former not being subject to the jurisdiction of the Court of Federal Claims. "The Tucker Act . . . does not confer jurisdiction of claims against the United States, implied at law, they must be implied in fact." Lopez, 858 F.2d at 714-15. "Implied-in-fact contracts differ from contracts implied in law (quasi-contracts), where a duty is imposed by operation of law without regard to the intent of the parties." Russell Corp. v. United States, 537 F.2d 474, 482 (Ct. Cl. 1976). Implied-in-fact contracts are characterized by "circumstances [that] strongly support[] a factual inference that a warranty was implied." Lopez, 858 F.2d at 715. "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Hercules, 516 U.S. at 424 (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923)). "In the absence of allegation or showing of circumstances requiring a conclusion that a *Spearin* warranty was implied, the asserted warranty would be . . . implied in law, not fact, and a Tucker Act court would lack jurisdiction to imply it." Lopez, 858 F.2d at 716.

Examination of plaintiff's allegations reveals the elements of an implied-in-fact warranty, rather than one implied-in-law. Plaintiff consulted both the NRCS and the PDEP regarding environmental regulation prior to purchase of the SMS Transfer Facility property. Am. Compl. ¶ 8. The NRCS provided design specifications that, according to plaintiff, were intended to lead to the construction of an SMS Transfer Facility that was "not to be a 'point

source' [as defined] under the Clean Water Act." Id., ¶ 12. These facts indicate that an implied-in-fact warranty can be based on the tacit understanding of the parties, as demonstrated by their conduct, so that this court could exercise jurisdiction over plaintiff's claim if it otherwise satisfied the jurisdictional prerequisites for bringing a contract action in the Court of Federal Claims.

Defendant raises another objection based on jurisdiction, asserting that the scope of relief requested by plaintiff is not within that which was proximately caused by the breach of the implied warranty. If design specifications provided by the Government that are subject to a Spearin warranty are defective, "the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach." Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1289 (Fed. Cir. 2000). Defendant argues that the request for indemnification for a settlement of a third-party claim against plaintiff lies outside the scope of proximate causation from the breach.

Petitioners in Hercules, which manufactured an herbicide code-named Agent Orange under a government contract, incurred "substantial costs defending, and then settling, third-party tort claims arising out of their performance of Government contracts." 516 U.S. at 419. Petitioners argued that "the United States [was] responsible for costs incurred in defending and settling the third-party tort claims." Id. at 424-25. The Supreme Court held:

> Neither the warranty nor *Spearin* extends that far. When the Government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications. The specifications will not frustrate performance or make it impossible. It is quite logical to infer from the circumstance of one party providing specifications for performance that that [sic] party warrants the capability of performance. But this circumstance alone does not support a further inference that would extend the warranty beyond performance to third-party claims against the contractor.

Id. at 425.

The court has ruled that jurisdiction is lacking. If jurisdiction were otherwise present, defendant's argument would implicate the adequacy of the claim that plaintiff attempts to state. Again, the court notes that significant differences exist between the facts of plaintiff's case and the facts of Hercules and concludes that, for the purpose of proximate causation, the differences are substantial enough to distinguish the two fact patterns. The design specifications provided by the Government to plaintiff may have frustrated performance by

Case 1:06-cv-00255-CCM Document 24 Filed 04/10/2007 Page 16 of 16

using an inaccurate computation of drainage area by the NRCS, while in Hercules the design specifications permitted full production of the intended product, as well as an unintended side-effect of the product. In this case the SMS Treatment Facility's "capability of performance" included an understanding that it would comply with regulatory authority. See Hercules, 516 U.S. at 425. It is the violation of that warranty of performance that led to the settlement in the Reynolds case. Therefore, applying the rule established in Hercules to the NRCS Agreement, plaintiff's claim for indemnification of third-party claims relating to compliance with federal and state regulations would come within those injuries that could have been proximately caused by the breach of a Spearin-type warranty.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss is granted, and the Clerk of the Court shall dismiss the Amended Complaint without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

No costs.

s/ Christine O.C. Miller

**Christine Odell Cook Miller**
Judge